### UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | x : : : |
| Plaintiffs, | : : |
| ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*, | : : : |
| and | : : |
| Consolidated Plaintiffs, | : Consol. Court No. 22-00210 : |
| and | : : |
| LUMBER LIQUIDATORS SERVICES, LLC, | : : |
| Plaintiff-Intervenor, | : : |
| v. | : : |
| UNITED STATES, | : : |
| Defendant, | : : |
| and | : : |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | : : : |
| Defendant-Intervenor. | : : |
| | : x |

### PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation

(collectively, "Baroque") respectfully move for judgment on the administrative record. For the

reasons set forth in the accompanying Memorandum of Law in support of its motion, Baroque

requests that the Court determine that the U.S. Department of Commerce's results in

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (June 16,

2022), and the accompanying Issues and Decision Memorandum, is not supported by substantial

evidence on the record and is otherwise not in accordance with law.

> Respectfully submitted,
>
> GRUNFELD, DESIDERIO, LEBOWITZ,
> SILVERMAN & KLESTADT LLP
>
> */s/ Andrew T. Schutz*
> Francis J. Sailer
> Andrew T. Schutz
> Jordan C. Kahn
> Michael S. Holton
>
> 1201 New York Ave., NW, Suite 650
> Washington, DC 20005
> (202) 783-6881

Dated: February 7, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, ET AL, | x : : : : |
| Plaintiffs, | : : |
| v. | : Consol. Court No. 22-00210 : |
| UNITED STATES, | : **PUBLIC VERSION** : |
| Defendant, | : : |
| and | : : |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | : : : |
| Defendant-Intervenor. | : : : x |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Francis J. Sailer
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: February 7, 2023

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................1

   A.  Administrative Decision Under Appeal ........................................................1

   B.  Reasons For Contesting The Administrative Decision .................................1

   C.  Issues Presented And Summary Of Argument .............................................1

STATEMENT OF FACTS .....................................................................................3

STANDARD OF REVIEW .....................................................................................5

ARGUMENT ........................................................................................................6

I.     COMMERCE'S TIER 2 BENCHMARK SELECTIONS FOR THE PLYWOOD
      AND VENEER FOR LTAR PROGRAM ARE UNSUPPORTED BY
      SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH
      LAW ........................................................................................................6

      A.    LEGAL BACKGROUND ON THE SELECTION OF PRODUCT SPECIFIC
           BENCHMARKS ........................................................................................6

      B.    COMMERCE FAILED TO SELECT PRODUCT SPECIFIC BENCHMARKS FOR
           PLYWOOD AND VENEER ........................................................................11

          1.    Plywood ..........................................................................................11

               a.  Commerce Wholly Failed To Address Record Evidence
                   Demonstrating That ITTO C/CC Grade Prices From The "Pine
                   Plywood EU Market" and "Peru Plywood" Categories Are The
                   Most Product-Specific ...................................................12

               b.  Commerce's Reasoning Is Unsupported By Record Evidence ..15

          2.    Veneer ..........................................................................................17

II.   COMMERCE UNLAWFULLY CALCULATED THE INLAND FREIGHT
      BENCHMARK ..........................................................................................21

III.  COMMERCE UNLAWFULLY APPLIED AFA WITH REGARD TO CERTAIN
      ISSUES ..................................................................................................23

A.  LEGAL FRAMEWORK FOR AFA DETERMINATIONS IN CVD PROCEEDINGS ............................................................**24**

B.  THE APPLICATION OF AFA TO THE GOC FOR THE GOVERNMENT AUTHORITY STATUS OF SPECIFIC INPUT SUPPLIERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................................................**26**

    1.  Background and Relevant Facts ..................................**27**

    2.  Argument ...........................................................**32**

        a.  Commerce Did Not Address Specific Input Suppliers, Rendering its Determination Unreviewable .........................**32**

        b.  Commerce Failed to Notify the GOC of Any Deficiency ......**36**

C.  COMMERCE UNLAWFULLY APPLIED AFA TO COUNTERVAIL THE EBCP ..... **40**

    1.  Commerce's Application Of AFA In Cases Involving The EBCP Have Been Consistently Rejected Under Almost Identical Factual Circumstances ........................................................**40**

    2.  Record Evidence Demonstrates that the EBCP Was Not Used By Baroque's Customers ..............................................**41**

    3.  None Of the Information Commerce Deems As "Missing" Actually Creates A Gap In The Record Concerning Usage And Information Concerning Usage Is Verifiable, As Demonstrated By Recent Commerce Verifications ....................................................**43**

CONCLUSION  ............................................................................**45**

# TABLE OF AUTHORITIES

**Cases**

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015). 8, 27, 38

*Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022)..................................................................................................................................... 41

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018)...... 25, 32

*Clearon Corp. v. United States*, Case No. 17-00171, 2021 WL 1821448 (Ct. Int'l Trade May 6, 2021)................................................................................................................................... 41, 43

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................ 5

*Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511 (D.C. Cir.1984).................................... 32

*Evolutions Flooring Inc. v. United States*, Ct. No. 21-591 ........................................................ 7

*F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000)................................................................................................................................... 26

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)........................................... 5

*GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342 (CIT 2020)............. 33

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (CIT 2018) ........................... 26, 42, 43

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) ................................ 37

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015).................... 11

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)............................... 5

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) ...................................... 38

*Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247 (Fed. Cir. 2009)....................... 25

*Nippon Steel Corp. v. United States,* 337 F.3d 1373 (Fed. Cir. 2003)......................................... 25

*NSK Ltd. v. United States,* 910 F.Supp. 663 (1995)........................................................................ 36

*Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (CIT 2022)...................................... 7, 8

*Saha Thai Steel Pipe Pub. Co. v. United States*, 2022 WL 17369301 (CIT Dec. 2, 2022).......... 38

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ................................... 5

*Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261 (CIT 2006)................... 25

*Sigma Corp. v. United States*, 841 F. Supp. 1255 (CIT 1993)...................................... 38

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................. 6

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)................................. 5

*Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804 (1999)...................... 36

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ......................... 32

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012)................... 6

*Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) ..... 25, 32, 35

*Zhejiang Junyue Standard Part Co. v. United States*, 578 F. Supp. 3d 1280 (CIT 2022)...... 40, 41

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................. 5

19 U.S.C. § 1677(5)(B)........................................................................ 27

19 U.S.C. § 1677(5)(E)(iv) ................................................................ 6, 14

19 U.S.C. § 1677e ............................................................................ 3

19 U.S.C. § 1677e(a)......................................................................... 24

19 U.S.C. § 1677e(a)(1)...................................................................... 37

19 U.S.C. § 1677e(a)(2)...................................................................... 37

19 U.S.C. § 1677e(b) ..................................................................... 24, 25

19 U.S.C. § 1677m(d)......................................................................... 37

**Regulations**

19 C.F.R. § 351.511(a)(2)................................................................... 6, 7

**Administrative Decisions**

*Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (Aug. 26, 2015).......... 22

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010)........................................................................................................................ 8

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 57,809 (Oct. 19, 2021)...................................................................................................................................... 44

*Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017) ............................................................ 11

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016) .......................................................... 8

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009) ............ 11

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021)............................................................................................................ 10, 11, 15

*Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec. 31, 2014) ................................... 36, 39, 40

*Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348 (Nov. 25, 1998)................................... 27

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017) ........................... 9

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) ................................................................................ 8

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005) ................................................................ 8

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) ........................................................................................ 9

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020)....................................................................................................................................... 9

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review;2019*, 86 Fed. Reg. 73,244 (Dec. 27, 2021) passim

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (June 16, 2022)...................................................................................................................... passim

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ................................................................ 27

*Stainless Steel Plate in Coils from Taiwan; Final Rescission of Antidumping Duty Administrative Review*, 70 Fed. Reg. 73,205 (Dec. 9, 2005) ............................................................................ 21

Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and

Riverside Plywood Corporation ("Riverside") (collectively "Baroque") submit this

Memorandum of Law to support their Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A.  ADMINISTRATIVE DECISION UNDER APPEAL

Baroque seeks review of the U.S. Department of Commerce's ("Commerce" or the

"Department") final results of the ninth administrative review ("AR9") of the countervailing duty

("CVD") order on multilayered wood flooring ("MLWF") from the People's Republic of China

("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final

Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed.

Reg. 36,305 (June 16, 2022) (**PR 375**) ("*Final Results*"), accompanying Issues and Decision

Memorandum (June 10, 2022) (**PR 369**) ("IDM").

### B.      REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Baroque's reasons for contesting the administrative decision are set forth in the Summary

of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.    ISSUES PRESENTED AND SUMMARY OF ARGUMENT

#### 1.      Is Commerce's calculation of the benchmark for plywood unlawful?

Yes. For the Final Results, the Department weight-averaged data from the International

Tropical Timber Organization ("ITTO") and UNComtrade export data to calculate a benchmark

price for the provision of plywood for less than adequate renumeration ("LTAR"). Commerce's

benchmark calculation and its rejection of Baroque's arguments that the Department should only

use the ITTO C/CC grade prices from the "Pine Plywood EU Market" and "Peru plywood"

categories are unsupported by substantial evidence and not in accordance with the law.

Commerce is required to select the most product-specific data for the calculation of benchmarks,

and record evidence demonstrates that Grade C/CC ITTO data was the most specific to the

inputs actually used by Baroque in the production of subject merchandise. In contrast,

UNComtrade includes many different types of plywood of both species and grade.

**2.    Is Commerce's calculation of the benchmark for veneer unlawful and unsupported by substantial evidence?**

Yes. Commerce improperly included non-specific UNComtrade data in calculating

separate benchmarks for face veneer and backboard veneer. As with respect to plywood, the

UNComtrade data does not delineate between different veneer grades and thus includes "basket"

Harmonized Tariff Schedule ("HTS") subheadings that could include all possible grades.

Baroque submitted undisputed evidence, acknowledged by Commerce, concerning the industry-

recognized differences between face and backboard veneer such that it was not appropriate to

value them using the same data. Such Commerce findings and record evidence preclude

Commerce from reasonably using UNComtrade data to value veneers, and the fact that Baroque

submitted such data does not in any way concede the propriety of its usage.

**3.    Is Commerce's calculation of the inland freight benchmark unlawful?**

Yes. When calculating the inland freight benchmark using World Bank rates for Beijing

and Shanghai, Commerce conducted a simple average instead of a weighted average – in

contradiction of its agency practice to weight average benchmark data when it is able to do so.

Commerce improperly faulted respondents for not providing relevant proceedings, as they in fact

cited to the Department having weight averaged benchmark data preliminarily in AR9, and

misplaced reliance on a single inapposite proceeding involving multiple datasets. Commerce

here unreasonably declined to weight average inland freight data from the same source, an action

that is not supported by the inaccurate and inapposite contention that such data were reported on

the same basis as respondents reported their distances.

**4.** **Is Commerce's application of adverse facts available to consider certain of Baroque's input suppliers to be governmental authorities unlawful?**

Yes. Commerce unlawfully applied adverse facts available ("AFA") to consider certain of Baroque's input suppliers to be governmental authorities. Necessary information for these nine suppliers was not missing from the record and the Government of China ("GOC") responded to all questions related to these suppliers. Thus, substantial evidence exists to demonstrate that these individually owned suppliers (including two affiliates) are not government authorities. Commerce's finding that the GOC did not provide certain unrequested information, without either requesting that information or specifying a deficiency in the GOC's responses, prevents the application of AFA under 19 U.S.C. § 1677e.

**5.** **Is Commerce's application of AFA to countervail the Export Buyer's Credit unlawful?**

Yes. As this Court has now found on numerous occasions, Commerce cannot apply AFA to the use of the Export Buyer's Credit Program ("EBCP") as there is no gap in the record regarding the usage of this program and when there is substantial unrefuted evidence on the record establishing that the respondents' U.S. customers did not use this program. This Court should remand this issue to Commerce, as it has done now in numerous prior cases on this issue. Commerce's position is particularly untenable as Commerce has started to successfully verify claims of non-use in other proceedings.

**STATEMENT OF FACTS**

On March 5, 2021, Commerce initiated AR9 and later that month selected Plaintiff Baroque and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), as mandatory respondents in the review. *See* Initial CVD Questionnaire (May 23, 2021) (**PR78**).

Baroque submitted its Initial CVD Questionnaire Response on May 14, 2021 (**PR109-**

3

**112**; **CR30-42**) ("IQR"), identifying subsidy programs from which the company received

benefits during the POR.

Baroque submitted additional information its Supplemental Questionnaire Response on

Aug. 26, 2021. In addition, Baroque submitted timely factual information in November 2021 for

Commerce's use in the valuation of the benchmarks for reported plywood, fiberboard,

paint/stain, and adhesive/glue purchases. Baroque Benchmark Data Submission (Nov. 23, 2021)

(**PR277-286**; **CR101-16**). This submission included ITTO export price data for Commerce to

use in calculating the benchmark for, inter alia, plywood and veneer. *Id*. at 2, Exhibit 2.  Rebuttal

Benchmark information was submitted on December 2, 2021.  **PR295**.

Commerce published its preliminary results on December 27, 2021. *Multilayered Wood

Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty

Administrative Review;2019*, 86 Fed. Reg. 73,244 (Dec. 27, 2021) ("*Preliminary Results*")

(**PR311**), accompanying Preliminary Decision Memorandum (**PR303**) ("PDM"). Commerce

preliminarily assigned an CVD rate of 22.70 percent to Baroque. *Preliminary Results*, 86 Fed.

Reg. at 73,246 (**PR311**).

On February 2, 2022, Baroque filed its Administrative Case Brief. **PR346**; **CR207**.

Baroque challenged certain aspects of the *Preliminary Results*, including, *inter alia*, that

Commerce should:

  (1) only use ITTO grade specific prices its calculation of the benchmark for: (a) plywood;
      and (b) and veneer;

  (2) use a weighted average to calculate the inland freight benchmark; and

  (3) not apply AFA to (a) the government authority determination for certain Baroque input
      suppliers and (b) usage of the EBCP.

*Id*. at 1-3, 5-17, 21-26, 35-63. Baroque also incorporated by reference arguments made by the

Government of China. *Id*. at 63.

On June 16, 2022, the Department published its *Final Results* assigning Baroque a final

CVD rate of 12.74 percent. *Final Results*, 87 Fed. Reg. 36,305 (June 16, 2022) (**PR375**). In the

*Final Results*, Commerce rejected certain arguments made by Baroque with regard to the: (1) use

of ITTO data in both the plywood and veneer benchmark calculations; (2) the inland freight

charge; and (3) application of AFA for Baroque's input suppliers and the EBCP. IDM Comments

1, 4, 8D-E, 10A (**PR369**).

Other relevant facts are discussed in the context of the arguments below.

## STANDARD OF REVIEW

The court must hold unlawful any aspect of Commerce's decision-making that is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Substantial evidence requires more than mere assertion of "evidence which in and of itself

justified {the determination}, without taking into account contradictory evidence or evidence

from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132

F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for

addressing like situations, it must either apply that practice or provide a reasonable explanation

as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-

84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate

explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir.

2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating

similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir.

2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing

a practice that it has 'consistently followed,' such a change is an unacceptable agency practice."

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

## ARGUMENT

### I.  COMMERCE'S TIER 2 BENCHMARK SELECTIONS FOR THE PLYWOOD AND VENEER FOR LTAR PROGRAM ARE UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

As set forth in turn below, Commerce in the *Final Results* unlawfully declined to

exclusively use ITTO data to calculate benchmark prices for: (a) plywood; and (b) veneer.

### A.  LEGAL BACKGROUND ON THE SELECTION OF PRODUCT SPECIFIC BENCHMARKS

The statute governing the selection of benchmarks for use in LTAR calculations provides

as follows:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv). Under its regulations, Commerce sets forth the basis for identifying

appropriate market-determined benchmarks for measuring the adequacy of remuneration for

government-provided goods or services. 19 C.F.R. § 351.511(a)(2). These potential benchmarks

are listed in hierarchical order by preference: (1) "a market-determined price for the good or

service resulting from actual transactions in the country in question" (tier one); (2) "world

6

market price where it is reasonable to conclude that such price would be available to purchasers

in the country in question. *Id*. Where there is more than one commercially available world

market price, the Secretary will average such prices to the extent practicable, ***making due***

***allowance for factors affecting comparability***" (tier two); or (3) "assessing whether the

government price is consistent with market principles" (tier three). *Id*. (emphasis added). At issue

in this case is the benchmark for plywood and veneer inputs under tier two of Commerce's

analytical framework. The issue with regard to plywood is the same as in Baroque's challenge of

the previous review, currently before this court. *See Evolutions Flooring Inc. v. United States*,

Ct. No. 21-591.

In a recent case, *Risen Energy Co. v. United States*, this Court confirmed Commerce's

obligation to calculate benchmarks using the most accurate data available. 570 F. Supp. 3d 1369

(CIT 2022). At issue in that case was Commerce's tier two benchmark for ocean freight, which it

calculated using data sourced from Descartes and Xeneta. *Id*. at 1377-78. Plaintiff argued that the

Descartes data was flawed and inaccurate, while Commerce maintained that its benchmark

calculation was lawful because it represented a "world market price." *Id*. at 1378. This Court

agreed with Plaintiff that given the record evidence, accuracy was key, noting that "in some

contexts, Commerce's choice might be viewed as a world market price. Here, however, the

Descartes data likely does not add to the accuracy of the benchmark calculation when there is the

clearly acceptable Xeneta data available." *Id.* at 1379. This Court held:

> Thus, the court remands to Commerce to reconsider the flaws raised by
> Plaintiffs. The court acknowledges that in some contexts, such data might
> result in a reasonably determination of the world market price. Here,
> however, ***Commerce should also consider the language and purpose of***
> ***the controlling regulation to decide whether it is necessary to use the***
> ***Descartes data to arrive at a "world market price" and discuss the***
> ***identified flaws in the data. Presently, the analysis does not consider***
> ***these flaws and whether the resulting Descartes data reasonably***

7

> "*reflect[s] the price a firm actually paid or would pay if it imported the product.*"

*Id*. (emphasis added). *See also Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 61 F. Supp. 3d 1306, 1341 (CIT 2015) ("import benchmark's 'comparability' means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute.").

It is also Commerce's practice to select the most product-specific benchmark possible for use in LTAR calculations. *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM Comment 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product, which, in this case, would be the annual IHS Markit data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader range of aluminum products)."); *see also Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), IDM at 3 ("Provision of Caustic Soda for LTAR ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis.")); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species-specific benchmark for timber to be more appropriate than a generic timber value); *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), IDM Comment 1 (selecting a region-specific benchmark in order to "conduct

the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices").

Commerce has followed this logic in rejecting non-product specific HTS categories in favor of more product-specific benchmarks in the past. In the CVD investigation on aluminum foil from China, Commerce initially valued the benchmark for ingot averaging the HTS provision for alloyed aluminum ingot and the separate HTS for unalloyed aluminum ingot in the benchmark for primary aluminum. However, in the final determination, Commerce changed its benchmark because the respondent only purchased unalloyed ingot:

> The benchmark for primary aluminum currently includes unalloyed aluminum ingot, HTS 7601.10, and alloyed ingot, HTS 7601.20. Because the respondent purchased unalloyed aluminum ingots, consistent with our practice, we have revised the benchmark to include only unalloyed aluminum ingot, HTS 7601.10, for this final determination.

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), IDM Comment 16; *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), IDM Comment 15 ("the relevant section of India's Harmonized Tariff Schedule which shows that that this is a basket category for all PP films that are 'flexible, plain.' Therefore, we have excluded these Indian export statistics from your benchmark calculation").

Commerce also has followed this practice, in part, in prior segments under this Order and has removed certain wood species (*e.g.*, tropical wood) from the benchmark when it was demonstrated that the respondents do not purchase inputs made of certain types of wood. *See Multilayered Wood Flooring from the People's Republic of China: Final Results; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), IDM Comment 6 (removing the HTS provisions covering tropical wood and stating that "Commerce's practice is normally to rely on data reflecting the narrowest

category of products encompassing the input product.").

Commerce has recognized in other cases that the grade of a particular product can impact the price of that product and, in those circumstances, has removed certain grades from the benchmark when record evidence demonstrates that the respondent has not purchased those grades. Commerce addressed whether to remove X-grade hot rolled steel ("HRS") from the benchmark when record evidence demonstrated that the respondent only purchases non-X-grade HRS from government sources in *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021) ("*CWP from Turkey*"), IDM Comment 1. In rejecting the petitioner's calls for the benchmark to include both X-grade and non-X-grade HRS, Commerce explained that:

> Commerce must consider factors affecting comparability, such as product quality and similarity, in determining the appropriate benchmark to measure the adequacy of remuneration for the HRS provided by Turkish authorities. In the Preliminary Results, we found that X-series grade and non-X-series grade HRS are not comparable according to the evidence on the record of this review. The Borusan Companies have clearly segregated their HRS purchases into X-series and non-X-series grade HRS. The Borusan Companies have also provided product catalogues and invoices, which demonstrate that X-series grade and non-X-series grade HRS each possess distinct physical characteristics and, thus, the two HRS grades are not comparable. Although we are examining whether HRS was provided for LTAR during the POR, regardless of grade, the subsidy benefit analysis should take into account our finding that X-series and non-X-series grade HRS are not comparable grades of HRS. . . .

> Product grade, which in this case manifests itself in the form of X-series and non-X-series grade HRS, affects comparability, as evidenced by the product catalogue and invoice information the Borusan Companies submitted on the record.

*Id.*

Commerce then made clear that it "cannot allow the practice of using broad averages to overcome Commerce's regulatory obligation to utilize benchmarks that are more comparable if record information permits it." *Id*. Finally, it concluded that "***Commerce delineates by grade or product characteristic when such data are available and where record information indicates that the market for the good in question accounts for such grade or product characteristics in the ordinary course of business***." *Id*. (emphasis added); *see, e.g.*, *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), IDM at 21 (where Commerce delineated by steel grade in the LTAR benefit calculation); *Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017), PDM at 54-56 (where Commerce delineated by coniferous species in the LTAR benefit calculation).

The cases discussed above confirm that the statute, Commerce's regulations, as well as judicial and Commerce precedent, require that Commerce select the most product-specific data in calculating benchmarks. As discussed below, Commerce failed to do so in this instance, and therefore failed in its obligation to calculate CVD rates as accurately as possible. *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (CIT 2015). Calculating a subsidy benefit based on data that consists of products that Baroque does not purchase, cannot and does not achieve this objective and subverts Commerce's legal obligations.

### B.   COMMERCE FAILED TO SELECT PRODUCT SPECIFIC BENCHMARKS FOR PLYWOOD AND VENEER

#### 1.   Plywood

In the *Preliminary Results*, as in the *Final Results*, Commerce created a benchmark for plywood by averaging UNComtrade export data under various HTS provisions and prices

reported in ITTO. PDM at 40-44 (**PR303**); Riverside Preliminary Calculation Memorandum

(Dec. 17, 2021) at 5-7 **PR308**; **CR130**), accompanying Preliminary Calculation Worksheets,

Tab: "Plywood Bench" (**PR309**; **CR131**). In its Administrative Case Brief, Baroque argued that

Commerce should use only Grade C/ CC ITTO data (i.e., the "Pine Plywood EU Market" and

"Peru plywood" categories) to create the benchmark for plywood, because it was the most

specific to the inputs actually used by Baroque in the production of subject merchandise. Case

Brief at 13-14 (**PR346**; **CR207**). ITTO date was the only grade-specific price on the record and

different grades of plywood have vastly different prices. *Id*. In contrast, UNComtrade includes

all grades of plywood. *Id*.

In the *Final Results*, Commerce continued to average the ITTO and UNComtrade data

together. *Id*. For the reasons discussed below, this Commerce determination was unsupported by

substantial record evidence and not in accordance with the law.

### a. Commerce Wholly Failed To Address Record Evidence Demonstrating That ITTO C/CC Grade Prices From The "Pine Plywood EU Market" and "Peru Plywood" Categories Are The Most Product-Specific

In making its determination, Commerce wholly disregarded substantial record evidence

Baroque submitted demonstrating that ITTO C/CC Grade data is the most product-specific and

therefore the most appropriate data to use in the calculation of the plywood benchmark.

Record evidence demonstrates that the plywood market is delineated both by species and

by grade and that grade in particular has a significant impact on price. The plywood market

around the world and in the United States is divided into Grade A, B, C, and D (hybrid grades

like CC, CD, etc. are also present). Baroque Benchmark Data Submission (Nov. 23, 2021) at 2,

Exhibit 4A (**PR277-86**; **CR101-15**). "Most plywood is graded upon the finish of the **exterior**

**layers**, specifically the amount and type of defects that are allowed in these layers." *Id*.: *CDX*

*Plywood* at 1/10. Since wood flooring consists of face veneers of high-quality wood placed on top of plywood, C grade and below plywood is sufficient for subject merchandise: "CC grade. . . is often used as the underside of veneers . . . The structure is sound but there will be defects on the underside of the material. These can include open knots, discoloration, and splits. These defects mean that our veneered plywood is suitable for applications where only one good face is needed." *Id.*: *Kitronik* at 5 (unnumbered).

The information contained in Exhibit 4A of Riverside Plywood's Benchmark Submission demonstrates the importance of grade in plywood valuation. Moreover, this fact is further confirmed by an expert statement submitted to rebut Petitioner's benchmark information. Rebuttal Benchmark at 1, Exhibit 1 (Dec. 2, 2021) (**PR295**). Professor Dai, a Wood Sciences professor at the University of British Columbia states as follows:

6. Unlike in other industries or applications (such as wooden cabinets or wooden furniture), the plywood used in MLWF is of a low-quality because it is used for the core of the product, which cannot be seen by the consumer;

7. Based upon my industry experience, most Chinese producers of MLWF choose low grade, fast growing wood species, such as poplar or eucalyptus, to produce plywood for MLWF;

8. There are several factors that influence the price of plywood. These are species type, grade (A, B, C, D), overall thickness and size. The two biggest influences on price are species type and grade, with grade being the most important. There is a significant price difference between Grade AB plywood and Grade CD plywood.

9. Different wood species types have significantly different prices due to desirability of appearance and growth. Slow growing hardwoods - like oak, cherry and walnut that are desired for their appearance and hardness for use in cabinetry and furniture - are much more expensive than fast growing woods like eucalyptus which is used almost exclusively for non-decorative, structural applications. For example, eucalyptus may be priced as low as one-third or one-fourth of any other popular hardwood (e.g., see Attachment 1: ITTO Report Vol 24, page 17);

10. And for the same type of wood, different grades of plywood vary in cost, and therefore in market prices;

11. Grade of plywood is largely determined by the top face of the plywood, and inner plies are always low, C or D grades (Attachment 2: PS-1-2010-APA, pages 16-17, Tables 2 and 3);

12. ***I have requested materials and supporting documents for the plywood Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") used in producing MLWF***;

13. I have examined and analyzed the well-recognized American Plywood Association (APA) Structural Plywood Standard (Attachment 2: PS-1-2010-APA, pages 16-21); Some pictures on which I have relied to make judgment are provided in (Attachment 3: Veneer grade of same species);

14. ***I believe the plywood Baroque Timber used in production of MLWF is Grade D or Grade C/D plywood based upon a review of pictures of Baroque's plywood (Attachment 4: Photos of Eucalyptus veneer used by Baroque Timber) and interviews with employees***;

15. Reviewing the Harmonized Tariff Schedule ("HTS") categories for plywood that were placed on the record – i.e., 4412.33, 4412.39 and 4412.32 – ***the only characteristic accounted for in these categories is species (there is a reference to the per ply thickness but not overall thickness of the plywood)***;

*Id*. Exhibit 1 (emphases added).

The record evidence outlined above establishes the following facts:

- Plywood comes in a variety of different grades and these grades significantly impact price;

- Plywood used for subject merchandise is Grade C or D, generally, since a high-quality face veneer is placed on top of the plywood;

- The plywood that Baroque Timber uses in its production is Grade C/D; and

- The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

Since grade is a significant factor affecting comparability and reflects "prevailing market conditions," Commerce is mandated by statute to account for it. 19 U.S.C. § 1677(5)(E)(iv). Yet Commerce entirely failed to do so in its *Final Results*. Commerce has followed a practice in the

14

past, most recently in *CWP from Turkey*, *supra*, in which it considers grade in the benchmark when:

1) evidence shows that there are different grades of the product that have different prices;

2) evidence shows that the respondent only purchased certain types of grades; and

3) the grade specific benchmarks are able to be extracted from the data.

In this case, all three of those circumstances are present. Since the ITTO prices are the only plywood prices on the record that identify grade, Commerce should have used the Grade C/CC specific prices as the sole benchmark price for plywood in this review.

### b. Commerce's Reasoning Is Unsupported By Record Evidence

Commerce cited the following reason for dismissing Baroque's arguments that the only C/CC grade ITTO data should be used: "Riverside did not adequately support its arguments that the UNComtrade data are inappropriate to calculate plywood benchmarks for Baroque Timber's purchases of C/D grade plywood." IDM at 86. Riverside, however, provided substantial evidence demonstrating that its plywood input is limited to a particular grade.

First, the record **does** in fact contain substantial evidence demonstrating that Baroque's plywood input is limited to a particular grade. Specifically, Baroque conclusively demonstrated that it does not purchase certain types of plywood, and uses only eucalyptus plywood. *See* Riverside Benchmark Data Submission Exhibits 1-4A (**PR277-86**; **CR101-15**); *see also* Riverside Benchmark Rebuttal Exhibit 1 (**PR295**). In its benchmark submission, Baroque provided Commerce with supplier certifications certifying that the plywood Baroque purchased was made of C/D grade only. Baroque Benchmark Data Submission at Exhibit 2 (**PR277-86**; **CR101-15**). This record evidence was never called into question and provides uncontroverted proof that Baroque's plywood input is limited to lower grade purchases.

Second, Commerce cursorily dismissed the witness statement provided by Baroque. As demonstrated in the excerpts above, Professor Dai provided comments on the industry generally, but also commented on Baroque specifically, after a careful review of information provided by Baroque to him. Mr. Dai examined "materials and supporting documents for the plywood . . . {Baroque Timber} . . . used in producing MLWF" and he further based his analyses on "a review of pictures of Baroque's plywood (Attachment 4: Photos of Eucalyptus veneer used by Baroque Timber) and interviews with employees." *See* Baroque Benchmark Rebuttal at Exhibit 1 (**PR295**).

Third, record evidence demonstrates that different grades cannot be used to produce subject merchandise. Specifically, Baroque provided various articles and website printouts discussing the different grade and pricing criteria for plywood to assist Commerce in selecting the proper world price for the eucalyptus plywood that Baroque reported. Baroque Benchmark Data Submission, Exhibit 4A (**PR277-286**; **CR101-115**). These documents established, *inter alia*, the qualitative differences between the different grades of plywood. Information from ANDERSON PLYWOOD explains, for example, that Grade A plywood is used "where excellent appearance is very important as in cabinets and furniture." *Id.*: *Plywood Grading Information* at 2 (unnumbered). In contrast, Grades C and D "provide sound surfaces but allow unlimited color variation. Repairs in increasing size ranges allowed respectively from C to D. Applications – where surface will be hidden or a more natural appearance is desired." *Id*.

Another source submitted by Baroque explains that CC grade plywood is used precisely for applications like flooring: "This is often used as the underside of veneers . … The structure is sound but there will be defects on the underside of the material. These can include open knots,

discolouration, and splits. These defects mean that our veneered plywood is suitable for applications where only one good face is needed." *Id*. at Exh. 4A.

Further, as discussed above, the statements provided by Professor Dai – who was retained as an independent industry expert – confirm that Baroque did not use higher grade plywood in the production of subject merchandise, and that using data that includes higher grade plywood to calculate the benchmark would be distortive and inaccurate. Riverside Benchmark Rebuttal at Exhibit 1 (**PR 295**). These expert opinions combined with the information provided by Baroque on the importance of grade in the pricing of plywood, and Baroque's uncontroverted record evidence that it used only lower grade eucalyptus in the manufacture of its products demonstrates that Commerce's determination to include UNComtrade data in establishing a benchmark for plywood is unsupported by substantial evidence and not in accordance with the law.

### 2. Veneer

Similar to plywood, the *Preliminary Results* calculated a single veneer benchmark for Baroque's backboard (back) and face veneer purchase by averaging UNComtrade export data under various HTS provisions and prices reported in ITTO. PDM at 41-42; Riverside Preliminary Calculation Memorandum at 5-7 (**PR 308**; **CR 130**), accompanying Preliminary Calculation Worksheets at Tab: "Plywood Bench" (**PR 309**; **CR 131**). In its Administrative Case Brief, Baroque argued that Commerce should create separate benchmarks for its face veneer and backboard veneer. Baroque Case Brief at 25-26 (**PR346**; **CR207**). Specifically, because these veneer types are of distinctly different grades, Baroque argued for using ITTO prices for face veneer to value face veneer and ITTO prices for core veneer, to value backboard veneer. *Id*. In contrast and as already discussed, UNComtrade data does not delineate between different veneer grades and thus each HTS subheading is a basket that could include all possible grades –

expensive grades and inexpensive grades. *Id*. at 13-14; Baroque Rebuttal Case Brief at 7

(**PR359**); Section I.A.2, *supra*.

In the *Final Results*, Commerce revised the single veneer benchmark used to calculate

Baroque's benefit to include separate benchmarks for backboard veneer and face veneer as

argued by Baroque. *Id*. Comment 8E. Commerce agreed with Baroque and the supporting record

evidence, rejecting the Petitioner's contrary allegation:

> The record supports Riverside's claims that Baroque Timber's backboard differs from face veneers "in terms of wood species, price and use." Riverside provided industry information on the classification of wood products based on characteristics like appearance and wood species. The pictures of sample backboard and face veneer provided by Riverside generally conform to these grading practices and describe the applications of the different grades. In other words, **Baroque Timber's distinction between backboard and face veneer appears to be genuine and reflect real industry practices**. Furthermore, Baroque Timber's verification questionnaire response demonstrates that it **differentiates between backboard and face veneer** throughout its purchasing, warehousing, and invoicing systems. Additionally, Baroque Timber's suppliers for backboard and face veneer are entirely separate; no supplier is reported having sold both backboard and face veneer to Baroque Timber during the POR. The petitioner has identified no record evidence to support its claims that this distinction is "artificial."
>
> Additionally, Riverside has submitted benchmark data that are **specific to backboard and to face veneer.** These data further demonstrate that **the distinction between backboard and face veneer is common throughout the industry and are appropriate to value** Baroque Timber's purchases of the input.

*Id*. at 91-92 (emphasis added) (footnotes omitted).

Based on this information, Commerce determined to calculate a separate face veneer

benchmark and backboard veneer benchmark. Specifically, Commerce calculated a face veneer

benchmark using a weighted average of the UNComtrade data averaged with the simple average

of the ITTO Peru – Core/Face data and the Ghana – Face data. *Id*. at 92. Commerce calculated

backboard veneer benchmark using the same UNComtrade data as it did for the face veneer with

18

the Peru – Core/Face data and the Ghana – Core data. *Id.* For the reasons discussed below,

Commerce's determination to include non-specific UNComtrade data in both benchmarks, in the

*Final Results*, is unsupported by substantial record evidence and not in accordance with the law.

Commerce provided the following two reasons for dismissing Baroque's arguments for

excluding the UNComtrade data: (1) "Riverside did not show that the {UNComtrade}

benchmark data on the record is unrepresentative of backboard and face veneer purchases;" and

(2) "Riverside also provided benchmark information that included both core and face veneer,

undercutting its claims that the UNComtrade data are unsuitable for this reason." *Id.* (footnotes

omitted).

First, Commerce's assertion that Riverside did not show that the UNComtrade

benchmark data on the record are unrepresentative of backboard and face veneer purchases is

flawed. As Commerce specifically found, Baroque provided record evidence that showed:

1)  "**backboard differs from face veneers** 'in terms of wood species, price and
    use;'"

2)  "Riverside provided **industry information** on the classification of wood products
    based on characteristics like appearance and wood species;"

3)  "Baroque Timber's distinction between backboard and face veneer appears to be
    genuine and reflect **real industry practices**;" and

4)  Specific benchmark data for backboard and face veneer "demonstrate that the
    distinction between backboard and face veneer **is common throughout the
    industry and are appropriate to value** Baroque Timber's purchases of the
    input."

*Id.* at 91-92 (emphasis added) (footnotes omitted). These are Commerce's own findings based on

the record evidence submitted by Baroque; Commerce concluded that it is common to treat face

and core veneers differently, and that it is appropriate to value them differently. *See id.*

Commerce's conclusions, based on record evidence, are undisputed and rebut its

assertion that Baroque did not show that the UNComtrade benchmark data based on broad Custom HTS subheadings that are unrepresentative of backboard and face veneer purchase prices. There is no dispute that UNComtrade benchmark data include both face and core veneers. There is also no dispute that it is impossible to know the exact composition of the HTS subheadings.  However, these are not reasons to include the broad Custom HTS subheading values in the benchmark averages given the record evidence submitted by Baroque. To the contrary, they are the very reasons to reject it when more specific prices exist on the record.

There is no dispute that the industry values and treats these veneers differently. These facts are evidence that the broad HTS subheadings from the UNComtrade data are not representative of backboard and face veneer purchases. In other words, given the record information, the UNComtrade data pricing cannot be representative of both types of veneers. For example, assuming for purposes of argument, the UNComtrade data are evenly split and contain 50 percent face veneer values and 50 percent backboard veneer values, this composition would be nonetheless be distortive of both benchmarks – *i.e.*, artificially lowering one price and artificially increasing the other price. In other words, the Customs HTS subheading data reported by UNComtrade cannot be representative of industry pricing standards for both veneer types based on the record evidence, regardless of the composition of the data.

Finally, there is no merit to Commerce's finding that because Baroque submitted UNComtrade data, such data are "suitable." *Id*. at 92. First, this statement is conclusory and ignores all the other information that Baroque placed on the record.[1] Second, placing information

---

[1]     Baroque recognizes that, in certain cases, UNComtrade data may be suitable when there is no other record evidence or prices. *See*, *e.g.* Preliminary Calculation Worksheets (**PR309**; **CR131**), Tabs: "Paint Bench" & "Glue Bench." In AR9 with respect to veneers, however, there are more specific pricing data and record evidence that the industry treats these items differently. Given this record information and the fact that there are more specific pricing data on the record,

on the record is not a concession that Baroque believes those data to be suitable. Rather, doing so

is an aspect of developing a record – which Commerce often emphasizes is the responsibility of

respondents. *See*, *e.g.*, *Stainless Steel Plate in Coils from Taiwan; Final Rescission of

Antidumping Duty Administrative Review*, 70 Fed. Reg. 73,205 (Dec. 9, 2005), accompanying

IDM Comment 1 ("it is the respondent's burden to develop a record fully"). It is simply

irrelevant whether Baroque included the UNComtrade in its benchmark submission, given that

the other record evidence and Commerce's own conclusions rebut use of the UNComtrade data.

Given these facts and Commerce's own acknowledgment that these veneers are different,

there is no basis for averaging the UNComtrade HTS subheading data with the specific

backboard veneer and face veneer ITTO prices that can be supported by substantial evidence.

## II.    COMMERCE UNLAWFULLY CALCULATED THE INLAND FREIGHT BENCHMARK

In its *Final Results*, Commerce used a simple average of the Beijing and Shanghai inland

freight rates as reported by the World Bank's *Doing Business in China 2020* to value the inland

freight added to the Tier 2 benchmarks for each input. IDM at Comment 10A (**PR 369**). As

argued by both Baroque and Fine Furniture (Shanghai) Limited in their Administrative Case

Briefs Commerce should have instead weight-averaged the Beijing and Shanghai rates by: first

summing the weight, distance, and cost separately for Beijing and Shanghai; and then calculating

the weighted average which would have resulted in an inland freight benchmark 0.000192

USD/KG/KM. Baroque Case Brief at 28-29 (**PR346**; **CR206**); Fine Furniture Case Brief at 17-

18 (**PR354**). Commerce's failure to calculate the inland freight rates in this manner is contrary to

past practice and unreasonable.

---

the UNComtrade data in this case are no longer suitable for the veneer benchmarks.

Commerce asserted the following three reasons for dismissing Baroque's and Fine

Furniture's argument for weight averaging the inland freight benchmark:

1) claiming that its inland freight calculation was consistent with Department's practice in other CVD proceedings, citing *Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (Aug. 26, 2015) ("*Boltless Steel Shelving*"), accompanying IDM Comment 7;

2) Baroque and Fine Furniture did not "identif{y} past proceedings where Commerce has employed a weight-average method;"

3) Although Baroque's and Fine Furniture's statements that Commerce calculated similar benchmarks using weighted-average approach, the Department found "that approach is not necessary for our calculation of the inland freight benchmark because the evidence on the record demonstrates that the inland freight benchmark information is already provided on the same basis (*i.e.*, per kilometer) as the respondents' reported distances."

IDM at 97 (**PR 369**). None of these bases provide a valid justification for declining to weight-

average the inland freight benchmark.

First, Commerce's citation to *Boltless Steel Shelving* is wrong and misleading. *Boltless*

*Steel Shelving* does not address the averaging of the inland freight benchmark or more generally

data contained in *Doing Business in China 2020*. *See Boltless Steel Shelving*, 80 Fed. Reg.

51,775, IDM Comment 7. Rather *Boltless Steel Shelving* consider the averaging of hot-rolled coil

steel prices from multiple sources (*i.e.*, American Metal Market, MEPS (International) Ltd.,

Metal Bulletin, Steel Orbis, and SBB-Platts). *Id*. Indeed, Commerce followed this approach in

this review when confronted with multiple data sources – first it calculated the weighted (where

possible) or simple average by source, and then calculated a simple average of the different

sources. This methodology does not apply where, as here, there is only a single source on the

record for a particular price. In this case, there is a single source that reports volume, distance,

and cost, for multiple shipments, related to inland freight. Therefore, consistent with

Commerce's benchmark calculations for the UNComtrade pricing in this case, which weight-

averages the values, *see* Preliminary Calculation Worksheets (**PR309**; **CR131**), Tabs: "Paint Bench" tab & "Glue Bench," Commerce should be consistent and weight average the *Doing Business in China 2020* data.

Second, Commerce alleges that Baroque and Fine Furniture did not "identif{y} past proceedings where Commerce has employed a weight-average method." IDM at 97 (**PR369**). This is not accurate. Here, both Baroque and Fine Furniture indicated that a weight average approach is consistent with other benchmark calculations in this very case. Case Brief at 28-29 (**PR 346**; **CR206**); Fine Furniture Case Brief at 17-18(**PR354**). Indeed, Commerce's third purported justification acknowledges this fact, but tries deflecting by claiming that the inland freight benchmark is different because it is on the same basis as respondents' data. IDM at 97. This is not accurate. While respondents reported the distance to the nearest international port in kilometers, they made purchases on different bases (*i.e.*, some purchases were in kilograms, metric tons, cubic meters or pieces). In other words, it is not accurate to assert that the inland freight is on the basis as respondent's purchases. Ultimately, Commerce's claim here is a red herring and has nothing to do with whether a simple or weight average should be used.

Here, *Doing Business in China 2020* reports volume, distance, and cost for each sample price – allowing for the benchmark to be weight averaged consistent with Commerce practice.

## III.    COMMERCE UNLAWFULLY APPLIED AFA WITH REGARD TO CERTAIN ISSUES

In the *Final Results*, Commerce applied AFA to the GOC for (1) failing to provide requested information regarding the government authority status of respondents' input suppliers; and (2) failing to provide requested information regarding the China Export-Import Bank's EBCP. As AFA, Commerce found that all of Baroque's input suppliers were government authorities and that the EBCP was used by Baroque's U.S. customers. Neither of these

determinations are supported by substantial evidence or in accordance with law.

### A. LEGAL FRAMEWORK FOR AFA DETERMINATIONS IN CVD PROCEEDINGS

To be consistent with the law, Commerce's AFA finding must satisfy three criteria: (1) it must identify a gap in the record; (2) it must identify how the offending party failed to cooperate to the best of its ability; and (3) the application of AFA to *each* element of the subsidy analysis (financial contribution, specificity, government authority, etc.) must be supported by substantial evidence.

The statutory provisions for the application of facts otherwise available and for the application of adverse inferences are separate, but related. The use of facts otherwise available is governed by 19 U.S.C. § 1677e(a):

(a) In general

If-
(1) necessary information is not available on the record, or
(2) an interested party or any other person-
  (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
  (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
  (C) significantly impedes a proceeding under this subtitle, or
  (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
  the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

The use of "adverse inferences" (*i.e.*, AFA), is governed by 19 U.S.C. § 1677e(b):

(b) Adverse inferences. If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an

24

>inference that is adverse to the interests of that party in selecting from
>among the facts otherwise available.

The statute accordingly requires satisfaction of both of these separate findings, *i.e.*, an

adverse inference cannot be applied unless it is appropriate to use facts otherwise available. *See,*

*e.g.*, *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1289 (CIT 2006)

("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse

inference"). Moreover, reliance on facts otherwise available is only appropriate to "fill gaps" in

the record necessary for Commerce to complete its calculation. *See Nippon Steel Corp. v. United*

*States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is

to "fill in the gaps" when "Commerce has received less than the full and complete facts needed

to make a determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255

(Fed. Cir. 2009) ("The legislative history of the URAA thus reveals that Congress intended

§ 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the

antidumping laws"); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348

(Fed. Cir. 2011) ("Commerce can only use facts otherwise available to fill a gap in the record").

In addition to showing that the information is missing from the record, Commerce is

also required to show that the interested party "failed to cooperate by not acting to the best of its

ability to comply with a request for information." 19 U.S.C. § 1677e(b). In determining whether

a party cooperated to the best of its ability, the courts have instructed that Commerce cannot

apply AFA for a "failure to respond, but only under circumstances in which it is reasonable for

Commerce to expect that more forthcoming responses should have been made; *i.e.*, under

circumstances in which it is reasonable to conclude that less than full cooperation has been

shown." *Nippon Steel*, 337 F.3d at 1381; *see Changzhou Trina Solar Energy Co. v. United*

*States*, 352 F. Supp. 3d 1316, 1326 (CIT 2018) ("The use of facts available allows Commerce to

25

render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA"); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018) ("Compliance with the 'best of its ability' standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation"). As the U.S. Court of Appeals for the Federal Circuit has stated, "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

As discussed below, Commerce failed to meet the requisite criteria described above in its AR9 AFA determinations.

### B. THE APPLICATION OF AFA TO THE GOC FOR THE GOVERNMENT AUTHORITY STATUS OF SPECIFIC INPUT SUPPLIERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

In its *Final Results*, Commerce found every input supplier reported by both mandatory respondents for the various input for LTAR programs (*i.e.*, plywood, veneers, paint, glue and fiberboard) to be government authorities on the basis of AFA. Specifically, Commerce found that the GOC did not provide certain information requested in the Input Supplier Appendix[2] for each supplier and therefore AFA was warranted. As AFA, Commerce determined that all input suppliers were government authorities. This finding is unsupported by substantial evidence and unlawful for certain of Baroque's input suppliers. More specifically, for **eight** input suppliers that were either owned by individuals, including two that were non-cross-owned affiliates of

---

[2] A sample Input Supplier Appendix can be found in the Initial CVD Questionnaire (May 23, 2021) (**PR78**).

Baroque, the GOC in fact provided all information requested by Commerce to show that these suppliers were not government authorities and, thus, there is not a gap in the record with regard to these suppliers. These suppliers are identified in **Attachment 1** to this brief.

## 1.  Background and Relevant Facts

For a countervailable subsidy to be found under the law, the entity providing the subsidy must be an "authority." 19 U.S.C. § 1677(5)(B). "'Authority' is defined {by 19 U.S.C. § 1677(5)(B)} as a country's 'government' or any 'public entity' within the country's territory." *Borusan*, 61 F. Supp. 3d at 1314. Commerce treats entities that are owned by a government as "authorities." *Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348, 65,402 (Nov. 25, 1998).  This is not in dispute here.  Where there is no or minimal government ownership, as is the issue with nine of Baroque's input suppliers, Commerce analyzes "the totality of record evidence and whether it demonstrates that the government has meaningful control over an entity such that it possesses, exercises, or is vested with government authority in order to determine whether it is an "authority" under section 771(5)(B) of the Act." *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021), IDM at Cmt. 1.

To assist in this analysis, Commerce requires the GOC to submit an Input Supplier Appendix for each supplier reported by the mandatory respondents. GOC IQR at Exhibit LTAR-1. The GOC submitted this information in its initial questionnaire response at Exhibit LTAR-1 and Exhibit LTAR-2 (**PR115-126; CR45-54**) and in its supplemental response at Exhibit SQ-2 (**PR154; CR69-77**). At the outset, it is important to understand the difference between the information the GOC submitted *in this case* in its input supplier appendix responses and the information the GOC submits *in virtually every other case*. In almost every case, the GOC

refuses to provide the requested documents or answer many of the questions. More specifically,

the GOC refuses to provide information regarding the two most important questions in the

appendix. These relate to ownership and Chinese Communist Party ("CCP")/Government Entity

involvement:

> 2. For all input producers that are not majority Government-owned and that produced the input purchased by the respondent companies during the, please provide the original Chinese and full translations of the following:
>
> a. Full corporate name of the company and address (please include the address where the company is registered and the address of each facility. Identify the address of the facility(ies) where the input product is produced).
> b. Articles of Incorporation.
> c. Capital Verification Reports.
> d. Articles of Groupings.
> e. Company by-laws.
> f. Annual Report(s) pertaining to the POR, and the two preceding years.
> g. Articles of Association.
> h. Business group registration.
> i. Business license(s).
> j. Tax Registration documents

GOC IQR at Exhibit LTAR-1 at p. LTAR-2 (**PR 115-126; CR 45-54**) (hereinafter "The

Documents Question"). And:

> 3. Commerce understands that for each level of Government, i.e., central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP. Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of stateownership. For the purposes of this questionnaire, we refer to officials of any of these 9 entities as "Government or CCP officials." Please explain whether a CCP committee, branch or "primary organization" has been formed within

the enterprise. Please also explain any decisions taken by the entity that
are subject to review or approval by the Government or the 9 entities listed
above, as either an owner or regulator, or both (*e.g.*, mergers/acquisition,
issuance of shares, change in capital structure, change in leadership
positions or board composition, *etc*.).

*Id*. at Exhibit LTAR-1 at p. LTAR-26-27 (hereinafter the "9 Entities Question"). Often the GOC

only provides information contained in its Enterprise Credit Information Publicity System

("ECIPS"), which is the country's business registration system that identifies ownership, and

outright refuses to provide a response to the 9 Entities Question. This failure to provide

information always results in AFA and every input supplier being found to be a government

authority. **This case, however, is different.**

In this case, for the very first time, the GOC provided detailed responses (and

documentation where requested) to all questions in the Input Supplier Appendix, including the

two questions above. For each supplier listed in **Attachment 1**, the GOC provided

incontrovertible evidence on each companies' ownership, including ECIPS information for each

company and all the documents requested in the Documents Question (where such documents

existed). This information showed that eight of these companies were owned by individuals and

one was owned by foreign companies. *See* GOC Initial QRE at Exhibit LTAR-2 (**PR115-126;**

**CR45-54**); GOC Supp QRE at Exhibit SQ-2.1 (**PR154; CR69-77**); Baroque Affiliation

Response at Exh. 1 (**CR16; PR85**). Commerce does not appear dispute this evidence and did not

find that the ownership information provided was deficient or missing. IDM at Cmt. 4.

Then, for each of these suppliers, either in the IQR or in its supplemental questionnaire

response, the GOC responded fully to the 9 Entities Question as follows:

There is no primary party organization in this producer. There is no
decision taken by the producer that are subject to the review or approval
by the Government or the 9 entities listed in the question. As demonstrated
in the Articles of Association of the producer, the decisions are made

> within internal organizations of the producer without reference to any
> external review or approval.

GOC IQR at Exh. LTAR-1, pp. LTAR-27-29; GOC Supp. Response at 14-16.  For the one

supplier that did have a primary party organization, the GOC explained:

> 8. [                                      ]:
>
> There is a primary party organization at this producer. However, based on
> its Articles of association and signed statement, there are no decisions
> taken by the producer that are subject to the review or approval by the
> Government or the 9 entities listed in the question. As demonstrated in the
> Articles of Association of the producer (chapter 4 and 5), the decisions are
> made within internal organizations of the producer without reference to
> any external review or approval. The company has also provided a
> summary report for the activities of the primary party organization, which
> proves the primary party organization is not involved in the operation of
> the company. Instead, it organizes the learning and social activities of the
> members of party.

GOC Supp. Response at 16.

Commerce did not indicate in its supplemental questionnaire that the GOC's initial

responses to the Nine Entities Question were deficient for the suppliers for which a response was

provided. *Id*. at 13. Instead, Commerce simply repeated the Nine Entities Question, telling the

GOC to respond "For all producers." *Id*. After answering the Nine Entities Question with respect

to several additional suppliers in this supplemental questionnaire response, the GOC did not

receive another supplemental questionnaire indicating that this response was deficient.

In addition to the Documents Question and the Nine Entities Question, the supplemental

questionnaire contained a different follow up question in response to the GOC's initial response:

> 22. For all producers from whom the respondents purchased inputs during
> the POR, please identify which owners, managers, and directors were
> Chinese government or CCP officials during the POR.
>
> **Response: The GOC has confirmed that, for the companies that the
> GOC was able to collect and submit requested documents in the IQR
> and Exhibit SQ-1, all of the owners, directors, or managers were not
> Chinese Government or CCP officials during the POR.**

GOC Supp Response at 16-17 (hereinafter the "CCP Question"). The GOC fully responded to this question. The GOC did not receive supplemental questionnaire after this response indicating that the response was deficient.

Finally, while the GOC responded fully to each question in the Input Supplier Appendix as well as the Supplemental Questionnaire, it also provided additional, unsolicited information regarding certain suppliers to demonstrate the companies' lack of government control. This information included signed certifications from these suppliers.[3]

Commerce again did not issue any supplemental questions on the information the GOC provided. However, in its *Preliminary Results*, Commerce found that the GOC failed to provide the information requested and otherwise failed to act to the best of its ability. PDM at 13-16 (PR 303). Commerce then found, as AFA, that all input suppliers were government authorities.

Both the GOC and Baroque filed administrative case briefs challenging this AFA determination. Baroque specifically addressed nine of its individually owned suppliers (and one foreign owned supplier) and the factual information on the record showing that these suppliers were not government authorities. Case Br. at 40-56 (**PR346**; **CR207**). Two of these eight suppliers, [                                                                ], are non-cross owned affiliates (*i.e.*, affiliated companies in which Baroque did not have a controlling interest). *See* Baroque Affiliation Response at Exh. 1. (**CR16; PR85**).

In the *Final Results*, Commerce maintained its position that AFA was warranted for the GOC's failure to provide requested information. Specifically, Commerce found that:

> As a result of incomplete responses to Commerce's questionnaires, we find that the GOC failed to cooperate by not acting to the best of its ability to comply with our requests for information. Consequently, we determine that the GOC withheld information, and that an adverse inference is warranted in

_____

[3] GOC Supp QRE at Exhibit SQ 2.1 (**PR154; CR 69-77**).

selecting from the facts available. As AFA, we find that CCP officials are present in each of the mandatory respondents' privately-owned input producers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the government, meaningful control over the companies and their resources.

2.   **Argument**

a.   **Commerce Did Not Address Specific Input Suppliers, Rendering its Determination Unreviewable**

Commerce's determination in its *Final Results* that the GOC failed to cooperate with regard to **all** input suppliers is indecipherable, necessitating a remand. The first step in the application of AFA is to determine whether information is missing from the record. *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348; see *Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1326 ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA"). In its *Final Results* Commerce did not specifically address any of the nine input suppliers that Baroque raised in its brief. Instead, Commerce's determination only speaks in generalities about the information provided rendering a review of whether and what information was missing or deficient for **each specific input supplier** impossible. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review'"); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1513 (D.C. Cir.1984) (agency decisions must be "reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choices made").

A determination whether an entity is a government authority within the meaning of the statute is a particular factual finding specific to that entity. Commerce's determination as to *each*

input supplier must be supported by substantial evidence. Commerce cannot use the failure to provide certain information for one input supplier (or a certain group of input suppliers) as an imputed finding that information is missing for a different, specific supplier. This is particularly true in this case where the GOC provided different kinds and documentary information for certain input suppliers. This means that in order for Commerce's AFA determination to be supported by substantial evidence it is "Commerce's burden to provide enough information to allow the court to discern reasonably which particular evidence Commerce determined was missing." *GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1354–55 (CIT 2020). Commerce has not done that here.

In this case, the GOC was required to provide information requested in the Input Supplier Appendix for a large number of input suppliers. For example, Baroque reported more than 100 input suppliers. Baroque IQR at Exhs. 11a, 11b, 25a, 25b, 25c (**PR110-112; CR30-43**). The GOC provided basic ownership information for many of these suppliers. GOC IQR at Exhibit CUT-2, PLY-2, FB-2, VEN-2, SAWN-2, GLUE-2 and PAINT-2 (**PR115-126; CR45-54**). However, Baroque did not challenge the application of AFA to all of its suppliers. Instead, Baroque limited its arguments to specific input suppliers where full information was provided. Commerce did not address these suppliers specifically.

For example, Commerce explained:

> we disagree with the GOC and Riverside that it provided Commerce with sufficient information to determine whether any of the mandatory respondents' input producers are privately-owned or wholly foreign-owned entities. We explained in the *Preliminary Results* that the GOC's responses to the Input Producer Appendix for the inputs being investigated were deficient, and that the ECIPS information and the information supplied from the mandatory respondents' input suppliers were not sufficient for our analysis of whether the input producers identified by the company respondents are authorities under the Act.

IDM at Cmt. 4. For the specific suppliers Baroque addressed in its administrative case brief, the GOC did not *only* provide ECIPS information. Instead, the GOC provided ECIPS information, and every document Commerce requested regarding ownership (*i.e.*, a response to the Documents Question), to the extent those documents existed. Thus, Commerce's discussion of whether ECIPS information alone is sufficient for its purposes is moot with regard to these nine suppliers.

Next, Commerce discusses generally that the GOC provided "articles of incorporation, capital verification reports, company by-laws, business licenses, and financial statements for . . . certain individually- or wholly foreign-owned suppliers," which Commerce acknowledges is "helpful in identifying the individual owners, board members, officers, and managers of the company." *Id*. However, Commerce then concludes that "this documentation lacks information as to whether the owners and shareholders of the companies have any CCP involvement" and that the GOC did not "respond in full to Commerce's questions regarding the role of CCP officials and organizations in the management and operations of the input suppliers." *Id*. This statement ignores the fact that the GOC provided full responses to all CCP questions for the nine suppliers Baroque addresses in its brief. For eight of the suppliers, the GOC responded to the 9 Entities Question as follows:

> There is no primary party organization in this producer. There is no decision taken by the producer that are subject to the review or approval by the Government or the 9 entities listed in the question. As demonstrated in the Articles of Association of the producer, the decisions are made within internal organizations of the producer without reference to any external review or approval.

GOC IQR at Exh. LTAR-1, pp. LTAR-27-29 (**PR115-126; CR45-54**); GOC Supp. Response at 14-16 (**PR154; CR69-77**). For the ninth supplier, the GOC indicated that the company had a primary party organization but then explained the role of that organization in the company, again fully answering the question:

> There is a primary party organization at this producer. However, based on its Articles of association and signed statement, there are no decisions taken by the producer that are subject to the review or approval by the Government or the 9 entities listed in the question. As demonstrated in the Articles of Association of the producer (chapter 4 and 5), the decisions are made within internal organizations of the producer without reference to any external review or approval. The company has also provided a summary report for the activities of the primary party organization, which proves the primary party organization is not involved in the operation of the company. Instead, it organizes the learning and social activities of the members of party.

GOC Supp. Response at 16. In addition, the GOC fully responded to the CCP Question that none of these nine suppliers had "owners, managers, and directors were Chinese government or CCP officials during the POR." *Id*. at 16-17. Commerce provides no explanation why responding fully to the Nine Entities Question in this manner results in the information being rendered missing from the record. If the information is not missing, facts available and adverse inferences cannot be applied. *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348.

Ignoring this information, Commerce inexplicably focuses on the one supplier that had a primary party organization, stating that the "the summary report primarily indicates the influence of the CCP over the employees in the company." IDM at Cmt. 4. It is not clear how Commerce is using this information to support its AFA determination. The fact that the GOC actually provided this information shows that the information *is not missing*. Commerce instead seems to be concluding (or impling) that this information shows that the supplier is a government authority because it has a primary party organization. Again, if Commerce is reaching such a conclusion based on evidence submitted, then AFA is not applicable. But then, confusingly, Commerce concludes that "the GOC failed to provide information necessary for us to analyze whether the mandatory respondents' input producers are authorities." IDM at Cmt. 4.

Taken together, it is apparent that Commerce has failed to identify with particularity what precise necessary information it requested but that was missing for each supplier and why, with regard to each of those suppliers, adverse inferences are warranted.

### b. Commerce Failed to Notify the GOC of Any Deficiency

Commerce does not, however, end it there. Commerce goes on in its decision to explain that the GOC's narrative responses to the Nine Entities Question and CCP Question, and additional certifications from the specific suppliers, were not the information Commerce wanted in response to these questions because of, in part, information submitted nine years ago in another unrelated review, *Citric Acid from China 2012.*[4]  Commerce ultimately concludes that "GOC did not provide any government documentation to support its claim that the independently-owned suppliers were not government authorities" and that "the GOC withheld information." IDM at Cmt. 4. There are several errors in this analysis.

First, neither the Nine Entities Questions nor the CCP Question requested documentation. Yet Commerce determined that documentation was "missing" from the record, necessitating AFA. Both of these questions only ask the GOC to indicate whether or not certain circumstances exist for each supplier. If the answer is yes, the questions ask the GOC to explain. If the answer is no, Commerce does not provide any further direction on how to respond. It is axiomatic that "it is Commerce, not the respondent, which bears the burden of asking questions[,]" and that Commerce must ask "clear" questions "to let the respondent know what information it really wants". *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804, 820 (1999); s*ee also NSK Ltd. v. United States,* 910 F.Supp. 663, 671 (1995) ("[r]espondents should not be

---

[4] *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec. 31, 2014).

required to guess the parameters of Commerce's interpretation of a phrase in the statute"). Commerce cannot lawfully deem information necessary that it does not ask for.

Second, the failure to request documentation that Commerce deems "sufficient" or "necessary" runs afoul of 19 U.S.C. § 1677m(d). The first step in the application of AFA is for Commerce to identify one of the five categories of deficiencies: when (1) "necessary information is not available on the record, or" an interested party (2) "withholds information that has been requested," (3) "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," (4) "significantly impedes a proceeding ... or," (5) "provides such information but the information cannot be verified" 19 U.S.C. § 1677e(a)(1)–(2). Once one of the categories has been identified Commerce "shall, *subject to section 1677m(d) of this title*, use the facts otherwise available in reaching the applicable determination." *Id.* (emphasis added). The Federal Circuit has further explained that:

> Section 1677e(a)(2)(D) requires that the authorization to rely on adverse facts available is subject to § 1677m(d), which requires Commerce to provide notice and an opportunity to remedy a deficiency. Commerce has no authority to apply adverse facts and inferences unless the respondent has failed to provide requested information when notified of the deficiency, and has not acted to the best of its ability in responding to such requests. 19 U.S.C. § 1677e(a).

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385 (Fed. Cir. 2022).

In this case, Commerce did not provide the GOC with any notice that the specific information provided regarding the nine suppliers at issue was deficient in any way.  For example, for several of these suppliers, the GOC provided full answers to the Documents Question and the Nine Entities Question in the initial questionnaire response. GOC IQR at Exhs. LTAR-1, LTAR-2 (**PR115-126; CR45-54**). In the only supplemental questionnaire issued to the GOC, Commerce did not provide any indication that the GOC's answers that the suppliers had no primary party organization was deficient. GOC Supp. Response at 14-17 (**PR154; CR69-77**).

Commerce simply repeated the Nine Entities Question without any reference to the GOC's initial questionnaire response. *Id.* at 16. Repeating the question without specifying the deficit in the information already provided is insufficient for purposes of 1677m(d). *See Borusan*, 61 F. Supp. 3d at 1345-48, *aff'd sub nom. Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) (Commerce must provide a sufficiently detailed explanation of the "nature of the deficiency" and must permit the respondent to correct the deficiency).

Similarly, in the supplemental questionnaire, Commerce asked the GOC for the first time: "For all producers from whom the respondents purchased inputs during the POR, please identify which owners, managers, and directors were Chinese government or CCP officials during the POR." GOC Supp. Response at 16-17. The GOC fully responded to this question. Commerce then used the GOC's response to this question and the failure to provide "official documents" as the basis for applying AFA. IDM at Cmt. 4. We again stress that Commerce's questionnaire only requested an answer to its question and did not reference the need for any documentation. Any question that requires documentation normally states so explicitly. The GOC went a step further and provided some certifications for certain suppliers to back up its statement that none of the producers had CCP officials in them. GOC Supp QRE at Exhibit SQ-2.1 (**PR154; CR69-77**). If Commerce required documentation for answers to this question, and more importantly wanted specific documentation that was provided in an unrelated review *nine years ago*, then it should have expressly requested this information. "The law requires respondents to be diligent, not clairvoyant." *Saha Thai Steel Pipe Pub. Co. v. United States*, 2022 WL 17369301, at *11 (CIT Dec. 2, 2022); *see also Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (CIT 1993) ("Commerce cannot expect a respondent to be a mind-reader").

PUBLIC VERSION

Third, Commerce's reliance on *Citric Acid from China 2012* as essentially the sole basis for determining that the GOC did not provide the information requested of it and did not act to the best of its ability is unreasonable. The facts of that case were extremely case specific and do not translate to this review. Indeed, the issue in that case was that for two individually owned suppliers the owner of both had been Secretary of the Party Committee of Liujiadu Village prior to the POR but no longer held that position during the POR. Commerce explained the information provided in the IDM:

> GOC provided a certified letter from the CCP Committee of the village indicating that the owner of Companies B and C held the position of Secretary from June 2009 to December 2011. 216 The Department established at verification through official government documentation provided by the GOC and the CCP (e.g., stamped originals of election notification from the CCP Committee of Lijiaxiang Town), that the owner of Companies B and C did not serve as Secretary for the Party Committee of Liujiadu Village in the PRC during the POR and that the village does not geographically overlap with the locations of the producers' operations. 217 The Department was also able to establish at verification that another person was elected to the position of Secretary for the Party Committee of Liujiadu Village on December 28, 2011, ending the owner of Companies B and C's tenure as Secretary before the POR. In addition, the December 28, 2011 election notification announced the approval of another person for Secretary of the Party Committee for the village in which Companies B and C are located.

*Citric Acid from China 2012* at IDM Cmt. 2. This type of "documentation" was only possible because the owner had been secretary of a specific government entity and then was no longer part of that entity. Commerce failed to specify *in the instant review* what sort of documentation could be provided for a scenario where none of the owners or managers are part of (and were never part of) any of the Nine Entities. Indeed, we note that Commerce did not require in *Citric Acid from China 2012* that the GOC demonstrate with official documentation that the owner was not part of any other government entity; it only required documentation to show that the owner was no longer part of the government entity he had been involved with. It is therefore entirely unreasonable, and indeed

arbitrary and capricious, to use the specific factual scenario presented in *Citric Acid from China 2012* as the basis for determining that the GOC did not act to the best of its ability in this case

### C.   COMMERCE UNLAWFULLY APPLIED AFA TO COUNTERVAIL THE EBCP

In its *Final Results*, Commerce applied AFA to countervail the GOC's EBCP after unlawfully finding that "the record of the instant review does not support a finding of non-use." IDM at 23 (**PR369**). Until very recently, Commerce has made the same determination by rote in every decision on this program; namely, finding that the GOC's failure to provide a list of partner banks and to provide the 2013 revisions to the administrative measures requires the application of AFA to this program. *Id*. While Commerce continues to make this finding in every case, this Court has rejected it many recent cases on which it has been appealed. This Court should do so again in this case.

### 1.   Commerce's Application Of AFA In Cases Involving The EBCP Have Been Consistently Rejected Under Almost Identical Factual Circumstances

This Court has addressed Commerce's application of AFA to the usage of the EBCP in numerous cases now, under almost identical facts. In many such cases, when cooperative respondents have provided evidence of non-use of the EBCP, this Court has unequivocally rejected Commerce's attempts to apply AFA due to the GOC's perceived failure to provide requested information on the EBCP. As discussed below, this Court have found in these cases that even if the information was critical to some "understanding" of the program, the information was only critical to understanding the operation of the program and not to establishing usage of this program or verification of that usage. This Court should follow the same reasoning here.

Recently, this Court again rejected Commerce's attempts to apply AFA to the EBCP in in *Zhejiang Junyue Standard Part Co. v. United States*, 578 F. Supp. 3d 1280 (CIT 2022). This Court explained:

> The statute mandates that Commerce "shall verify all information relied upon in making ... a final determination in an investigation." See 19 U.S.C. § 1677m(i)(1). It seems that here Commerce gave up on that duty by insisting that without the operational information that China failed to provide its "typical non-use verification procedure" would be too burdensome to employ, if, it turned out, that more than a "small number of loans" existed on the books of the Plaintiffs' U.S. customers. See Final IDM at 34. As this Court recently stated in response to Commerce's "unreasonably onerous" argument, "Commerce's position assumes that it cannot narrow the scope of its inquiry. But to know whether it can narrow the scope, or establish an alternative method of verification, Commerce needs to ask the [respondent] and its U.S. customers for assistance." Both-Well (Taizhou) Steel Fittings, Co. v. United States, 46 CIT ——, ——, 557 F. Supp. 3d 1327, 1336 (2022) (citation omitted). The record does not show, and Commerce does not claim, that when deciding whether to verify the claims of non-use the Department undertook to determine the number of loans on Plaintiffs' U.S. customers' books during the period of investigation.
>
> Under these circumstances, the court cannot say that substantial evidence supports Commerce's determination that a gap in the factual record existed as to whether Plaintiffs' U.S. customers used the Export Buyer's Credit Program to purchase subject merchandise exported by Plaintiffs.

*Id*. at 1294-95.

This decision is the most recent in a long line of cases in which this Court has rejected Commerce's position on the exact same basis. *See, e.g., Both-Well (Taizhou) Steel Fittings*, *Co. v. United States*, 557 F. Supp. 3d 1327 (CIT 2022); *Clearon Corp. v. United States*, 2021 WL 1821448 (CIT May 6, 2021), *2 (sustaining Commerce's second remand results, issued under protest, in which Commerce found that neither respondent nor its customers used or received a benefit under the EBCP).

### 2.  Record Evidence Demonstrates that the EBCP Was Not Used By Baroque's Customers

This case is indistinguishable, both factually and legally, from the previous cases before this Court as summarized above. First, as in the cited cases, there is no question that Baroque was a cooperative respondent in this review. As this Court has warned, Commerce has an

"obligation when drawing an adverse inference based on a lack of cooperation by a foreign government to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information." *Guizhou Tyre*, 348 F. Supp. 3d at 1271. When Commerce concluded that the GOC had failed to cooperate with Commerce's inquiries in this review, it applied AFA to determine that Baroque – a cooperative respondent – used and benefited from the program.

Second, as in the cases above, the record of this case contains overwhelming and consistent evidence demonstrating that Baroque's customers did not use the EBCP. This includes: (1) statements of non-use in the GOC's questionnaire response; (2) Baroque's statement of non-use in its initial response after confirmation with its U.S. customers; and (3) Baroque's customer declarations of non-use. *See* GOC IQR at 23-28 (**PR 115-26**; **CR 45-63**); Baroque IQR at Exhibit 11c (**PR109-12**; **CR30-42**). Recent decisions before this Court have found that this evidence is sufficient to demonstrate non-use and that Commerce's AFA findings were unlawful. There is no evidence on the record of this proceeding that Baroque or its U.S. customers used the EBCP. Finally, as discussed in greater detail below and just as in these other cases, Commerce's *Final Results* continue to focus on the operation of the EBCP but fail to effectively identify what gap exists warranting application of AFA against Baroque. IDM at Cmt.1 (**PR369**). Commerce provided a lengthy discussion summarizing the history of how it has treated this program, *id.* – but made no attempt to address the extensive precedent rejecting its practice of applying AFA to the EBCP. The *Final Results* are therefore unsupported by substantial evidence and not in accordance with law.

**3.** <u>None Of the Information Commerce Deems As "Missing" Actually Creates A Gap In The Record Concerning Usage And Information Concerning Usage Is Verifiable, As Demonstrated By Recent Commerce Verifications</u>

Commerce explained in its *Final Results* that it found the GOC's responses deficient due to two missing pieces of information relating to the operation of the EBCP: (1) the 2013 Administrative Measures; and (2) the identity of all partner/correspondent banks involved in disbursement of funds under the EBCP. IDM at Cmt. 1(**PR369**). Commerce's finding that this missing information creates a gap in the record regarding the usage of the EBCP is unsupported by substantial evidence. As established by the precedent detailed above, none of the information that Commerce has deemed as "missing" actually creates a gap in the record concerning usage. Even if this information was critical to Commerce's "understanding," it was only critical to **understanding** the operation of the program – not establishing **usage** of this program. *Guizhou Tyre*, 348 F. Supp. 3d at 1271; *Clearon Corp.*, 359 F. Supp. 3d at 1360. If there is no evidence on the record regarding usage, then there is no evidence on which Commerce can base either the financial contribution or benefit elements of the subsidy analysis.

Furthermore, in its *Final Results*, Commerce concluded that without the missing information it requested, it would be not be able to complete its verification process. IDM (**PR 369**) Comment 1. According to Commerce, it would be "onerous for Commerce to comb through the business activities of the company respondents' customers without any guidance as to how to simplify the process or any guidance as to which loans or banks should be subject to scrutiny as part of a verification of each company." *Id*. Commerce further argued that it could not "accurately and effectively" verify usage of the company respondents' customers because it would "amount to looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found." *Id*. As discussed above, these

claims are without merit and have been soundly – **and repeatedly** – rejected by this Court.

Furthermore, these claims are demonstrably false as proven by Commerce now having conducted verifications of the EBCP program. *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 57,809 (Oct. 19, 2021), IDM Comment 5. Commerce in that investigation explained that:

> regarding benefit, we recognize that the CIT directed Commerce in numerous decisions to consider whether any available information provided by respondents may be sufficient to fill the gap of missing record information in considering claims of non-use for the EBC program. As a result, we issued supplemental questionnaires and questionnaires in lieu of onsite verification to each mandatory respondent and their U.S. customers, requesting additional information regarding its financing activities. We received complete responses from the respondents, and, consequently, as facts available, we find that neither Dingli nor LGMG – or their U.S. customers used the program.

*Id*.

Because Commerce has demonstrated in other proceedings that it is able to verify the EBCP, its claims in the *Final Results* that it is unable to do so without the "missing" information it requires, are demonstrably invalidated.

PUBLIC VERSION

## CONCLUSION

For the reasons discussed above, Baroque requests that this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law, and remand the *Final Results* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  February 7, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 13,780 words, less than the 14,000 word limit.

_/s/ Andrew T. Schutz_
Andrew T. Schutz

_Counsel to Plaintiffs, Baroque Timber_
_Industries (Zhongshan) Co., Ltd. and_
_Riverside Plywood Corporation_

Dated: February 7, 2023