**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE TIMOTHY M. REIF, JUDGE

———————————————————————————————

|  |  |  |
|---|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORP., | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| ZHEJIANG DADONGWU GREENHOME WOOD CO. LTD., *et al.*, | ) | |
| Consolidated Plaintiffs, | ) | |
| and | ) | |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | Consol. Ct. No. 22-00210 |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| Defendant, | ) | Business Proprietary Information Denoted by Brackets on Page 23 |
| and | ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) | |
| Defendant-Intervenor. | ) | |

———————————————————————————————

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                          KELLY M. GEDDES
JonZachary Forbes                    Trial Attorney
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Civil Division
for Trade Enforcement and Compliance Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480
Washington, D.C.                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Telephone: (202) 307-2867
                                     E-mail: Kelly.Geddes2@usdoj.gov


June 21, 2023                        Attorneys for Defendant

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE TIMOTHY M. REIF, JUDGE

_____

|  |  |  |
|---|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZHEJIANG DADONGWU GREENHOME WOOD CO. LTD., *et al.*, | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | Consol. Ct. No. 22-00210 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## **ORDER**

Upon consideration of plaintiffs', consolidated plaintiffs', and plaintiff-intervenor's motions for judgment upon the agency record, the responses thereto, the replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's final results are sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated:_____, 2023
      New York, NY

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

STATEMENT PURSUANT TO RULE 56.2 ..........................................................................2

    I.    Administrative Determination Under Review.............................................................2

    II.  Statement Of Issues ...................................................................................................2

STATEMENT OF FACTS......................................................................................................3

SUMMARY OF ARGUMENT ..............................................................................................5

ARGUMENT ........................................................................................................................8

    I.    Standard Of Review ...................................................................................................8

    II.  Commerce's Calculations Of The Benchmark Prices For Plywood And Veneer Are
         Supported By Substantial Evidence And Otherwise In Accordance With Law...........8

         A. Legal Framework For Calculating Benchmark Prices .....................................9

         B. Commerce's Calculation Of The Benchmark Price For Plywood Is Supported
            By Substantial Evidence And Otherwise In Accordance With Law...............11

         C. Commerce's Calculation Of The Benchmark Price For Veneer Is Supported
            By Substantial Evidence And Otherwise In Accordance With Law ...............18

    III. Commerce's Calculation Of The Benchmark Price For Inland Freight Is Supported
         By Substantial Evidence And Otherwise In Accordance With Law ...........................21

    IV. Commerce's Finding Of Use Of The EBC Program Based On An Adverse Inference
         Is Supported By Substantial Evidence And Otherwise In Accordance With Law ......24

         A. Legal Framework ..........................................................................................25

         B. Commerce's Use Of An Adverse Inference Based On The Government Of
            China's Failure To Report Requested Information Regarding The EBC
            Program Was Reasonable................................................................................26

    V.  Commerce's Finding That Certain Input Suppliers Are Government Authorities
         Based On An Adverse Inference Is Supported By Substantial Evidence And Is
         Otherwise In Accordance With Law ........................................................................37

CONCLUSION ...................................................................................................................42

## <u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004)................................................8

*Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ........10

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ................................................................................37

*Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ................................................................................32

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ................................................................................35

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019)........................26, 36

*Cooper (Kunshan) Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022)...7, 27, 34

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ................................................35

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) (*Essar II*)............................9, 10

*Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) (*Essar I*)........10, 20

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ......................25

*Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, 2022 WL 4180886 (Ct. Int'l Trade Sept. 13, 2022) ................................................................................26, 33

*Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034 (Fed. Cir. 1996)................................................8

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ..........passim

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ................................................................................26

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ................................................25

*Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002).............35

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ............................8

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)............................................25

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) ....................26

*Peer Bearing Company-Changshan v. United States*, 298 F. Supp. 2d 1328 (Ct. Int'l Trade 2003) ................................................................................11

*Pohang Iron & Steel Co. v. United States*, 23 Ct. Int'l Trade 778 (1999)....................................35

*Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (Ct. Int'l Trade May 12, 2022)......13, 18

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)............................35

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) ....................................................8

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F.Supp.2d 1191 (Ct. Int'l Trade 2004)..35

*Unicatch Industrial Co., Ltd. v. United States*, 539 F. Supp. 3d 1229 (Ct. Int'l Trade 2021)........41

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)...................................................................8

**Statutes**

19 U.S.C. § 1516a...................................................................................................................8

19 U.S.C. § 1677.............................................................................................................passim

19 U.S.C. § 1677e.........................................................................................25, 36, 38, 41

19 U.S.C. § 1677m.............................................................................................................41

**Regulations**

19 C.F.R. § 351.307...........................................................................................................33

19 C.F.R. § 351.308...........................................................................................................25

19 C.F.R. § 351.51.............................................................................................................6

19 C.F.R. § 351.511.....................................................................................................passim

19 C.F.R. § 351.523...........................................................................................................16

19 C.F.R. § 351.525.............................................................................................................3

**Administrative Determinations**

*Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (Aug. 26, 2015), and accompanying IDM.................................................................................................23

*Carbon and Alloy Steel Threaded Rod from the People's Republic of China: Preliminary Affirmative Countervailing Duty Investigation and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 Fed. Reg. 36,578 (Dep't of Commerce July 29, 2019), and accompanying PDM.................................................................................31

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Dep't of Commerce Sept. 27, 2010).............................................................................16

*Certain Fabricated Structural Steel from China*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020), and accompanying IDM.................................................................................21

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 2, 2016), and accompanying IDM.........................................................................................................15

*Chlorinated Isocyanurates from the People's Republic of China: Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014), and accompanying IDM.................................................................................30

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), and accompanying IDM.................................................................................................17

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021), and accompanying IDM .................................................................................................17

*Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (October 20, 2014), and accompanying IDM ...........................................................................................32

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM ...................................................................................................................................16

*Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 8,405 (January 25, 2017) (*Silica Fabric from China*), and accompanying IDM .................................................................28

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM ...................................................................................................................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM ..................................14

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005), and accompanying IDM ...................................................................................................................................16

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), and accompanying IDM ...............16

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021) .......................................................................................................15

*Multilayered Wood Flooring from the People's Republic of China: Final Results; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), and accompanying IDM ..........................................................16

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORP., | ) )  ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| ZHEJIANG DADONGWU GREENHOME WOOD CO. LTD*., et al.,* | ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| and | ) ) |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) |
| Defendant-Intervenor. | ) ) |

Consol. Ct. No. 22-00210

**PUBLIC VERSION**
Business Proprietary Information
Denoted by Brackets on Page 23

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully

responds to the motions for judgment on the agency record filed by plaintiffs, Baroque Timber

Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corp. (collectively, Baroque),

consolidated plaintiffs, Zhejiang Dadongwu GreenHome Wood Co., Ltd. (GreenHome), Fine

Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture), and Evolutions Flooring, Inc., and Struxtur, Inc. (collectively, Evolutions), and plaintiff-intervenor Lumber Liquidators Services, LLC (Lumber Liquidators) challenging the Department of Commerce's final results in the ninth administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.  As explained below, the motions should be denied because the final results are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (Dep't of Commerce June 16, 2022) (*Final Results*) (P.R. 375), and accompanying Issues and Decisions Memorandum (IDM) (P.R. 369). The period of review is January 1, 2019, through December 31, 2019.

### II.   Statement Of Issues

1.      Whether Commerce's calculation of the benchmark for plywood is supported by substantial evidence and otherwise in accordance with law.

2.      Whether Commerce's calculation of the benchmark for veneer is supported by substantial evidence and otherwise in accordance with law.

3.      Whether Commerce's calculations of the inland freight benchmark is supported by substantial evidence and otherwise in accordance with law.

4.      Whether Commerce's application of an adverse inference that respondents used the Export Buyer's Credit Program is supported by substantial evidence and otherwise in accordance with law.

5.      Whether Commerce's application of an adverse inference that certain input suppliers are government authorities is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

The Department of Commerce published a countervailing duty order on multilayered wood flooring from the People's Republic of China.  *See Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).  On December 2, 2020, Commerce issued a notice that interested parties could request an administrative review of the order.  *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 Fed. Reg. 77,431 (Dep't of Commerce Dec. 2, 2020).  Following timely requests, Commerce initiated the administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) (P.R. 62).

Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) and Baroque[1] as mandatory respondents in this administrative review.  *See* Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Respondent Selection (Mar. 19, 2021) (P.R. 77, C.R. 10).

On December 27, 2021, Commerce published its preliminary results.  *See Multilayered*

---

[1]  Commerce's respondent selection memorandum identifies Baroque's cross-owned affiliate, Riverside Plywood Corp., as the selected mandatory respondent.  However, Commerce noted that it had previously found the two companies to be cross-owned pursuant to 19 C.F.R. § 351.525 (b)(6) in a prior segment of this proceeding, and therefore treated the two companies as a single entity for purposes of this administrative review.

*Wood Flooring From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2019*, 86 Fed. Reg. 73,244 (Dep't of Commerce Dec. 27, 2021) (P.R. 311), and accompanying Issues and Decisions Memorandum (PDM) (P.R. 303).  The preliminary results included five determinations relevant to this action.  First, Commerce preliminarily determined to calculate a benchmark price of plywood, one of the inputs used to produce multilayered wood flooring, by averaging two datasets in the record: a dataset from the International Tropical Timber Organization (ITTO) and a dataset from the United Nations Comtrade database (UN Comtrade).  PDM at 40-42.  Second, it similarly determined to use an average of ITTO and UN Comtrade data to calculate a benchmark price for veneer.  *Id.*  Third, Commerce made a preliminary determination that, to determine the value of transporting inputs to respondents' production facilities, it would use a benchmark inland freight rate calculated by taking the simple average of two freight rates published in the World Bank's *Doing Business in China 2020 Report.  Id.* at 43-44; Preliminary Calculations at Inland Freight Tab (P.R. 307).

Fourth, Commerce made a preliminary determination to apply an adverse inference that Senmao and Baroque's United States customers benefited from the Export Buyer's Credit (EBC) program, a program through which banks owned by the government of China provide loans at preferential rates to customers who purchase Chinese exports.  PDM at 19-28.  Commerce based this determination on a preliminary finding that the government of China and the mandatory respondents, Baroque and Senmao, had withheld information necessary for assessing whether United States customers had benefitted from the EBC program.  *Id.* at 25-29.  Fifth, Commerce made a preliminary determination to apply an adverse inference that domestic producers of certain inputs were "authorities" of the government of China.  *Id.* at 13-16.

Following publication of the preliminary results, the American Manufacturers of Multilayered Wood Flooring (AMMWF) (the domestic petitioner), the government of China, Baroque, and Senmao submitted timely administrative case briefs, which included arguments concerning these five determinations. *See* IDM at 3. Additionally, several other interested parties including Fine Furniture, Lumber Liquidators, and Evolutions submitted case briefs or letters supporting arguments made by Baroque and Senmao. *Id.*

On June 16, 2022, Commerce published its final results. Commerce made several changes from the preliminary results. *See Final Results*; IDM at 7. Relevant to this action, it made a change to its calculation of the benchmark price of veneer: instead of calculating a single price, it determined that it would calculate two separate benchmark prices for backboard and face veneer. IDM at 91. It continued to use both the ITTO and UN Comtrade data to do so. *Id.* at 92. With respect to the other issues in this case, Commerce did not make any changes from the preliminary results. Commerce calculated a final countervailable subsidy rate of 12.74 percent for Baroque and its cross-owned affiliates, 3.36 percent for Senmao, and 9.85 percent for the non-selected companies. *Final Results*, 87 Fed. Reg. at 36,306.

## SUMMARY OF ARGUMENT

This Court should sustain Commerce's final results. None of the plaintiffs' challenges to the final results demonstrate that they lacked substantial evidence or were not in accordance with law.

First, Commerce's determination to average record UN Comtrade and International Tropical Timber Organization (ITTO) data for purposes of calculating a tier 2 plywood and veneer benchmark prices is supported by substantial evidence and in accordance with law. As required by regulation, Commerce identified the available datasets of world market prices for plywood and veneer that encompassed the purchases of parties. Specifically, Commerce utilized

both the robust UN Comtrade global dataset of prices, and the more limited dataset available from ITTO. The UN Comtrade data for plywood are not specific to particular grades of plywood, but they do encompass the grades of plywood purchased by respondents during the period of review. Similarly, the UN Comtrade data on the record does not have separate subheadings for face veneer and backboard veneer, but they do encompass the types of veneer purchased by respondents during the period of review. Parties argue that Commerce should have ignored the UN Comtrade data entirely and used only a narrow set of ITTO data. For plywood, this would include data from only Peru and Brazil, and for veneer, this would include data from only Peru and Ghana. However, to discard the UN Comtrade data and rely on these geographically limited datasets would be inconsistent with 19 C.F.R. § 351.51(a)(2)(ii), which instructs Commerce to take the average of all "commercially available world market price{s}." It would also result in an unreasonably narrow and potentially distorted subset of data.

Second, Commerce's determination to simple average the two inland freight rates on the record to calculate a benchmark rate is reasonable and supported by substantial evidence. The benchmark data provided by both Senmao and AMMWF contained two per-kilometer rates; therefore, to calculate the per kilometer benchmark Commerce took the average of the two rates. Baroque argues that Commerce should instead sum the component factors of each rate and then calculate an average benchmark price. However, Commerce relied on its normal practice, and Baroque does not identify any instance where Commerce used Baroque's proposed methodology to calculate an inland freight benchmark. Most importantly, Baroque does not identify any potential distortion or practical issue with Commerce's methodology, other than a claim that it is not Commerce's practice. Therefore, the Court should find Commerce's use of a simple average of the two per-kilometer rates provided by parties to arrive at a per-kilometer benchmark rate for

inland freight is reasonable and supported by substantial evidence.

Third, Commerce's determination to apply an adverse inference based on the government of China's failure to provide requested information regarding the EBC program was supported by substantial evidence and in accordance with law.  In accordance with the standard this Court established in *Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021), Commerce provided a thorough explanation identifying what information was missing from the record that the government of China failed to provide, why this information was necessary for Commerce to verify claims that respondents did not benefit from the EBC program, and why no other sources of information would be sufficient to make that verification.  Although Baroque provided certifications from customers that they did not use the EBC program, it did so only for a minority of its customers.  Commerce reasonably determined, in accordance with this Court's precedents, that this was insufficient.  *See Cooper (Kunshan) Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287, 1318 (Ct. Int'l Trade 2022).

Finally, Commerce's determination that certain input suppliers of the respondents are government authorities within the meaning of 19 U.S.C. § 1677(5)(B) is supported by substantial evidence and in accordance with law.  The record includes a memorandum by an international trade analyst explaining that the government of China exercises significant control over economic activity in China.  IDM at 56; *see also* Public Bodies Memorandum (P.R. 167-186).  Therefore, Commerce requested certain information from the government of China to demonstrate whether the government or Chinese Communist Party persons or organizations exercise control in any of the reported input suppliers.  The government of China did not provide the requested information. Though the government of China did provide certain information from a small subset of the input suppliers, Commerce reasonably determined that this information was insufficient to demonstrate

freedom from government or Chinese Communist Party control for each of the input suppliers in question.

## ARGUMENT

### I.    Standard Of Review

Commerce's determinations, findings, or conclusions in a countervailing duty proceeding are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001). Substantial evidence is "more than a mere scintilla" and is evidence that "a reasonable mind might" accept as adequate. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (citation omitted). The agency's findings may be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. *Id*. at 1308-09. The Court must sustain the determination if it is "reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion." *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004).

### II.    Commerce's Calculations Of The Benchmark Prices For Plywood And Veneer Are Supported By Substantial Evidence And Otherwise In Accordance With Law

Baroque argues that when calculating the benchmark prices for plywood and veneer, Commerce should not have included UN Comtrade data and should have relied exclusively on ITTO data that were more narrowly tailored to the products at issue. Baroque Br. at 11-21. However, Commerce reasonably determined to include the robust global UN Comtrade data

rather than to rely solely on the ITTO data, which was a narrow dataset of prices from only Brazil and Peru for plywood, and from only Ghana and Peru for veneer.

## A.   <u>Legal Framework For Calculating Benchmark Prices</u>

When foreign entities export goods to the United States, countervailing duties are applied to offset subsidies provided to the exporters by foreign governments.  Under the countervailing duty statute, a subsidy requires that the exporter receive a "benefit."  19 U.S.C. § 1677(5)(B). Among other things, a benefit is conferred where "goods…are provided…for less than adequate remuneration." *Id.* § 1677(5)(E)(iv).  In determining whether government-subsidized goods have been provided for less than adequate remuneration, Commerce must identify a benchmark price (market price) to compare with the price of the goods receiving a government subsidy.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (*Essar II*).  If the exporter is receiving government-subsidized goods for less than the benchmark price, it is receiving a "benefit."

Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good. . . resulting from actual transactions."  19 C.F.R. § 351.511(a)(2)(i).  This is known as a "tier 1" benchmark.  *See Essar II*, 678 F.3d at 1273.  When using a tier 1 benchmark, the goal is to identify actual transactions within the relevant market, and to define that market as specifically as possible, in order to most accurately reflect the price of the specific product at issue.

However, when data for actual transactions within the relevant market are not available, Commerce calculates a "tier 2" benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(ii), which provides:

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by

> comparing the government price to a world market price where it is
> reasonable to conclude that such price would be available to
> purchasers in the country in question.  Where there is more than one
> commercially available world market price, {Commerce} will
> average such prices to the extent practicable, making due allowance
> for factors affecting comparability.

In other words, where actual data from the market at issue are not available, Commerce uses broad, worldwide data and takes the average of that data to reasonably approximate the market price.  When calculating a tier 2 benchmark price, Commerce is not required to use data for products that are "nearly identical" to the product purchased by the exporter.  *See Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014).  Rather, the regulation requires only "that the selected benchmarks be comparable."  *Id.*  (concluding that Commerce could use a general benchmark price for sulfuric acid, without differentiating by grade); *see also Essar II*, 678 F. 3d at 1273-74 ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue.").  If Commerce determines that multiple datasets are sufficiently reliable and representative, "Commerce must average all commercially available world market prices to arrive at the benchmark figure."  *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade 2010) (*Essar I*) (citing 19 C.F.R. § 351.511(a)(2)(ii)).

"The factors relied upon by {Commerce} when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a case-by-case basis."  *See e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM at Comment 6.  "The court's role is not to assess whether the benchmark data Commerce used was

the 'best available,' but rather whether Commerce's choice was reasonable." *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) (citing *Peer Bearing Company-Changshan v. United States*, 298 F. Supp. 2d 1328, 1336 (Ct. Int'l Trade 2003)).

**B.     Commerce's Calculation Of The Benchmark Price For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

In its final results, Commerce averaged record UN Comtrade data and International Tropical Timber Organization (ITTO) data for purposes of calculating plywood benchmark prices to compare to the prices of plywood purchased by respondents during the period of review.  IDM at 87-92.  This was a reasonable methodology that was supported by substantial evidence and in accordance with the legal framework described above.

The record included a UN Comtrade dataset, submitted by AMMWF and Senmao, consisting of data reported by about 90 countries for plywood transactions during the period of review.  *See* AMMWF Benchmark Pricing Information (Nov. 22, 2021) at 1-5, Exhibit 1-A (P.R. 256); Senmao Benchmark Pricing Information (Nov. 22, 2021) at Attachments 1-3 (P.R. 257). The UN Comtrade *See id.*  It also included an ITTO dataset, submitted by Baroque, including relevant plywood data from Brazil and Peru.  *See* Baroque Benchmark Pricing Information (Nov. 23, 2022) at 1-3, Exhibits 2 (P.R. 277).  Commerce determined that both datasets constituted market prices that were for comparable to the inputs purchased by respondents, and that would have been available during the period of review.  Commerce therefore took the average of both datasets to calculate its benchmark price for plywood.  *See* IDM at 86-87.

Baroque argues that Commerce's calculation of the benchmark price was unreasonable because it was not limited to data for C/CC grade plywood, and that Commerce should have therefore relied exclusively on the narrow ITTO dataset of prices for C/CC grade plywood from

Brazil and Peru.[2]  Baroque Br. at 6-17.  However, as explained above, Commerce's practice is to consider whether a dataset represents comparable—not identical—commercially available world market prices, and if so, to include it in the calculation of the benchmark, narrowing it to a more relevant subset if appropriate.  Here, Commerce determined that the UN Comtrade data, although not differentiated by grade, were usable as a world market price in its tier 2 benchmark because the UN Comtrade data indisputably contains the C/D grade plywood purchases by Baroque and is a broad world market price.  In the final results, Commerce averaged this robust UN Comtrade data with the ITTO data.  IDM at 86-88.  In this manner, Commerce fulfilled its obligation to "average {world market prices} to the extent practicable, making due allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).

Baroque cites various cases that, it argues, show that Commerce must only use "the most product-specific data in calculating benchmarks."  Baroque Br. at 6-11.  According to Baroque, these cases indicate that Commerce acted unreasonably in this instance by including UN Comtrade data at all, because those data were not differentiated by grade and therefore could not be limited to include exclusively grade C/CC plywood.  However, this argument confuses the standard for calculating tier 2 benchmarks with the standard for calculating tier 1 benchmarks.

A tier 1 benchmark draws on actual transactions from the actual relevant market, and it is therefore beneficial to choose transactions that are as similar to the product at issue as possible.  A tier 2 benchmark, however, is calculated when real transactions from the relevant market are not available, such that they are necessarily drawn from other markets that may have different prices.

---

[2]  In this review, Commerce used the "Brazil – Parica Domestic Plywood Prices," "Brazil – Pinewood EY Exports," and "Peru Plywood" categories from the ITTO data submitted by respondents.  *See* IDM at 86.  Baroque's brief references the use of the "Pine Plywood EU Market" category and does not mention the "Brazil – Parica Domestic Plywood Prices" or "Brazil – Pinewood EY Exports" categories.  Baroque Br. at 12-17.  We believe this is an inadvertent error by Baroque.

Accordingly, rather than using a narrowly tailored dataset that may differ from the actual prices in the relevant market for any of number reasons, Commerce draws on global datasets and takes the average, as required by 19 C.F.R. § 351.511(a)(2)(ii), to approximate a reasonable benchmark price. Commerce tailors those global datasets to the extent possible by using only the subheadings of the data that match the product at issue. Baroque asks Commerce to ignore the robust global datasets entirely and to rely only on narrow datasets from two limited geographic regions, because, according to Baroque, Commerce must use the most product-specific data in calculating benchmarks. Riverside Br. at 11. Baroque's proposed method, however, is inconsistent with 19 C.F.R. § 351.511(a)(2)(ii).

Baroque's characterization more accurately describes the tier 1 approach and completely ignores the importance of drawing from a broad global dataset in a tier 2 calculation. A closer look at the cases on which Baroque relies makes this distinction clear. First, Baroque cites *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (Ct. Int'l Trade May 12, 2022), for the proposition that Commerce must use "the most accurate data available." Baroque Br. at 7-8. However, in *Risen*, the Court *rejected* precisely what Baroque is now asking Commerce to do: rely on a narrow, geographically limited dataset in a tier 2 benchmark calculation. The Court in *Risen* found that Commerce had erred by relying exclusively on a dataset of transactions between the United States and China, rather than finding a "world market price" as required by the regulation. *Id.* at 1378. The Court reasoned that this dataset was "sourced from limited samples," and that including it in the calculation risked "overvaluing the United States to China route data." *Id.* at 1379. The same result would occur here were Commerce to rely only upon a narrow subset of ITTO data from two regions, and disregard the global UN Comtrade dataset. Accordingly, while it is true that the Court in *Risen* emphasized the importance of using data that contributed to

the "accuracy" of the benchmark price, "a more accurate world market price" was achieved by including *broader* datasets, not a narrower, geographically limited dataset.

Baroque then cites decision memoranda from several past countervailing duty reviews to argue that Commerce selects "the most product-specific benchmark possible for use in LTAR calculations." Baroque Br. at 8-9. However, again, the cases it cites do not undermine, and indeed are consistent with Commerce's calculation in this case.

For instance, Baroque cites *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM at Comment 3, for the proposition that Commerce should narrow further from the dataset in the UN Comtrade data because, in Baroque's opinion, such narrowing would result in the use of the narrowest dataset possible. In that case, Commerce found two datasets it could use for a tier 2 calculation: UN Comtrade data that were less product-specific (including various sorts of aluminum products), but that had the advantage of being reported on a monthly basis, and more narrowly tailored HIS Markit data that more accurately represented the specific product in question (aluminum frames) but was reported only on an annual basis. *Id.* Commerce considered it to be a "strength" that the HIS Markit data was more narrowly tailored, but ultimately it averaged both datasets to arrive at its benchmark price. Here, Commerce did the same, averaging the more robust Comtrade data with the more narrowly tailored ITTO data. Thus, Commerce's reasoning in *Crystalline Silicon Photovoltaic* case supports Commerce's practice here, and does not support the argument that a global dataset should be thrown out entirely in favor of a narrower dataset that is limited to two specific geographical regions.

Next, Baroque cites *Certain Uncoated Paper from the People's Republic of China: Final*

*Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 2, 2016), and accompanying IDM at 3, again arguing that it supports discarding the UN Comtrade data to arrive at a more narrowly tailored dataset. But in that case, Commerce explained that it tailored a *global* dataset by using the HTS categories that represented the grades of paper used by the respondent, explaining that Commerce will "deriv{e} benchmark prices by grade *when such data are available*." *Id.* (emphasis added). This is consistent with Commerce's practice, and with what Commerce has done in this proceeding. In the prior review of this order, Commerce removed certain HTS subheadings from a UN Comtrade dataset covering wood species shown by respondents not to properly represent their plywood purchases. *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021). Commerce has used the same narrowed set of HTS subheadings in this review, consistent with its practice. *See* IDM at 86, PDM at 40-42. In other words, Commerce has narrowed the UN Comtrade dataset to the most product-specific HTS categories. Now, the parties go too far: they do not argue that Commerce should *more* narrowly tailor the UN Comtrade dataset, but instead argue that, now that the UN Comtrade data cannot be more narrowly tailored, Commerce should ignore the dataset completely and rely on a narrow dataset from only two countries. *See* Baroque Br. and Fine Furniture Br. This would be inconsistent with Commerce's regulations and practice. Commerce is not required to discard the UN Comtrade dataset entirely only because that data could not be filtered by grade in the manner preferred by the respondent.

Baroque also cites another case where Commerce relied on a dataset limited to the specific species of timber used by the respondent. Baroque Br. at 8 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative*

*Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Dep't of Commerce Sept. 27, 2010)).

Again, it is true that Commerce will narrow a benchmark by species or grade when those data are

available, but in this case, Commerce could not filter the UN Comtrade dataset by grade.

Baroque then cites a case where Commerce calculated a benchmark price for purposes of

upstream subsidy calculations under 19 C.F.R. § 351.523(c)(1) by finding an appropriate

"surrogate" market.  Baroque Br. at 8-9 (citing *Final Results of Countervailing Duty New Shipper*

*Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Dep't of

Commerce Sept. 28, 2005), and accompanying IDM at Comment 1).  This case is inapposite.

Calculating surrogate values in the context of upstream subsidy calculations is an entirely distinct

process from calculating average world market prices for a tier 2 benchmark under 19 C.F.R.

§ 351.511(a)(2)(ii), *see id.* at Comment 5, and the cited standard is irrelevant to the calculation

Baroque is challenging here.

Baroque next argues that Commerce has "reject{ed} non-product specific HTS categories

in favor of more product-specific benchmarks."  Baroque Br. at 9 (citing *Countervailing Duty*

*Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative*

*Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM at Comment 16;

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing*

*Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), and accompanying IDM at Comment

15; *Multilayered Wood Flooring from the People's Republic of China: Final Results; 2017*, 85

Fed. Reg. 76,011 (Nov. 27, 2020), and accompanying IDM at Comment 6 (prior review of the

countervailing duty order at issue here)).

In *Aluminum Foil from China*, the record included a Global Trade Atlas dataset consisting

of two subheadings, and Commerce reasonably determined to only the data from the subheading

that matched the input used by the respondent.  *Aluminum Foil from China* IDM at Comment 16.

In *Woven Sacks from China*, Commerce used World Trade Atlas data but narrowed it to "the most

specific harmonized tariff category available" available, and excluded data from a single country

based on evidence that that country's data was an overbroad "basket category."  *Woven Sacks*

*from China* IDM at Comment 15.  Finally, in the prior review of the countervailing duty order on

multilayered wood flooring from China cited by Baroque, Commerce relied on a UN Comtrade

database but removed specific subheadings that were inapplicable.  In short, all these cases

illustrate that Commerce will narrow a global dataset to the extent possible, but in none of them

did Commerce discard a global dataset entirely when it could not be further narrowed.

Finally, Baroque cites two instances where Commerce narrowed price datasets by grade to

calculate tier 1 benchmarks, but these cases are inapposite in the tier 2 context.  *See* Riverside Br.

at 10-11 (citing *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey:*

*Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg.

6,866 (Jan. 25, 2021), and accompanying IDM at Comment 1; *Circular Welded Austenitic*

*Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing*

*Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), and accompanying IDM at 21).  As

explained above, Commerce calculates a tier 1 benchmark by finding the most representative

transactions in the actual relevant market, which typically involves using the most product-

specific data available.  Commerce could not calculate a tier 1 benchmark in this case because

China is considered a non-market economy.  It therefore applied the entirely different tier 2

process for calculating a *global* benchmark.  In addition, Commerce explained in *CWP From*

*Turkey* that even in a tier 1 calculation, it delineates by grade only "when such data are available."

*CWP From Turkey* IDM at Comment 1.  In this case, the UN Comtrade data are a broad global

dataset covering all grades of plywood purchased by Baroque during the period of review, but were not differentiated by grade, such that Commerce could only tailor the data by grade if it discarded the global dataset entirely.  Finally, part of the reason Commerce distinguished by grade in *Pressure Pipe from China* was that it found certain grades "incompatible with the production process used to produce {subject merchandise}." *Pressure Pipe from China* IDM at 21.  Here, however, Commerce found that respondents had not shown that the additional grades of plywood included in the UN Comtrade dataset would be incompatible with producing multilayered wood flooring.  Accordingly, Commerce found the UN Comtrade data to be a usable world average dataset.  IDM at 86.

In sum, Baroque's argument relies on a mischaracterization of the legal standard for a tier 2 benchmark calculation.  In a tier 2 calculation, Commerce's goal is to find robust data from worldwide markets and then to narrow those data to the extent it is able to do so to reflect the appropriate product.  IDM at 86.  Here, Commerce reasonably included in its calculation a  global dataset from UN Comtrade that i cover the grades of plywood purchased by Baroque.  To discard that global dataset entirely in favor a far more limited dataset from only Brazil and Peru, simply because that dataset is, according to Baroque, more product-specific, would turn the tier 2 process on its head and result in the same error the Court identified in *Risen*: giving undue weight to a specific regional dataset rather than calculating an average world market price as required by the regulation.

### C. Commerce's Calculation Of The Benchmark Price For Veneer Is Supported By Substantial Evidence And Otherwise In Accordance With Law

In its final results, Commerce averaged record UN Comtrade and International ITTO data to calculate two separate veneer benchmark prices, one for backboard and one for face veneer, to compare to the prices of veneer purchased by respondents during the period of review.  IDM at

91-92.  This calculation is supported by substantial evidence and in accordance with law.

Similar to plywood, the record included UN Comtrade data for veneer provided by AMMWF, as well as ITTO data for veneer from Peru and Ghana provided by Baroque.  *See* AMMWF Benchmark Pricing Information (Nov. 22, 2021) at 1-5, Exhibit 1-C (P.R. 256, 268); Baroque Benchmark Pricing Information (Nov. 23, 2022) at 1-3, Exhibit 2 (P.R. 277).  Based on record evidence provided by Baroque, Commerce determined that backboard veneers and face veneers differ sufficiently that separate price benchmarks would most accurately calculate the benefit of each type of veneer provided for less than adequate remuneration.  IDM at 91.  However, only the ITTO data from Ghana was differentiated by whether it represented backboard or face veneer.  *See* Baroque Benchmark Pricing Information (Nov. 23, 2022) at Exhibit 2 (P.R. 277 at PDF page 53.  Accordingly, when calculating the tier 2 benchmark for backboard veneer, Commerce excluded the ITTO data from Ghana for face veneer.  Similarly, when calculating the tier 2 benchmark for face veneer, Commerce excluded the ITTO data from Ghana for backboard veneer.  But Commerce was then faced with a choice similar to the choice it faced for plywood: to include a robust global dataset of UN Comtrade data, along with ITTO data from Peru, even though those datasets were not as narrowly tailored as would be ideal, or to rely entirely on data from a single country as representing a "world market price."  19 C.F.R. § 351.511(a)(2)(ii).  Once again, Commerce reasonably chose to include the less differentiated data.  IDM at 92.

Baroque argues that including the UN Comtrade data in both of Commerce's benchmark calculations is distortive since it includes both backboard and face veneers.  *See* Baroque Br. at 17-21.  However, Commerce found that the record did not show that the UN Comtrade data are unrepresentative of backboard or face veneer purchases.  IDM at 92.  Rather, Commerce found that the data include and sufficiently describe both sets of veneer, making it suitable for inclusion

in both benchmarks.  IDM at 92.  Given that it could not further tailor the UN Comtrade data as it would if there were sufficient evidence to do so, Commerce concluded that it would be unreasonable, given its obligation to take the average of all "commercially available world market price{s}," to completely discard the UN Comtrade data.  *See Essar I*, 721 F. Supp. 2d at 1293 (citing 19 C.F.R. § 351.511(a)(2)(ii)).  Although Baroque argues that the UN Comtrade data's inclusion introduces potential distortion into the benchmark calculations since it includes both backboard and face veneers, *see* Baroque Br. at 20, solely relying on the much narrower ITTO data for Peru and Ghana would also create potential distortion.  IDM at 86-87.  Commerce's inclusion of multiple datasets is therefore reasonable, and it is in accordance with the goal of the tier two regulation of avoiding reliance upon singular and narrow data sources.

Further, as Commerce noted in the IDM, the argument that it was unreasonable for Commerce to include the UN Comtrade data is undermined by the fact that Baroque itself submitted the ITTO data from Peru, which also failed to differentiate between face veneer and backboard veneer.  *See* IDM at 92 (citing Baroque Benchmark Pricing Information at Exhibit 2 (P.R. 277 at PDF page 53)).[3]  In fact, Baroque entirely fails to address the fact that if the Court accepts Baroque's argument that datasets including both face and backboard veneer must be excluded, Commerce would be required to exclude the Peru data and rely entirely on the data from Ghana.  Baroque instead urges Commerce to exclude the UN Comtrade data because it includes both face and backboard veneer, but to continue relying on Peru data that have the exact

---

[3]  In its brief, Baroque appears to have misunderstood the IDM.  The IDM explained that Baroque "provided benchmark information that included both core and face veneer, undercutting its claims that the UN Comtrade data are unsuitable for this reason."  IDM at 92.  This is true.  However, Baroque writes that "there is no merit to Commerce's finding that because Baroque submitted UNComtrade data, such data are 'suitable.'"  Baroque Br. at 20.  But Commerce was not referring to UN Comtrade data provided by Baroque; it was referring to a subset of the ITTO data that Baroque has consistently indicated should be included in the benchmark calculations.

same issue.  This position is unreasonable on its face and should be rejected.

For these reasons and the reasons described in the previous section discussing plywood, Commerce's determination to include the UN Comtrade data in its tier 2 veneer benchmark calculations is supported by substantial evidence and in accordance with law.

III.    **Commerce's Calculation Of The Benchmark Price For Inland Freight Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

As part of its calculation of the value of the inputs received for less than adequate remuneration, Commerce calculated an inland freight benchmark to use for calculating the value of transporting those inputs from seaports to manufacturing facilities.  *See* PDM at 43-44; IDM at 97.  Commerce relied on benchmark data from the World Bank's *Doing Business in China 2020 Report*.  IDM at 101; PDM at 43 (citing AMMWF Benchmark Pricing Information (Nov. 22, 2021) at 4, Exhibits 5-A and 5-B (P.R. 256); Senmao Benchmark Pricing Information (Nov. 22, 2021) at 2, Attachment 9 (P.R. 257).  Commerce routinely uses the World Bank's "Doing Business" reports to calculate freight rates.  *See, e.g.*, *Certain Fabricated Structural Steel from China*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020), and accompanying IDM at 75 ("The Doing Business Russia provides a publicly available, broad market average freight rate, and we have consistently found the Doing Business publication to provide the best available information in other prior cases to value inland freight.").

The World Bank report provides "case studies" showing the cost of shipping a standardized, 15 metric ton import or export from a given city to the relevant port or border.  *See* Senmao Benchmark Pricing Information (Nov. 22, 2021) at Attachment 9, page 91 of report (P.R. 257).  For China, it includes case studies for both Shanghai and Beijing.  *Id.* at pages 82-89 of report.  The case studies indicate that it costs $219 to ship a theoretical 15 metric ton import to Shanghai from the nearest port (31 kilometers), and that it costs $395 to ship a theoretical 15

metric ton import to Beijing from the nearest port (182 kilometers). *Id.* at pages 84, 88 of report. Accordingly, the freight rates for each case study are $0.4710 per metric ton per kilometer (to Shanghai) and $0.1447 per metric ton per kilometer (to Beijing). Commerce took the simple average of these rates, $0.3078 per metric ton per kilometer, as a benchmark rate to use in its calculations. *See* Preliminary Calculations at Inland Freight Tab (P.R. 307) (unchanged in final results).

Baroque argues that it was unreasonable to take the simple average of the two freight rates, and that Commerce instead should have summed the constituent weight, distance, and cost factors comprising the two rates and then calculated an average. Baroque Br. at 21-23. However, Commerce's determination to take the simple average of the two inland freight rates provided by interested parties is reasonable and in accordance with the law. Indeed, Baroque does not actually challenge Commerce's method on its merits—other than saying without explanation that it is "unreasonable"—but rather relies entirely on the contention that Commerce has a "practice" of weight-averaging benchmarks. Baroque Br. at 21-23. However, Commerce makes innumerable kinds of calculations when determining benchmark prices in countervailing duty reviews, and it is a vast oversimplification to say that it has a "practice" of using only weighted averages. Rather, the specific methodology—including whether to use a simple or weighted average—depends on the specific context.

Moreover, Baroque provides only bare support for its assertion that Commerce always uses weighted averages when calculating benchmarks. It fails to identify a single case outside of this review. Further, Commerce used *both* weighted and simple averages in its calculations in this review, as it found appropriate based on the specific calculation at issue. *See, e.g.*, IDM at 63.

Commerce has also used simple averages elsewhere, as it did in *Boltless Steel Shelving*

*Units Prepackaged for Sale from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (Aug. 26, 2015), and accompanying IDM at Comment 7. Baroque argues that "Commerce's citation to *Boltless Steel Shelving* is wrong and misleading" because it does not specifically concern "the averaging of the inland freight benchmark or more generally data contained in *Doing Business in China 2020*." Baroque Br. at 22. This is completely beside the point. Baroque has failed to identify any established practice of using only weighted averages when calculating benchmark prices, and Commerce was simply showing that, on the contrary, its practice is to use simple averages where appropriate, depending on the specific factual and methodological circumstances.

Further, even if the Court were to consider whether a simple average is "unreasonable" in this context—despite Baroque's failure to demonstrate why—this argument is baseless. As explained above, the freight rates provided in *Doing Business in China 2020* are example case studies, not compilations of data from real transactions. In other words, while the freight rate for Beijing represents a longer route that the freight rate from Shanghai, it does not represent a larger quantity of underlying data.[4] Baroque offers no explanation why the rates should be weighted in accordance with its preferred method, or why doing so would more accurately reflect the actual value of transporting Baroque's imports. Notably, Baroque fails to mention that its own production facility is [            ] from the nearest port. Baroque Supp. Resp. at 5 (C.R. 78). If anything, it therefore appears that the 31 kilometer Shanghai route would more accurately

---

[4] In its administrative case brief, Fine Furniture cited the calculation of the plywood benchmark as an example of Commerce's "practice" of using weighted averages. Fine Furniture Administrative Br. at 17 (citing Prelim. Calc. Mem. Attach. 2, at Plywood Bench Tab (Public Version) (P.R. 307)). This appears to be the only concrete example that the parties have provided of this alleged practice. However, in that case, Commerce was taking the average of datasets of actual transactions, such that it was reasonable to weight the average so that larger quantities of data would be given greater weight. This rationale does not apply when averaging two rates that each reflect the sample cost of a single transaction.

reflect Baroque's freight costs than the 182 kilometer Beijing route.  Yet Baroque suggests, without any rationale, that the Beijing rate should be given almost six times the weight of the Shanghai rate by applying Baroque's preferred, but unexplained, methodology.

For these reasons, the Court should sustain Commerce's calculation of the benchmark inland freight rate.

**IV.     Commerce's Finding Of Use Of The EBC Program Based On An Adverse Inference Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce lawfully applied an adverse inference that respondents benefited from the Export Buyer's Credit (EBC) Program.  IDM at 30-41.  As explained above, the EBC Program is a program through which banks owned by the government of China provide loans at preferential rates to customers who purchase Chinese exports.  Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenor claim that respondents did not benefit from the program and that Commerce's determination is unsupported by substantial evidence and unlawful.  The record, however, demonstrates that Commerce repeatedly requested that the government of China provide information necessary for Commerce to assess whether respondents benefited from the EBC program, and that the government of China failed to do so.  IDM at 23-41.  Commerce could not obtain this information from any other source, despite its attempts to look to respondents' submitted information to fill in the gaps created by the government of China's failure to provide certain necessary information.  *Id.*  As a result, Commerce had no verifiable understanding of the EBC Program and could not determine whether respondents or their United States customers benefited from the program.  *Id.*  Commerce explained in detail the information missing from the record, the necessity of the information, and how lack of that information affected Commerce's ability to verify non-use of the program.  Commerce's application of an adverse inference is therefore supported by substantial evidence and in accordance with law.

A.    **Legal Framework**

Commerce applies facts otherwise available to fill gaps in the record if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party: (a) withholds information requested by Commerce; (b) fails to provide the information in the form or in the manner requested; (c) significantly impedes the proceedings; or (d) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2)(A)-(D).  When applying facts otherwise available in a countervailing duty proceeding, Commerce may apply an adverse inference if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b).  When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c).  Commerce may lawfully apply an adverse inference based upon the government of China's failure to provide requested information, even where the respondents cooperate.  *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014) (affirming Commerce's application of adverse inferences, despite the respondents' cooperation, when the government of China did not provide requested information); *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral impact on a cooperating party does not render the application of adverse inferences in a countervailing duty investigation improper).

An interested party fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  To avoid the application of adverse inferences, respondents should "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in

question." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (citing *Nippon Steel*, 337 F.3d at 1382).

The Court has addressed the EBC Program in the past and explained what is required to justify an adverse inference that respondents benefited from that program.  Recently, after surveying its decisions concerning the EBC Program, the Court summarized the applicable standard:

> {T}he Court has determined that to apply an adverse inference to find that a cooperating party benefitted from the {EBC program} based on the {government of China's} failure to cooperate, "Commerce must (1) define the gap in the record explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the {government of China} refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify."

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) (quoting *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019)).  Where Commerce provides a "thorough explanation of exactly why the missing information was necessary to verify {EBC program} non-use," that explanation "distinguishes {the} case from other cases where this court has held that Commerce failed to properly explain the need for the absent information." *Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, 2022 WL 4180886, at *6 (Ct. Int'l Trade Sept. 13, 2022) (citing, as an example, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1353 (Ct. Int'l Trade 2019)). Commerce met that standard here, as we explain below.

**B.** **Commerce's Use Of An Adverse Inference Based On The Government Of China's Failure To Report Requested Information Regarding The EBC Program Was Reasonable**

In past cases, the Court concluded that Commerce failed to make the requisite showing to

justify its use of adverse inferences concerning use of the EBC Program.  *See Guizhou Tyre*, 523

F. Supp. 3d at 1359-61.  However, we respectfully submit that Commerce has provided a

thorough and reasoned explanation of its determination in this review that addresses the concerns

raised in prior decisions of this Court.  Indeed, this Court has accepted essentially the same

explanation as adequate in other instances.  *See e.g.*, *Cooper*, 610 F. Supp. 3d at 1308-22.

### 1.    The Government of China Failed To Provide Requested Information Regarding The EBC Program

Commerce explained in the final results exactly which information is missing from the

record that led Commerce to rely on facts otherwise available, and ultimately to make an adverse

inference that respondents benefited from the EBC program.  *See* IDM at 30-32.

Commerce issued its initial countervailing duty questionnaire to Baroque, Senmao, and

the government of China on March 23, 2021.  *See* 2019 Countervailing Duty Administrative

Review of Multilayered Wood Flooring from the People's Republic of China: Countervailing

Duty Questionnaire (March 23, 2021) (Initial Questionnaire) (P.R. 78).  Commerce requested that

the government of China provide, among other things: the original and translated copies of laws,

regulations or other governing documents for the EBC program; a list of all partner/correspondent

banks involved in disbursement of funds under the program; and, if the government of China

claimed that no customer respondent used the buyer credits, a detailed explanation of the steps it

took to determine that the program was not used and to identify the documents, databases,

accounts, etc., that were examined to determine there was no use.  *See* IDM at 30 (citing Initial

Questionnaire at II-12).

The government of China did not comply with these requests.  In response to the request

for governing documents for the EBC program, the government of China provided the China EX-

IM Bank's 2000 Administrative Measures governing the EBC program, as well as detailed

implementation rules governing that program issued in 1995.  IDM at 30-31 (citing Government

of China Initial Questionnaire Response (China IQR) at Exhibits Export-2 and Export-3 (P.R.

115, 126)).  It maintained that these rules demonstrate that if there is an EBC loan provided by the

EX-IM Bank, the Chinese exporter and the United States importer are both involved and can

verify usage.  *Id.*  Specifically, the government of China stated that in accordance with the

provided rules, the EX-IM Bank must "investigate and verify the performance capability of the

Chinese exporters in its loan evaluation and approval proceeding."  China IQR at 26); IDM at 31.

Further, the government of China represented that the EX-IM Bank makes disbursements for the

EBC program by debiting the buyer's account and crediting the funds to the exporters, after it

receives the shipping documents from the exporter.  *Id.*  It also stated that the EX-IM Bank must

notify the buyer of this disbursement on the day it occurs.  *Id.*  Thus, according to the government

of China, the exporter receives the money directly from the EX-IM Bank and would therefore be

aware of receiving the benefits of the EBC Program.

However, the government of China did not provide *all* governing documents, as requested.

In a previous review concerning silica fabric from China, the government of China stated that in

2013, revisions were made to the EX-IM Bank's Administrative Measures, and these revisions

were one of three relevant documents pertaining to the EBC program.  IDM at 27 (citing

*Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's*

*Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 8,405 (January 25, 2017)

(*Silica Fabric from China*), and accompanying IDM at Comment 17); *see also* China IQR at

Exhibit Export-1 (copy of government of China's relevant response in *Silica Fabric from China*)

at 3 (P.R. 126) (acknowledging that "the Export-Import Bank adopted in 2013 certain internal

guidelines").  However, the government of China did not provide a copy of 2013 revisions to the

EX-IM Bank's Administrative Measures in its initial questionnaire response.  *See* IDM at 31-32; China IQR at 25.

Further, the government of China responded to Commerce's request for a list of all partner/correspondent banks involved in the EBC program by stating that the question is "not applicable" because "none of the U.S. customers of the respondents used the alleged program." China IQR at 25 (May 20, 2021) (P.R. 115).

Finally, the government of China did not comply with the request that it "identify the documents, databases, accounts etc. that were examined to determine there were no use."  China IQR at 25-28.  It merely asserted that it "determined" that respondents' customers did not use receive EBC loans "through a process in which the respondents provided their U.S. customer lists to {the government of China}." China IQR at 26 (P.R. 115).  It also asserted that the EX-IM Bank "searched it records" to confirm non-use.  *Id.*  However, the government of China failed to provide any further specificity, and certainly did not identify the specific documents, databases, or accounts it examined to make its determinations.

In a supplemental questionnaire, Commerce gave the government of China another opportunity to provide the missing information.  This time, it specifically requested the government of China provide a copy of the 2013 revisions to the EX-IM Bank's Administrative Measures.  *See* Section II Supplemental Questionnaire at 3-4 (P.R. 139).  It also repeated its request for a list of all partner/correspondent banks involved in disbursement of funds under the EBC program.  *Id.*  Further, it asked the government of China to "explain in detail" the steps it took to verify non-use of the EBC program, and reiterated that this should include identification of "the documents, databases, accounts etc. that were examined."  *Id.*  The government of China responded, as it did in its initial response, that the 2013 revisions and a list of

partner/correspondent banks were "not necessary."  Government of China Section II

Supplemental Questionnaire Response at 4 (P.R. 154); *see also* IDM at 31.  It did not provide

further details on its process of verifying that respondents did not benefit from the EBC program.

*Id.* at 5-6.

Thus, the government of China clearly failed to provide requested information, including

the 2013 revisions to the Administrative Measures, a list of partner/correspond banks, or an

explanation of how it searched its records to verify non-use.

### 2.       The Withheld Information Was Necessary To Verify Non-Use

Commerce also offered a thorough explanation of why the withheld information prevented

it from verifying non-use of the EBC program.  As Commerce explained, in prior investigations,

based on Commerce's understanding of the program at that time, verification of non-use appeared

to be possible through examining the financial statements and books and records of United States

customers for evidence of loans provided directly from the China EX-IM Bank to those

customers.  IDM at 32 (citing *Chlorinated Isocyanurates from the People's Republic of China:*

*Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't of

Commerce Sept. 22, 2014), and accompanying IDM at 15).  However, since that time, Commerce

has determined that it is not able to verify non-use by examining records of U.S. customers

because intermediary banks can be involved, and the government of China has refused to provide

the identities of those banks to Commerce.  IDM at 32.

As Commerce further explained, it obtained information in another countervailing duty

proceeding suggesting that, following the 2013 revisions to the EX-IM Bank's Administrative

Measures, the EX-IM Bank may now disburse export buyer's credits directly or through third-

party partner and/or correspondent banks. IDM at 32-33 (citing *Carbon and Alloy Steel Threaded*

*Rod from the People's Republic of China: Preliminary Affirmative Countervailing Duty*

*Investigation and Alignment of Final Determination with Final Antidumping Duty Determination*,

84 Fed. Reg. 36,578 (Dep't of Commerce July 29, 2019), and accompanying PDM at 9)).

      As part of this review, the government of China provided a copy of one of its

questionnaire responses in *Silica Fabric from China*, which includes the government of China's

admission that the EX-IM Bank sometimes issues EBC loans through third-party banks.  The

government of China explained:

> According to the Ex-Im Bank, in order to make a disbursement, the Ex-Im
> Bank lending contract requires the buyer (importer) and seller (exporter)
> to open accounts with either the Ex-Im Bank or one of its partner banks.
> While these accounts are typically opened at the Ex-Im Bank, *sometimes a*
> *customer prefers another bank (e.g., the Bank of China) which is more*
> *accessible than an account with the Ex-Im Bank*."

China IQR at Exhibit Export-1 at pages 4-5 (P.R. 126) (emphasis added). Accordingly, the

available record evidence indicates that under the EBC program, credits are not necessarily direct

transactions from the China Ex-Im Bank to the United States customers of the respondent

exporters; rather, intermediary banks can be involved.  IDM at 33.

      As a result, verifying whether the "manufacture, production, or export" of the company

respondents' merchandise has been subsidized would require knowing the names of the

intermediary banks; it would be their names, not the name "China EX-IM Bank," that would

appear in the subledgers of the United States customers if they received the credits.  *Id.*

Accordingly, the government of China's refusal to provide the names of intermediary banks, or

sample EBC documents that would help Commerce identify EBC transactions, prevented

Commerce from reviewing financial documents from respondents' customers to verify non-use.

### 3.     No Other Information In The Record Or Provided By Respondents Could Verify Non-Use Of The EBC Program

      Finally, Commerce gave a detailed explanation as to why it could not verify non-use of

the EBC program through other evidence in the record, or other evidence in the possession of the

respondents.

The key missing information, as explained in the previous section, is the list of banks that may have disbursed loans to respondents' United States customers. This information can only be provided by the government of China because it is only known by the originating bank, the China EX-IM Bank, which is a government-controlled bank. IDM at 35 (citing *Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (October 20, 2014), and accompanying IDM at 31 (confirming that the government of China solely owns the China Ex-Im Bank)). Therefore, without cooperation from the China EX-IM Bank and/or the government of China, Commerce cannot learn the identities of the banks that could have disbursed EBC loans to the respondents' customers. *Id.* at 35-36. As a result, as this Court has previously acknowledged "only the government of China, and in particular the {China} Ex-Im {Bank}, could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {period of review} from the EBC Program." *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016).

There was no reasonable way for Commerce to verify non-use relying only on other record evidence, which Commerce extensively explained in the final results. *See* IDM at 35-37. In its typical non-use verification procedure, Commerce examines a company's subledgers for references to any party that might have issued it a loan through the EBC program. *Id.* Without knowing the identities of the correspondent banks who make such loans, this would be extremely onerous, if not impossible. Commerce would be required to comb through the business activities of respondents' customers without any guidance as to how to identify loans or banks that might be related to the EBC program and should therefore be subject to scrutiny. *Id.* Because it could

32

not identify such loans or banks, Commerce would be required to view the underlying documentation for all entries from the subledger to attempt to confirm the origin of each loan.  *Id.*

Nor could Commerce accept the government of China's assertion that respondents did not benefit from the EBC program.  Commerce "understandably doesn't take the government of China's representations on faith."  *Fujian Yinfeng*, 2022 WL 4180886, at *6 n.5.  Further, as explained above, the government of China was repeatedly asked to provide a detailed explanation of *how* it had verified non-use, and it refused to do so.  *See id.* at *6 (sustaining Commerce's use of an adverse inference regarding the EBC program in part because "this representation by the Chinese government failed to provide any documentation to show on what basis the purported search was conducted—or even if it really was").  It claimed that the EBC program process is such that an exporter is always aware of the EBC loans and therefore able to confirm non-use, but, as also explained above, it was unwilling to back up this claim by providing all of the governing rules and regulations, most notably by withholding the 2013 revisions to the EX-IM Bank's Administrative Measures.  *See* Government of China's Supp. Section II Response at 4-6.

Accordingly, Commerce could not rely on other evidence to fill the gap because the sole party in possession of the necessary information refused to provide it.

Baroque argues that it provided sufficient evidence for Commerce to find that its customers did not use the EBC program.  Baroque Br. at 42; *see also* Fine Furniture Br. at 14-15.  According to Baroque, this consisted of statements of non-use and customer declarations of non-use.  Baroque Br. at 42.  However, a mere statement by a respondent is not enough to establish a fact.  Rather, Commerce is entitled to "verify factual information" that it relies on in a countervailing duty proceeding.  19 C.F.R. § 351.307.  For the same reason, certificates of non-use by customers may not be sufficient.  *See Fujian Yinfeng*, 2022 WL 4180886, at*4, *6

(upholding Commerce's application of an adverse inference "even though Yinfeng reported no

receipt of {EBC program} benefits and submitted certifications of non-use from its customers").

  However, we recognize that this Court has, in numerous decisions, directed Commerce to

consider whether any available information provided by respondents may be sufficient to fill the

gap of missing record information in considering claims of non-use of the EBC program.  *See*

IDM at 37.  Therefore, it considered whether Baroque's non-use certifications might enable it to

verify that Baroque did not benefit from the EBC program.  However, Baroque only submitted

non-use certificates from a minority of its customers.  IDM at 37 (citing Baroque Initial

Questionnaire Response at Exhibits 18a, 18b (C.R.37)).  To verify use (or non-use) of the EBC

program, *all* of the respondent's United States customers must be willing to participate in the

review because an exporter would receive a benefit even if only some of its customers received

EBC loans.  IDM at 37.  This Court has acknowledged that Commerce's practice of finding

partial certifications insufficient to verify non-use of the EBC program is "consistent with the

Court's treatment of incomplete certifications."  *Cooper (Kunshan) Tire Co., Ltd. v. United

States*, 610 F. Supp. 3d 1287, 1318 (Ct. Int'l Trade 2022).  It has also explained that Commerce

has no obligation to send questionnaires to respondents requesting comprehensive non-use

certifications before making an adverse inference, because it is "bas{ing} its application of {an

adverse inference} on the {government of China's} noncooperation and not on any need for

certifications from customers to verify the EBCP in the first place."  *Id.*  Accordingly, Commerce

reasonably applied an adverse inference despite Baroque's non-use certifications.

  Fine Furniture argues that Commerce failed to explain why it could not "adjust the {EBC

program} rate to account for the level of customer compliance."  Fine Furniture Br. at 15.

However, Fine Furniture did not raise this issue of adjusting the EBC program rate in its case

brief before Commerce, *see* Fine Furniture Admin Br. (Feb. 18, 2022) at 2-9 (P.R. 345), nor did any other party in the review.  "{T}he Court of International Trade generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quoting *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F.Supp.2d 1191, 1205 (Ct. Int'l Trade 2004); *Pohang Iron & Steel Co. v. United States*, 23 Ct. Int'l Trade 778, 792 (1999)). Therefore, this Court should hold that Fine Furniture has failed to exhaust its administrative remedies with respect to this issue, which is not a pure question of law and would not have been futile to raise before the agency.  *See Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002) (explaining that exhaustion is required except in particular circumstances such as futility, intervening case law, pure questions of law, or the agency's departure from clearly applicable precedent).  In any event, Fine Furniture does not develop this argument further.  For example, it does not specify what type of adjustment it is advocating. Accordingly, the Court should reject this argument.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases illustrating that where party failed to include "developed argument" in opening brief, the argument was waived).

In sum, Commerce explained what information the government of China failed to provide, why that information was necessary to verify non-use, and why no other available information could fill that gap.  The facts of this case are distinct from those where this Court set aside Commerce's determination because the respondent had provided the necessary information, or where Commerce failed to provide a reasoned explanation for why the information would be necessary.  *See, e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1291-93 (Ct. Int'l Trade 2020) (sustaining on remand determination that respondents did not use

program where Commerce did not ask any questions to attempt verification); *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1353 (Ct. Int'l Trade 2020) (holding on remand that substantial evidence did not support applying an adverse inference where Commerce did not analyze whether the missing information actually impacted its ability to verify); *Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1349-53 (Ct. Int'l Trade 2019) (holding application of an adverse inference of use and benefit was unsupported by substantial evidence where Commerce failed to explain why missing information was necessary); *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l Trade 2018) (finding lack of substantial evidence where Commerce failed to make initial finding that claimed missing information would be necessary). Unlike those cases, here Commerce did in fact detail what information it needed: the revised EX-IM Bank Administrative Measures, the list of participating banks, and a detailed description of how the government of China had confirmed that respondents did not benefit from the EBC program.

Thus, Commerce reasonably found that the government of China withheld necessary information that was requested of it which resulted in necessary information not being available on the record of this review, and that the government of China significantly impeded the proceeding. IDM at 39. Accordingly, Commerce must rely on facts otherwise available in filling the gap. 19 U.S.C. § 1677e(a)(1), (a)(2)(A), and (a)(2)(C). *Id.* In addition, for the reasons explained, Commerce lawfully found that an adverse inference is warranted in the application of facts available, pursuant to 19 U.S.C. § 1677e(b), because the government of China did not act to the best of its ability in providing the necessary information to Commerce. Commerce's use of an adverse inference to determine that it is unable to verify non-usage of the EBC program is therefore reasonable and supported by substantial evidence on the record.

V.   **Commerce's Finding That Certain Input Suppliers Are Government Authorities Based On An Adverse Inference Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law**

Commerce's use of an adverse inference that certain input suppliers are government authorities is supported by substantial evidence and in accordance with law. A subsidy may be found where an authority provides a financial contribution "to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B).  An authority is defined as "a government of a country or any public entity within the territory of the country."  19 U.S.C. § 1677(5)(B).  Congress has not defined "public entity," leaving it to Commerce to supply a reasonable interpretation of the term. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2015).

In the initial questionnaire, Commerce requested information regarding the ownership of the input producers identified by the respondents, including articles of incorporation, capital verification reports, articles of groupings, company by-laws, annual reports, articles of association, business group registrations, business licenses, and tax registration documents.  *See* Initial Questionnaire at II-5 – II-9, II-24 – II-28, II-38 – II-42 (P.R. 78); IDM at 54-55.  Moreover, Commerce requested information concerning whether any individual owners, board members, or senior managers involved with these producers were government or Chinese Communist Party officials and the role of any Chinese Communist Party primary organization within the producers. *Id*.  Specifically, to the extent that the owners, managers, or directors of a producer are Chinese Communist Party officials or are otherwise influenced by certain Chinese Communist Party-related entities, Commerce requested information regarding the means by which the government of China may exercise control over company operations and other Chinese Communist Party-related information to determine if the input suppliers should be considered authorities for purposes of Commerce's calculations.  *Id*.  Commerce explained its understanding of the Chinese

Communist Party's involvement in China's economic and political structure in current and past China countervailing duty proceedings, including why it considers the requested information regarding the Chinese Communist Party's involvement in China's economic and political structure to be relevant. *Id.* (citing Commerce Memorandum (Oct. 5, 2021) at Attachment I (Public Bodies Memorandum) (P.R. 167-186)).

In its initial response, the government of China confirmed the identity of companies that produced and supplied inputs to the mandatory respondents, as reported by the mandatory respondents. IDM at 55 (citing China's IQR at Exhibits CUT-1, CUT-2, VEN-1, VEN-2, PLY-1, PLY-2, FB-1, FB-2, SAWN-1, SAWN-2, GLUE-1, GLUE-2, PAINT-1, and PAINT-2). However, the government of China did not provide all the information requested of it. Specifically, although the government of China provided information such as articles of incorporation, financial statements, appointment documentation, and certifications pertaining to its involvement, the government of China only provided such information for 18 of the 140 companies which supplied inputs to the mandatory respondents during the period of review. *Id.* Commerce explained that this information is necessary to fully evaluate whether the input producers are "authorities" within the meaning of section 19 U.S.C. § 1677(5)(B). Therefore, Commerce reasonably determined that necessary information was missing from the record, and that the government of China had withheld information that was requested of it and significantly impeded the proceeding within the meaning of 19 U.S.C. § 1677e(a)(1) and 19 U.S.C. § 1677e(2)(A), (C). IDM at 56. Further, Commerce determined that the government of China failed to cooperate by not acting to the best of its ability, because the government of China failed to provide the requested information after multiple opportunities. IDM at 39. Therefore, Commerce found that an adverse inference was warranted. *Id.*

Baroque argues that Commerce was unreasonable in concluding that the various input suppliers reported by respondents were authorities, and that Commerce should have concluded that nine identified suppliers were not authorities. Baroque Br. at 26-36. The government of China submitted certifications from these companies denying any role of the Chinese Communist Party in company operations. IDM at 55. However, Commerce reasonably concluded that these certifications are not the documents that it requested, and that they are largely *pro forma* in nature, lacking particular details of government involvement in each company. IDM at 55. When asked to identify any owners, members of the boards of directors, or managers of the input producers who were government or Chinese Communist Party officials during the period of review, the government of China explained that there is "no central informational database to search for such information." *Id*.

However, in prior countervailing duty proceedings, Commerce has found that the government of China was able to obtain the information requested independently from the companies involved, and that statements from company respondents, rather than from the government of China, were not sufficient. *Id.* at 56. Commerce provided record evidence that the Chinese Communist Party exerts significant control over economic activities in China. *Id.*; PDM at 15 n. 71; Public Bodies Memorandum (P.R. 167-186). Thus, Commerce reasonably found that the information requested regarding the role of Chinese Communist Party officials and Chinese Communist Party committees in the management and operations of the respondents' privately-owned input producers is necessary to its determination of whether these producers are "authorities" within the meaning of section 19 U.S.C. § 1677(5)(B). *Id.* As explained above, however, the government of China failed to respond to Commerce's questions requesting information regarding the Chinese Communist Party's role in the ownership and management of

the mandatory respondents' input producers.

Commerce explained that the government of China's proffered information was not sufficient to determine whether any of the mandatory respondents' input producers are privately-owned or wholly foreign-owned entities.  Specifically, regarding the company-specific information submitted by the government of China, such as articles of incorporation, capital verification reports, company by-laws, business licenses, and financial statements submitted for certain individually- or wholly foreign-owned suppliers, the documentation is helpful in identifying the individual owners, board members, officers, and managers of the company.  *Id.* at 57.  However, this documentation lacks information as to whether the owners and shareholders of the companies have any Chinese Communist Party involvement.  *Id.*  The government of China did not provide any government documentation to support its claim that the independently-owned suppliers were not government authorities.  *Id.* at 58.  Further, the company statements provided for a small subset of the suppliers do not definitively deny the involvement by the government or the Chinese Communist Party in these suppliers; rather, they merely claim without providing further explanation that even if there was some Chinese Communist Party presence in the company, it has no bearing on the company's management and operations.  *Id.*  They do not squarely address whether any of the supplier's individual owners, managers, or board of directors are in fact Chinese Communist Party officials.  *Id.* Commerce reasonably found that necessary information was missing from the record and that the government of China withheld information that was requested of it.  IDM at 56.  Commerce further found that the government of China had failed to respond to Commerce's questions requesting information regarding the CCP's role in the ownership and management of the mandatory respondents' input producers that Commerce and therefore failed to cooperate by not

acting to the best of its ability in responding to Commerce's requests for information, within the meaning of 19 U.S.C. § 1677e(b).  *Id.*  Therefore, Commerce's determination that the input producers which supplied the mandatory respondents are "authorities" within the meaning of section 19 U.S.C. § 1677(5)(B) is supported by substantial evidence and in accordance with law.

Baroque additionally argues that Commerce failed to provide any notice of deficiency to the government of China to remedy its responses on this issue, as required by 19 U.S.C. § 1677m(d).  Baroque Br. at 36-40.  As a threshold matter, Baroque failed to raise this issue before Commerce, *see* Baroque Admin. Case Br. (Feb. 22, 2022) at 35-56 (P.R. 346), and therefore the Court should find that Baroque has failed to exhaust its administrative remedies.  *See Unicatch Industrial Co., Ltd. v. United States*, 539 F. Supp. 3d 1229, 1246 (Ct. Int'l Trade 2021) ("{W}ith respect to {Plaintiff}'s argument that Commerce failed to comply with 19 U.S.C. § 1677m(d) because it did not request additional information from {Plaintiff}, {Plaintiff} failed to exhaust its administrative remedies with respect to this argument by failing to raise it before Commerce.").  Further, Commerce issued a supplemental questionnaire to the government of China requesting the information identified above that the government of China had failed to provide in its initial questionnaire response.  *See* Section II Questionnaire at 8-9 (P.R. 139).  This additional request for the information that the government of China failed to provide in its initial questionnaire response adequately fulfills Commerce's obligations under 19 U.S.C. § 1677m(d).

Commerce provided multiple opportunities to the government of China to supply a list of specific information that Commerce identified to demonstrate that the reported input suppliers are not authorities within the meaning of 19 U.S.C. § 1677(5)(B).  While the government of China did provide certain information for some of the reported suppliers, Commerce reasonably explained in detail why the proffered information was insufficient to demonstrate that the input

suppliers were not authorities and why the information the government of China did not provide was necessary. Therefore, Commerce's application of an adverse inference is supported by substantial evidence and in accordance with law.

**<u>CONCLUSION</u>**

For these reasons, we respectfully request that the Court deny the motions for judgment on the agency record and sustain Commerce's final results in their entirety.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td><u>/s/ Tara K. Hogan</u><br>TARA K. HOGAN<br>Assistant Director</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td><u>/s/ Kelly M. Geddes</u><br>KELLY M. GEDDES</td></tr>
<tr><td>OF COUNSEL:<br>JonZachary Forbes<br>Attorney<br>Office of the Chief Counsel<br>for Trade Enforcement and Compliance<br>U.S. Department of Commerce<br>Washington, D.C.</td><td>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Telephone: (202) 307-2867<br>E-mail: Kelly.Geddes2@usdoj.gov</td></tr>
<tr><td></td><td></td></tr>
<tr><td>June 21, 2023</td><td>Attorneys for Defendant</td></tr>
</table>

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 12,920 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s Kelly M. Geddes</u>
Kelly M. Geddes