**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr>
<td>

**BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION,**

**Plaintiffs,**

**and,**

**ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD.,** *et al.,*

**Consolidated-Plaintiffs**

**and,**

**LUMBER LIQUIDATORS SERVICES, LLC,**

**Plaintiff-Intervenor**

**v.**

**UNITED STATES,**

**Defendant,**

**and,**

**AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,**

**Defendant-Intervenor.**

</td>
<td>

**Before: Hon. Timothy M. Reif, Judge**

**Consol. Court No. 22-00210**

</td>
</tr>
</table>

<u>**RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

**Timothy C. Brightbill, Esq.**
**Stephanie M. Bell, Esq.**
**Theodore P. Brackemyre, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to American Manufacturers of Multilayered Wood Flooring*

**Dated: July 21, 2023**

Consol. Ct. No. 22-00210

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................ 1

II.     RULE 56.2 STATEMENT ........................................................................... 1

        A.     Administrative Decision Under Review ..........................................1

        B.     Issues Presented and Summary of Argument ..........................................2

III.    STATEMENT OF FACTS ........................................................................... 4

IV.     STANDARD OF REVIEW ......................................................................... 7

V.      ARGUMENT .............................................................................................. 9

        A.     Commerce's Benchmark Calculations for Plywood and Veneer Are
               Supported by Substantial Evidence and in Accordance with Law ..........................9

               1.     Commerce Properly Relied on UN Comtrade Data to
                      Construct its Plywood Benchmarks ..........................................10

               2.     Commerce Properly Relied on UN Comtrade Data to
                      Construct its Veneer Benchmarks ..........................................16

        B.     Commerce's Benchmark Calculation for Inland Freight Is
               Supported by Substantial Evidence and in Accordance with Law ..........................17

        C.     Commerce's Decision to Apply AFA with Respect to the
               Respondents' Use of the EBC Program Is Supported by Substantial
               Evidence and in Accordance with Law ..........................................20

        D.     Commerce's Decision to Apply AFA in Finding Certain Input
               Suppliers to Be Government Authorities Is Supported by Substantial
               Evidence and in Accordance with Law ..........................................23

VI.     CONCLUSION............................................................................................ 26

Consol. Ct. No. 22-00210

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Archer Daniels Midland Co. v. United States,*
  968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ...........................................................14

*Beijing Tianhai Indus. Co. v. United States,*
  52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ............................................................13

*Consol. Fibers, Inc. v. United States,*
  32 CIT 24, 535 F. Supp. 2d 1345 (2008) .................................................................9

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ................................................................................................7

*Cooper (Kunshan) Tire Co. v. United States,*
  610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) .....................................................21, 22

*Dongtai Peak Honey Indus. Co. v. United States,*
  971 F. Supp. 2d 1234 (Ct. Int'l Trade 2014), *aff'd*, 777 F.3d 1343 (Fed. Cir.
  2015) .................................................................................................................7, 8

*Fujian Yinfeng Imp. & Exp. Trading Co. v. United States,*
  No. 21-00088, Slip. Op. 22-107 (Ct. Int'l Trade Sept. 13, 2022) .............................20

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ....................................................................7, 8, 13, 18

*Guizhou Tyre Co. v. United States,*
  348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ......................................................7, 10

*I.N.S. v. Elias-Zacarias,*
  502 U.S. 478 (1992) .............................................................................................7, 8

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .........................................................8, 9

*Matsushita Elec. Indus. Co. v United States,*
  750 F.2d 927 (Fed. Cir. 1984) .................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................................8

*Regiomontana, S.A. v. United States,*
  810 F.2d 1137 (Fed. Cir. 1987) ................................................................................8

Consol. Ct. No. 22-00210

*Risen Energy Co. v. United States*,
  570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ..........................................................14

*Ticaret A.S. v. United States*,
  61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ....................................................13, 14

*Timken Co. v. United States*,
  12 CIT 955, 699 F. Supp. 300 (1988).............................................................8, 13

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)....................................................................................................7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................................7

**Administrative Materials**

*Certain Hot-Rolled Carbon Steel Flat Products from India*,
  74 Fed. Reg. 20,923 (Dep't Commerce May 6, 2009) .........................................13

*Certain Softwood Lumber Products from Canada*,
  82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017)........................................12

*Countervailing Duty Investigation of Certain Aluminum Foil From the People's
  Republic of China*, 83 Fed. Reg. 9274 (Dep't Commerce Mar. 5, 2018)...............15

Consol. Ct. No. 22-00210

## I.    INTRODUCTION

On behalf of the defendant-intervenor in this action, American Manufacturers of Multilayered Wood Flooring ("AMMWF" or "Defendant-Intervenor"), we hereby submit the following response to the February 7, 2023 motion for judgment on the agency record filed by Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and Riverside Plywood Corporation ("Riverside") and the March 9, 2023 motions for judgment on the agency record filed by Consolidated Plaintiffs Fine Furniture (Shanghai) Limited and Double F Limited, Evolutions Flooring, Inc. and Struxtur, Inc., and Zhejiang Dadongwu GreenHome Wood Co., Ltd. and Plaintiff-Intervenor Lumber Liquidators Services, LLC.

For the reasons discussed in this brief, in conjunction with the arguments presented by Defendant United States in its June 21, 2023 response brief, Defendant-Intervenor respectfully requests that this Court reject the arguments raised by Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenor and affirm the Final Results of the U.S. Department of Commerce ("Commerce") in the 2019 administrative review of the countervailing duty ("CVD") order on *Multilayered Wood Flooring from the People's Republic of China* ("*MLWF from China*").

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination challenged is Commerce's Final Results in the 2019 administrative review of the CVD order on *MLWF from China*. *Multilayered Wood Flooring From the People's Republic of China*, 87 Fed. Reg. 36,305 (Dep't Commerce June 16, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019), P.R. 375 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 369 ("Final I&D Memo").[1]

---

[1]    Documents on the public record of the underlying administrative review are identified here as "P.R.," followed by the number assigned to the relevant document in the Administrative Record

1

Consol. Ct. No. 22-00210

B.     **Issues Presented and Summary of Argument**

1.     **Whether Commerce's Benchmark Calculations for Plywood and Veneer Are Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Commerce properly included UN Comtrade data in its benchmark calculations for the plywood and veneer for less than adequate remuneration ("LTAR") programs.  Commerce has broad discretion to make factual determinations such as these, and it appropriately exercised that discretion here.  Commerce reasonably determined that the UN Comtrade plywood data, which encompasses both grades of plywood purchased by Baroque Timber (*i.e.*, grades C and D) and was the only data set covering grade D plywood purchases, was appropriate to include in its plywood benchmark.  Commerce also reasonably found that the UN Comtrade veneer data, which was more comprehensive than the limited International Tropical Timber Organization ("ITTO") data and covered both face and backboard veneers, should be included in the veneer benchmark. Respondents' arguments to the contrary are erroneous and should be rejected by the Court.

2.     **Whether Commerce's Benchmark Calculation for Inland Freight Is Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Commerce properly calculated the inland freight benchmark using a simple average of the inland freight rates on the record.  Final I&D Memo at 96-97.  Contrary to the arguments made by respondents, there is no need to weight average this information.  Commerce is afforded significant deference in making technical and factual determinations such as the choice of averaging approach.  Moreover, the averaging methodology Commerce chooses is context dependent.  Here, based on the record, Commerce made a reasonable and more accurate calculation by using a simple average.  Respondents' arguments otherwise lack merit and should be rejected.

_____

Index (Sept. 26, 2022), ECF No. 34.  Documents in the confidential Administrative Record are identified by name, followed by "C.R." and the corresponding record number.

Consol. Ct. No. 22-00210

### 3. Whether Commerce's Decision to Apply AFA with Respect to the Respondents' Use of the EBC Program Is Supported by Substantial Evidence and in Accordance with Law?

Yes. Commerce properly applied adverse facts available ("AFA") in finding respondent companies to have used the Export Buyer's Credit program ("EBC program"). The Government of the People's Republic of China ("GOC") failed to provide complete information regarding the operations of this program, including critical information concerning changes made to the program and the partner and correspondent banks used to disburse program funds. As this Court has recognized, Commerce may reasonably apply AFA under such circumstances. Importantly, Riverside failed to provide non-use certifications for each of its U.S. customers, certifying that those companies did not use the EBC program during the period of review ("POR"). Commerce reasonably found that, without such certifications from each of Riverside's customers, it was not possible to verify non-use, and the agency applied AFA accordingly based on the GOC's refusal to cooperate fully. The arguments made by respondents fail to grapple with this fundamental fact and should be rejected by the Court.

### 4. Whether Commerce's Decision to Apply AFA in Finding Certain Input Suppliers to Be Government Authorities Is Supported by Substantial Evidence and in Accordance with Law?

Yes. Commerce properly applied AFA in finding all of the mandatory respondents' input suppliers to be government authorities. The GOC failed to provide information required by Commerce to evaluate whether these companies were controlled by the GOC or Chinese Communist Party ("CCP"). Without this information, Commerce reasonably determined that it could not confirm whether any of these companies were government controlled. Respondents' argument that nine specific suppliers should not have been found to be authorities is misplaced and should be rejected.

Consol. Ct. No. 22-00210

### III.   STATEMENT OF FACTS

Defendant-Intervenor agrees with and incorporates by reference the facts presented by Defendant, *see* Def.'s Resp. to Pls.' Mots. for J. on the Agency R. (June 21, 2023), ECF No. 52 at 3-5 ("Defendant Br."), and we wish to highlight the additional facts below for the Court.

Commerce initiated an administrative review of the CVD order on *MLWF from China* on February 4, 2021 for a POR covering the calendar year 2019.  *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 73,244 (Dep't Commerce Dec. 27, 2021) (prelim. results of countervailing duty admin. rev., and intent to rescind rev., in part; 2019), P.R. 311 and accompanying Preliminary Decision Memorandum, P.R. 303 at 2 ("Prelim Decision Memo"). Commerce selected Riverside and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") as mandatory respondents on March 19, 2021.[2]  Prelim Decision Memo at 2.

Riverside, Senmao, and the GOC submitted initial questionnaire responses between April 6, 2021 and May 20, 2021.  *See id.* at 2-3.  Throughout their initial responses, the GOC and respondents failed to provide complete information regarding the EBC program.  Final I&D Memo at 30-41.  Of note, the GOC chose not to submit information regarding 2013 amendments to the administrative measures and implementing rules of the EBC program, which appears to have eliminated an important USD $2 million minimum contract threshold that was in place for this program.  *Id.* at 31-35.  Likewise, the GOC refused to provide information regarding the partner and correspondent banks involved in the disbursement of funds under the EBC program.  *Id.* at 34-36.  Notably, Riverside failed to submit non-use certifications from its each of its U.S. customers. *Id.* at 37.

---

[2]     Baroque Timber is a cross-owned affiliate of Riverside, as well as a producer of subject flooring, that submitted information regarding its input purchases throughout the underlying review.  *See* Prelim Decision Memo at 10.

Consol. Ct. No. 22-00210

The GOC also failed to submit the information requested concerning the respondents' input suppliers, as it only "provided information such as articles of incorporation, financial statements, appointment documentation, and certifications pertaining to GOC involvement . . . for 18 of the 140 companies." *Id.* at 55. When asked to identify any owners, managers, or directors of the input suppliers who were GOC or CCP officials during the POR, the GOC explained that there is "no central informational database to search for such information." *Id.*

Riverside, Senmao, and the GOC submitted supplemental questionnaire responses between May 11, 2021 and August 26, 2021. *See* Prelim Decision Memo at 2-3. Despite being asked to provide additional information concerning the EBC program, in its supplemental response, the GOC failed to provide any information regarding the program's amendments, the minimum contract threshold, or the partner and correspondent banks involved in the disbursement of funds. Final I&D Memo at 31-36. The GOC was also issued a supplemental questionnaire, in which it provided some additional information regarding the respondents' suppliers but did not respond fully to Commerce's questions. *See* Prelim Decision Memo at 15; Final I&D Memo at 57.

Parties filed benchmark submissions with information for Commerce to consider using as benchmarks between November 22, 2021 and December 2, 2021. Prelim Decision Memo at 3. As part of these filings, AMMWF, Riverside, and Senmao each submitted export data from UN Comtrade to value various inputs purchased by the respondents. *Id.* at 40-41. In particular, AMMWF provided comprehensive UN Comtrade data to benchmark respondents' purchases of plywood and veneer for LTAR. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Benchmark Pricing Information* (Nov. 22, 2021), P.R. 256, 266-275 at Exhibits 1-A and 1-C ("AMMWF Benchmark Submission"). These data covered all types and grades of plywood and veneer shipments and

Consol. Ct. No. 22-00210

included shipments from all exporting countries.  *Id.*  AMMWF also submitted the *World Bank's Doing Business in China 2020 Report*, which included estimates for Beijing and Shanghai inland freight rates.  *Id.* at Exhibit 5-B, pp. 81-89.  This information included a conversion to a domestic transportation rate reflected in U.S. dollars per kilogram per kilometer.  *Id.* at Exhibit 5-A.

Riverside provided ITTO pricing data from a few countries to benchmark plywood, veneer, and fiberboard shipments.  Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Benchmark Data Submission: 2019 Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from the People's Republic of China (C-570-971)* (Nov. 23, 2021), C.R. 101-116, P.R. 276-286, at Exhibit 2.  The ITTO plywood data was limited to grade C/CC plywood and shipments from four countries – Brazil, Ghana, Malaysia, and Peru.  *See id.*  The ITTO veneer data covered core and face veneers and were limited to two countries – Ghana and Peru.  *Id.* at 2.

Commerce published its Final Results on June 16, 2022.  Final Results.  Consistent with its preliminary determination, Commerce relied on UN Comtrade data to construct its plywood and veneer benchmarks, finding that it would not be appropriate to exclude the UN Comtrade plywood and veneer data, which covered all types and grades purchased by the respondents.  Final I&D Memo at 86, 92.  Commerce also benchmarked inland freight expenses using a simple average of the Beijing and Shanghai rates, reasoning that a weighted average would not be appropriate, especially since "the inland freight benchmark information is already provided on the same basis (*i.e.*, per kilometer) as the respondents' reported distances."  *Id.* at 97.  Further, Commerce applied AFA to find that Riverside used the EBC program, concluding that the GOC failed to provide information necessary to determine usage of the program and that the respondent failed to provide non-use certifications for all of its U.S. customers.  *Id.* at 30-41.  Lastly,

Consol. Ct. No. 22-00210

Commerce applied AFA and found that the mandatory respondents' input suppliers were government authorities, finding that the GOC failed to provide information necessary to evaluate government control and that the record evidence was insufficient to determine that any of the input producers were not government controlled. *Id.* at 54-59. This action ensued.

## IV.   STANDARD OF REVIEW

This Court reviews Commerce's decisions in CVD proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Dongtai Peak Honey Indus. Co. v. United States*, 971 F. Supp. 2d 1234, 1238 (Ct. Int'l Trade 2014), *aff'd*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). With respect to benchmark calculations, "{t}he court's role is not to assess whether the benchmark data Commerce used was the 'best available,' but rather whether Commerce's choice was reasonable." *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1274 (Ct. Int'l Trade 2018) (citing *Peer Bearing Company-Changshan v. United States*, 27 CIT 1763, 1770, 298 F. Supp. 2d 1328, 1336 (2003)).

A plaintiff cannot ask the Court to re-weigh the evidence on the record and decide the case for Commerce. *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Factual findings by Commerce are afforded considerable deference. *See I.N.S. v. Elias-*

Consol. Ct. No. 22-00210

*Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). Indeed, Commerce is afforded "tremendous deference," which is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its "technical expertise in identifying, selecting, and applying methodologies to implement the dictates set forth in the governing statute." *Fujitsu Gen. Ltd.*, 88 F.3d at 1039.

Particularly regarding technical matters, it is not the role of the Court to "weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988). "{C}ountervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd.*, 88 F.3d at 1039. In addition, the Court "uphold{s} a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 286 (1974)); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43 (citation omitted).

In determining whether Commerce's decisions in CVD proceedings are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law," this Court reviews the agency's conduct under the abuse of discretion standard. *See Dongtai Peak*, 971 F. Supp. 2d at 1239, *aff'd*, 777 F.3d at 1349; *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.

Consol. Ct. No. 22-00210

Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014).   Accordingly, the Court has recognized that it "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35-36, 535 F. Supp. 2d 1345, 1354 (2008).

## V.   ARGUMENT

### A.   Commerce's Benchmark Calculations for Plywood and Veneer Are Supported by Substantial Evidence and in Accordance with Law

Commerce correctly included UN Comtrade data in its plywood and veneer benchmark calculations.  Final I&D Memo at 86-87, 91-92.  Respondents assert that Commerce should have excluded the UN Comtrade data and relied exclusively on ITTO data to construct its plywood and veneer benchmarks.  Mem. in Supp. of Pls.' Mot. for J. on the Agency R. (Feb. 7, 2023), ECF No. 43 at 6-21 ("Baroque Br."); Consol. Pl.'s Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Mar. 9, 2023), ECF No. 48 at 5-12 ("Fine Furniture Br.").  At the heart of their claim is the assertion that it is "Commerce's practice to select the most product-specific benchmark possible for use in LTAR calculations."  Baroque Br. at 8; Fine Furniture Br. at 7.  However, in making this point, respondents have severely misapplied the facts of this proceeding and their claims should be rejected.

Defendant-Intervenor supports the arguments made by Defendant in addressing respondents' misplaced contentions, *see* Defendant Br. at 8-21, and we stress that the goal of creating a product-specific benchmark does not warrant excluding UN Comtrade data, as these data cover all of the grades and types of inputs being purchased and thus are product-specific. Respondents simply disagree with Commerce's decision to use the broader UN Comtrade data instead of relying exclusively on the narrower ITTO data.  This is not a legitimate grounds for the

**Consol. Ct. No. 22-00210**

Court to overturn Commerce's benchmark calculations.  *See Guizhou Tyre Co.*, 348 F. Supp. 3d

at 1274 ("The court's role is not to assess whether the benchmark data Commerce used was the

'best available,' but rather whether Commerce's choice was reasonable" (citing *Peer Bearing*, 27

CIT at 1770, 298 F. Supp. 2d at 1336)).  Therefore, for the reasons below, the Court should find

that Commerce appropriately relied on UN Comtrade data in its plywood and veneer benchmark

calculations and, as such, that its calculations are supported by substantial evidence and in

accordance with law.

1.    **Commerce Properly Relied on UN Comtrade Data to Construct its
          Plywood Benchmarks**

In its plywood benchmark calculations, Commerce simply averaged the average unit values

calculated from the UN Comtrade data with those from the ITTO.  Final I&D Memo at 86.  In the

global plywood market, plywood is divided into several grades, such as A, B, C, and D.  Baroque

Br. at 12.  Commerce determined that Baroque Timber purchased only grade C and D plywood

during the POR.  Final I&D Memo at 86.  Commerce found that the UN Comtrade data submitted

by AMMWF and Senmao encompassed all grades of plywood (including C and D).  *See id.*

Commerce also concluded that the ITTO data provided by Riverside covered only grade C/CC

plywood.  *Id.*  Finding that Riverside failed to justify why the UN Comtrade data would be

inappropriate to benchmark grade C and D plywood purchases, Commerce reasonably relied on

both UN Comtrade and ITTO data in its benchmark calculations, consistent with its established

practice of averaging multiple world market prices.  *Id.*  Indeed, UN Comtrade is the only

comprehensive plywood data source on the record, encompassing export shipments from the entire

world.  *See* AMMWF Benchmark Submission at Exhibit 1-A.  In contrast, the ITTO data only

includes data from four countries and, under respondents' preferred approach, Baroque Timber's

purchases would be benchmarked against plywood data from only two countries (*i.e.*, Brazil and

Consol. Ct. No. 22-00210

Peru).  *See* Baroque Br. at 12.  As Defendant summarizes, "Commerce reasonably included in its calculation a global dataset from UN Comtrade that {covers} the grades of plywood purchased by Baroque {Timber}."  Defendant Br. at 18.

In addition to the arguments raised by Defendant, *see id.* at 11-18, Defendant-Intervenor wishes to highlight the fundamental flaw in respondents' claims, which is that they fail to grapple with the fact that the UN Comtrade plywood data encompassed types of inputs not covered by the ITTO data, *see* Baroque Br. at 11-17; Fine Furniture Br. at 8-10.  That is, as the respondents themselves acknowledge, Baroque Timber purchased grade D plywood during the POR.  Baroque Br. at 15; Fine Furniture Br. at 8.  But the ITTO data do not include any grade D plywood purchases.  Final I&D Memo at 86; Baroque Br. at 12.  The only source of grade D plywood data on the record is from UN Comtrade.  *See* Final I&D Memo at 86; Baroque Br. at 12.  Without the UN Comtrade data, the plywood benchmarks would contain no data pertinent to Baroque Timber's grade D plywood purchases.  Therefore, it was not only reasonable for Commerce to rely on the more comprehensive UN Comtrade data, but it was also necessary for the agency to do so to construct a benchmark that encompassed all of the grades of plywood actually purchased by the respondents.  The simple diagram below illustrates the relationship between these data sources and the plywood purchases they are intended to benchmark.

Consol. Ct. No. 22-00210



In arguing that Commerce should have used only the ITTO data, respondents effectively ask the Court to prioritize overly narrow data sets over broad data sets. *See* Baroque Br. at 11-17; Fine Furniture Br. at 8-10. This line of argument is misplaced and inconsistent with Commerce's established practice. The ITTO data covers some – but not all – of the grades of plywood purchased by the respondents. Conversely, the UN Comtrade covers all of the grades of plywood purchased by the respondents in addition a few grades not purchased by the respondents. Neither data set aligns perfectly with the grade C and D plywood purchases made by Baroque Timber. Yet, as Commerce has explained, "the legal requirements governing the Department's selection of benchmarks do not require perfection." Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (final affirm. countervailing duty deter., and final neg. deter. of critical circumstances) at 110. Accordingly, it was reasonable for Commerce to use both ITTO and UN Comtrade data in its benchmark.

Even setting aside that Commerce is afforded significant deference in making factual decisions such as these, *Fujitsu Gen. Ltd.*, 88 F.3d at 1039, and that it is not the Court's role to "weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record," *Timken Co.*, 12 CIT at 962, 699 F. Supp. at 306, there is simply no factual basis to reject Commerce's decision to rely on both the UN Comtrade and ITTO data to construct it plywood benchmarks. Neither is perfect, but they both cover the input in question, and it was reasonable for Commerce to include the UN Comtrade data in its benchmark. Indeed, this is why it is Commerce's established practice to use comprehensive benchmarks that include all data on the record that describe the input in question. For example, in the 2007 administrative review of the CVD order on *Certain Hot-Rolled Carbon Steel Flat Products from India*, Commerce found that there "is no requirement that the benchmark used in the Department's LTAR analysis be identical to the good sold by the foreign government," and that "the imposition of such a requirement would likely disqualify most, if not all, potential benchmarks under consideration in a LTAR analysis." Issues and Decision Memorandum accompanying *Certain Hot-Rolled Carbon Steel Flat Products from India*, 74 Fed. Reg. 20,923 (Dep't Commerce May 6, 2009) (final results and partial rescission of countervailing duty admin. rev.) at 52.

Moreover, Commerce's use of the UN Comtrade data, which necessarily cover the grades of plywood purchased by the respondents, is consistent with court precedent. *See, e.g.*, *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1369 (Ct. Int'l Trade 2015) ("there is nothing that requires that it use prices for merchandise that are *identical* to a respondent's purchases"); *Borusan Mannesmann Borus Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1341 (Ct. Int'l Trade 2015) ("An import benchmark's 'comparability' means it must bear a

reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute"); *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1278 (Ct. Int'l Trade 2014) ("Commerce, though, is required only to select benchmarks that are comparable, not identical."). Thus, there is no legal standard requiring Commerce to exclude the UN Comtrade data. The agency simply made a factual determination regarding what best constituted comparable merchandise for the purpose of the benchmark based on its broad discretion to do so.

In failing to properly apply the facts of this case or recognize that it was reasonable for Commerce to rely on both data sets, respondents mistakenly analogize to several other proceedings that are easily distinguishable from the current case. *See* Baroque Br. at 7-11; Fine Furniture Br. at 8-10. As Defendant explains, these cases "do not undermine, and indeed are consistent with Commerce's calculation in this case." Defendant Br. at 14. For instance, respondents refer to this Court's decision in *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022). Baroque Br. at 7; Fine Furniture Br. at 8-9. However, the Court's remand order to Commerce to reconsider its choice of ocean freight data in *Risen* is not applicable here. *See Risen*, 570 F. Supp. 3d at 1379. In that case, the Court found that Commerce failed to consider certain flaws in the ocean freight data used in its benchmark analysis. *Id.* But there are no such flaws here. The only concern that respondents raise with the UN Comtrade data is that it covers all grades of plywood. Further, contrary to respondents' claims, the UN Comtrade does "add to the accuracy of the benchmark calculation," as envisioned by the Court in *Risen*, because it includes a wide range of exporting countries and includes grade D plywood data not otherwise covered by any other data source. *See id.* at 1378.

Likewise, many of the Commerce cases cited by respondents follow a different pattern than the current proceeding and are clearly distinguishable. *See* Baroque Br. at 7-11; Fine Furniture

Consol. Ct. No. 22-00210

Br. at 8-10.  Most commonly in these cases, Commerce removed certain data from its benchmarks after it was shown that (1) the respondent did not purchase a particular type, grade, or size of an input, and (2) the removed data was specific to types, grades, or sizes that the respondent did not purchase.  For example, in Commerce's CVD investigation of *Certain Aluminum Foil from the People's Republic of China*, the benchmark for primary aluminum included data for unalloyed aluminum ingot and alloyed ingot, so when the respondent showed that it only produced unalloyed ingots, Commerce removed the data for alloyed ingots.  Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China*, 83 Fed. Reg. 9274 (Dep't Commerce Mar. 5, 2018) (final affirmative deter.) at 47.  Here, under the same logic, there is no data to remove, as the UN Comtrade data cover all plywood grades and there are no data that are specific to the inputs respondents claim were not purchased (*i.e.*, non-grade C and D).

In addition, contrary to respondents' argument, Commerce did not ignore evidence on the record that Baroque Timber's plywood purchases were limited to grades C and D.  *See* Final I&D Memo at 86-87; Baroque Br. at 15-16.  Rather, Commerce agreed that "Baroque Timber's plywood purchases consisted solely of C/D grade plywood."  Final I&D Memo at 86.  The agency simply disagreed that those facts justified removing the UN Comtrade data from its benchmark calculations.  *See id.* at 86-87.  As illustrated above, this decision was reasonable given that the UN Comtrade data covered all grades of plywood and thus was representative of all of Baroque Timber's plywood purchases.

Respondents also argue that that different plywood grades cannot be used to produce subject flooring.  Baroque Br. at 16.  This argument is both unsupported by the record and ultimately irrelevant to whether the UN Comtrade data can be reasonably used to benchmark

Consol. Ct. No. 22-00210

plywood purchases.  The record does not establish that subject flooring can only be produced with certain grades of plywood, and the UN Comtrade data cover all grades of plywood.  *See* Final I&D Memo at 86.  Thus, the UN Comtrade data relied on by Commerce remain a critical data point for approximating the prices that Baroque Timber would have paid for their plywood purchases.

> **2.    Commerce Properly Relied on UN Comtrade Data to Construct its Veneer Benchmarks**

In its veneer benchmark calculations, Commerce created separate benchmarks for Baroque Timber's backboard and face veneer purchases.  *Id.* at 91.  To calculate each of these benchmarks, Commerce averaged the ITTO data that was specific to either backboard or face veneers with the UN Comtrade data that covered all types of veneers.  *Id.* at 92.  Commerce agreed with Riverside that Baroque Timber's veneer purchases were differentiated enough that they warranted separate benchmarks, but the agency disagreed that the UN Comtrade data, which included both backboard and face veneer data, were not appropriate for both benchmarks.  *Id.*  Similar to how Commerce reasonably determined that the broad UN Comtrade plywood data were an appropriate benchmark source, the agency properly exercised its discretion in choosing to rely on the UN Comtrade data for both of Baroque Timber's backboard and face veneer benchmarks.  *See id.* at 91-92.  As Defendant reasons, Commerce faced "a choice similar to the choice it faced for plywood: to include a robust global dataset of UN Comtrade data, along with ITTO data from Peru" or "to rely entirely on data from a single country as representing a 'world market price.'"  Defendant Br. at 19.  "Once again, Commerce reasonably chose to include the less differentiated data."  *Id.*  We agree.

In this regard, for many of the same reasons detailed above with respect to plywood, respondents' arguments concerning the veneer benchmark calculations are also misplaced and should be rejected.  *See* Baroque Br. at 17-21; Fine Furniture Br. at 10-12.  In support of the

Consol. Ct. No. 22-00210

arguments made by Defendant, Defendant Br. at 18-21, Defendant-Intervenor stresses that respondents fail to establish that the UN Comtrade veneer data is not representative of Baroque Timber's backboard or face veneer purchases, *see* Baroque Br. at 17-21; Fine Furniture Br. at 10-12. Thus, Commerce reasonably determined that it was necessary to include the comprehensive UN Comtrade data, which not only covered the inputs in question but also a large number of exporting countries, along with the far narrower ITTO data, which was limited to only two countries (*i.e.*, Ghana and Peru). *See* Final I&D Memo at 91-92; AMMWF Benchmark Submission at Exhibit 1-C. Respondents do not appear to argue that these ITTO data, which are similar in this respect to the UN Comtrade data, should be excluded from the veneer benchmark. Accordingly, consistent with the broad discretion afforded the agency in constructing benchmarks, Commerce properly to choose to rely on UN Comtrade data for Baroque Timber's veneer benchmarks.

### B.   Commerce's Benchmark Calculation for Inland Freight Is Supported by Substantial Evidence and in Accordance with Law

Commerce properly calculated the inland freight benchmark using a simple average of the Beijing and Shanghai inland freight rates on the record from the *World Bank's Doing Business in China 2020 Report*. Final I&D Memo at 96-97. Respondents wrongly argue that Commerce should have weight averaged those two rates. Baroque Br. at 21-23. However, there is no need to weight average this type of information. In fact, Commerce reached a more accurate result in this instance by using a simple average. The agency reasoned that "a weighted-average approach . . . is not necessary for our calculation of the inland freight benchmark because the evidence on the record demonstrates that the inland freight benchmark information is already provided on the same basis (*i.e.*, per kilometer) as the respondents' reported distances." Final I&D Memo at 97. As Defendant recognizes, "the specific methodology—including whether to use a simple or weighted

Consol. Ct. No. 22-00210

average—depends on the specific context."  Defendant Br. at 22.  Defendant-Intervenor concurs and wishes to highlight for the Court that, in this context, Commerce correctly and reasonably used a simple average.

Specifically, the Beijing and Shanghai rates are based on sample inland freight price quotes describing two separate shipments of merchandise into China.  *See* Prelim Decision Memo at 43; AMMWF Benchmark Submission at Exhibit 5-B, pp. 81-89.  Based on the distance, weight, and price information provided, they were each converted to a domestic transportation rate reflected in U.S. dollars per kilogram per kilometer.  Memorandum from Dennis McClure, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII through Kathleen Marksberry, Program Manager, AD/CVD Operations, Off. VIII to The File, re: *Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Preliminary Results Calculations for Riverside Plywood Corp.* (Dec. 17, 2021), C.R. 130-131, P.R. 308-309 at Attachment 2 (tab 'Inland Freight'). In constructing its benchmarks, Commerce applied the simple average of the Beijing and Shanghai rates to each respondent based on the inland freight distances reported in order to benchmark inland freight prices on a respondent-specific and per-kilogram basis.  *See id.* at Attachment 2.  Since these rates were already provided on a per-kilometer and per-kilogram basis, there was no need to construct a weighted average in order to apply them to each respondent.  *See* Final I&D Memo at 97.  Further, since weight and distance were already factored in, a simple average approach was more appropriate than a weighted average.

The type of averaging methodology that Commerce uses in its benchmark calculations matters.  But these mathematical operations do not exist in a vacuum.  And Commerce is afforded significant deference in making technical and factual determination such as the choice of averaging approach.  *See, e.g.*, *Fujitsu Gen. Ltd.*, 88 F.3d at 1039.  As Commerce reasoned, and Defendant

explains in further detail, the context is important and what may be an appropriate methodology approach in one scenario may not be appropriate in another. *See* Final I&D Memo at 97; Defendant Br. at 21-23. Here, the key data point is the rate itself. The record contains a Shanghai quote resulting in one rate and a Beijing quote resulting in another rate. Taking the simple average of those two rates creates the most accurate average. Using a weighted average would belie common sense and basic mathematics. The distance and weight of the shipments covered by these two quotes are already accounted for by the fact that they are provided on a per-kilogram and per-kilometer basis. Weight averaging them again would be redundant and result in a less accurate calculation. There is simply no need to weight average in this context.

In arguing otherwise, respondents focus on Commerce's perceived failure to justify using a simple average. *See* Baroque Br. at 21-23. Yet, each of respondents' critiques fail because they ignore that the utility of applying a simple average depends on the context in which it is applied. *See id.* For instance, Commerce correctly claimed that using a simple average is consistent with its practice in other CVD proceedings. *See* Final I&D Memo at 97; Baroque Br. at 22-23. Commerce need not show an established methodology for each type of mathematical calculation it faces in constructing its benchmarks. As Defendant correctly recognizes, what Commerce has done is illustrate "its practice . . . to use simple averages where appropriate, depending on the specific factual and methodological circumstances." Defendant Br. at 23. Likewise, respondents have not demonstrated any established practice to the contrary. *See* Final I&D Memo at 97; Baroque Br. at 23. As shown above, what averaging methodology Commerce chooses is context dependent, so deciding to use a weighted average in one circumstance does not require that the same approach be used in another, different scenario – even if in the same proceeding.

Consol. Ct. No. 22-00210

     **C.**     <u>**Commerce's Decision to Apply AFA with Respect to the Respondents' Use of the EBC Program Is Supported by Substantial Evidence and in Accordance with Law**</u>

Respondents argue that Commerce erred in applying AFA regarding respondent companies' use of the EBC program. *See* Baroque Br. at 40-44; Fine Furniture Br. at 12-18; Pl.-Int.'s Rule 56.2 Mot. for J. on the Agency R. (Mar. 9, 2023), ECF No. 45 at 5-8. However, as Commerce explained, the record of the underlying administrative review does not contain complete information regarding the EBC program and does not adequately demonstrate that respondents did not use the program during the POR. *See* Final I&D Memo at 23-41. Importantly, this Court has recognized the deference afforded Commerce in upholding the agency's decision to apply AFA as to the use of this program under similar circumstances and pursuant to the same reasoning as in this review. *See Fujian Yinfeng Imp. & Exp. Trading Co. v. United States*, No. 21-00088, Slip. Op. 22-107 (Ct. Int'l Trade Sept. 13, 2022). In fact, the record here contains additional facts further supporting the application of AFA, as Riverside has failed to provide such certifications, whereas the respondent in *Fujian Yinfeng* had submitted non-use certifications for all of its customers. Final I&D Memo at 37; *Fujian Yinfeng* at *2, *4-6. Accordingly, Commerce appropriately applied AFA, and its decision to do so should be sustained by the Court.

In *Fujian Yinfeng*, this Court upheld Commerce's determination to apply AFA as to the use of the EBC program under a similar fact pattern. *See Fujian Yinfeng* at *4-6. There, the Court found that "Commerce explained at length why the missing information . . . was necessary" to "confirm { } non-use of the {EBC program}." *Id.* at *5. Specifically, the Court found that Commerce's "thorough explanation of exactly why the missing information was necessary to verify {EBC program} non-use distinguishes this case from other cases where this court has held that Commerce failed to properly explain the need for the absent information." *Id.* at *6. Likewise,

Consol. Ct. No. 22-00210

here, Commerce thoroughly explained why the GOC's refusal to provide requested information concerning the EBC program's USD $2 million contract minimum, the correspondent and partner banks of the EBC program, and other elements of this subsidy program have made it impossible for Commerce to fully verify whether respondents did in fact use this program.  *See* Final I&D Memo at 30-39; Defendant Br. at 24-36.

Defendant-Intervenor supports Defendant's thorough response to respondents' arguments on this issue, *see* Defendant Br. at 24-36, and we emphasize that a key aspect of Commerce's determination – and a fact that distinguishes this case from other proceedings – is that Riverside failed to provide non-use certifications for each of its U.S. customers. Final I&D Memo at 37. Commerce reasonably determined that, because of the GOC's non-cooperation, necessary information was missing from the record and that, since Riverside did not provide complete non-use certifications, it did not provide information capable of filling that gap in the record.  *Id.* at 37-39.  As the agency explained, "{i}n order for Commerce to determine use (or non-use) of the EBC program, all of the respondent's U.S. customers must be willing to participate in the review because any benefit calculation for this program would need to take them all into account."  *Id.* at 37. Thus, while these certifications by themselves are insufficient to demonstrate non-use, Riverside's failure to provide these certifications is clear evidence by itself that the respondent has not demonstrated that it did not use the EBC program during the POR.

In response to prior decisions from this Court, Commerce has developed a practice of requesting non-use certifications from Chinese respondents for each of their U.S. customers.  *See* Final I&D Memo at 37; Defendant Br. at 34; *Cooper (Kunshan) Tire Co. v. United States*, 610 F. Supp. 3d 1287, 1316-18 (Ct. Int'l Trade 2022).  Where a respondent is able to provide a non-use certification for each U.S. customer, Commerce will issue an EBC program supplemental

Consol. Ct. No. 22-00210

questionnaire, requesting additional information concerning the respondent's financing and potential use of the program. *See* Final I&D Memo at 37-38. However, when the agency does not receive non-use certifications from all U.S. customers, Commerce will *not* issue the supplemental questionnaire or otherwise attempt to verify the respondent's claims of non-use due to the lack of necessary information. *Cooper (Kunshan) Tire Co.*, 610 F. Supp. 3d at 1315-16. In other words, "Commerce's approach to attempting verification of statements pertaining to non-use is predicated upon the respondents voluntarily providing information on the record that might fill the gap caused by the GOC's noncooperation." *Id.* at 1316. Consistent with this practice, Commerce reasonably applies AFA when the GOC refuses to cooperate and the respondent, at a minimum, fails to provide non-use certifications for each of its U.S. customers. Indeed, as Defendant recognizes, in *Cooper (Kunshan) Tire Co.*, this Court averred that applying AFA to find non-use where respondents do not provide complete certifications "is consistent with the Court's treatment of incomplete certifications" in other cases. *Id.* at 1318. This Court should reach a similar decision here.

In arguing otherwise, respondents misapply the facts of this case. Respondents claim that "{t}his case is indistinguishable, both factually and legally, from previous cases before this Court." Baroque Br. at 41. This is simply false. Respondents fail to address the fact that Riverside did not provide non-use certifications or recognize how that key fact distinguishes this case from prior proceedings, including the reasoning provided by Commerce. *See id.* at 40-44. Similarly, respondents argue that "record evidence sufficiently supports that Riverside, including their U.S. customers, did not benefit from the EBCP because Riverside confirmed that none of their affiliated U.S. customers used or benefitted from the EBCP." Fine Furniture Br. at 13. As discussed above, this is incorrect, as the record is clear that Riverside did not provide the requisite non-use certifications. Respondents fail to address this shortcoming or demonstrate how the record is

22

Consol. Ct. No. 22-00210

complete notwithstanding this fact.  Accordingly, the Court should affirm Commerce's use of AFA in finding Riverside to have used the EBC program.

      **D.**      **<u>Commerce's Decision to Apply AFA in Finding Certain Input Suppliers to Be Government Authorities Is Supported by Substantial Evidence and in Accordance with Law</u>**

Commerce properly found, based on AFA, that the producers who supplied inputs to the mandatory respondents were "authorities" and thus provided a financial contribution within the meaning of the statute.  Final I&D Memo at 54.  To determine whether the input suppliers reported by the respondents were government authorities, Commerce requested information from the GOC regarding the ownership of these input producers.  *Id.* at 54-55.  The GOC failed to provide all of the information requested, only "provid{ing} information such as articles of incorporation, financial statements, appointment documentation, and certifications pertaining to GOC involvement . . . for 18 of the 140 companies."  *Id.* at 55.  The GOC submitted certifications from certain companies "denying any role for the CCP in company operations."  *Id.*  However, Commerce found that "these certifications are not the government documents we require and, moreover, we find them to be *pro forma* in nature, lacking particular details of government involvement in each company."  *Id.*  The GOC further stymied efforts by the agency to receive additional information about these companies, explaining that there is "no central informational database to search for such information."  *Id.*  The GOC made this assertion, even though, in prior CVD proceedings, Commerce has "found that the GOC was able to obtain the information requested independently from the companies involved."  *Id.* at 56.

Respondents argue that Commerce improperly found nine specific input suppliers to be government authorities.  Baroque Br. at 26-36.  Yet, as Defendant correctly reasons, "the government of China's proffered information was not sufficient to determine whether <u>any</u> of the

Consol. Ct. No. 22-00210

mandatory respondents' input producers are privately owned or wholly foreign-owned entities."
Defendant Br. at 40 (emphasis added).  Rather than address these shortcomings, respondents
unduly focus on the information that the GOC <u>did</u> provide, ignoring that information that it <u>did</u>
<u>not</u>.  *See* Baroque Br. at 29-31.  These arguments are a distraction from the core facts.  As detailed
above, Commerce found it necessary for the GOC to provide specific information in order for
Commerce to be able to determine whether individual companies are government controlled.  *See*
Final I&D Memo at 58.  The GOC failed to provide this information and thus Commerce
reasonably applied AFA.  *Id.* at 58-59.

Furthermore, with respect to the nine input suppliers raised by respondents, Baroque Br. at
26-40, Commerce made clear that its "request for information from the GOC is a request for
government information independent from company information," Final I&D Memo at 58.  And,
in this review, Commerce found that "the GOC did not provide any government documentation to
support its claim that the independently-owned suppliers were not government authorities."  *Id.*
That is, without the necessary information from the GOC, Commerce cannot verify whether an
entity is government controlled.  Government control necessarily entails two parties – the
controlled entity and the government itself.  Without complete information from both, Commerce
was reasonable in finding that it could not confirm that these companies were not government
authorities.  *See id.*

Moreover, contrary to respondents' claim, Commerce did not need to address each input
supplier individually in the Final Results.  *See* Baroque Br. at 32.  Rather, because of the GOC's
failure to provide necessary information, Commerce found that there were gaps in the record as to
<u>all</u> companies that necessitated the application of AFA.  *See* Final I&D Memo at 58-59.  Even so,
Commerce did address the nine input suppliers challenged by respondents, specifically noting that

**Consol. Ct. No. 22-00210**

the information provided by the GOC remained insufficient to allow a determination as to those companies. *See id.* at 58. Respondents fail to acknowledge the extent to which Commerce addressed these nine companies in reaching its final determination. *See* Baroque Br. at 32-36. Commerce reasoned that the company statements provided by these nine suppliers "do not definitively deny the involvement by the government or the CCP in these suppliers," but instead "merely state rhetorically that even if there was some CCP presence in the company, it has no bearing on the company's management and operations." Final I&D Memo at 58. In other words, the documents provided fail to show that the nine input suppliers were not actually CCP-controlled.

Respondents may dislike that the GOC's refusal to cooperate in this proceeding has impeded Commerce's ability to assess whether these nine input suppliers are government authorities, but that does not change the record or the fact that Commerce lacks the information it requires. As the finder of fact, it is Commerce's role to decide what information is necessary when investigating a subsidy program. Indeed, as the agency recognized, "it is for Commerce, not the GOC to determine what information is necessary in order for Commerce to complete its analysis." *Id.* And Commerce is afforded significant deference in developing its record and making factual assessments and determinations such as these. For the reasons above, Commerce was reasonable and well within the bounds of its discretion in applying AFA to find all of the respondents' input suppliers to be government authorities.

As a final matter, respondents argue that Commerce failed to provide sufficient notice of deficiencies in the GOC's responses or allow the GOC the opportunity to correct those responses. Baroque Br. at 36-40. As Defendant addresses, this argument has both not been exhausted, as Riverside failed to raise the issue in its administrative case briefs, and the agency did in fact provide multiple opportunities for the GOC to provide the information requested. Defendant Br. at 41-42.

Consol. Ct. No. 22-00210

## VI.    <u>CONCLUSION</u>

For the reasons detailed above, Defendant-Intervenor respectfully requests that the Court reject the arguments raised by Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenor and affirm Commerce's Final Results in the 2019 administrative review of the CVD order on *MLWF from China*.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel to American Manufacturers of
Multilayered Wood Flooring*

Dated: July 21, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,858 words.


<u>/s/ Timothy C. Brightbill</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>American Manufacturers of Multilayered Wood Flooring</u>
(Representative Of)

<u>July 21, 2023</u>
(Date)