## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORTION, | x : : : |
| Plaintiffs, | : : |
| ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*, | : : : |
| and | : |
| Consolidated Plaintiffs, | : Consol. Court No. 22-00210 : |
| and | : : |
| LUMBER LIQUIDATORS SERVICES, LLC, | : : |
| Plaintiff-Intervenor, | : : |
| v. | : : |
| UNITED STATES, | : : |
| Defendant, | : : |
| and | : : |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | : : : |
| Defendant-Intervenor. | : : x |

## <u>PLAINTIFFS' REPLY BRIEF</u>

Francis J. Sailer
Andrew T. Schutz
Kavita Mohan
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

Dated: September 15, 2023

## <u>TABLE OF CONTENTS</u>

I.     ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UN COMTRADE DATA ARE NOT ................................................. 1

II.    UN COMTRADE DATA ARE NOT REPRESENTATIVE OF BACKBOARD AND FACE VENEER PURCHASES .................................................................................. 7

III.   COMMERCE'S INLAND FREIGHT BENCHMARK IS UNLAWFUL AND UNSUPPORTED BY RECORD EVIDENCE ............................................................ 9

IV.   AFA SHOULD NOT HAVE BEEN APPLIED TO THE EXPORT BUYER'S CREDIT PROGRAM USAGE .................................................................................. 11

     A.    THE MISSING INFORMATION IS NOT NECESSARY TO DETERMINE USAGE ............. 11

     B.    COMMERCE SHOULD HAVE ACCEPTED STATEMENTS OF NON-USE IN THE QUESTIONNAIRE RESPONSE .................................................................................. 12

V.    COMMERCE'S AFA DETERMINATIONS AS TO CERTAIN INPUT SUPPLIER'S GOVERNMENT AUTHORITY STATUS IS UNLAWFUL ............. 14

     A.    THE COURT HAS AN INSUFFICIENT BASIS ON WHICH TO REVIEW COMMERCE'S DETERMINATION ................................................................................................. 15

     B.    EITHER INFORMATION FROM THE GOC IS MISSING OR THE INFORMATION PROVIDED CAN BE USED TO MAKE A GOVERNMENT AUTHORITY DETERMINATION; IT CANNOT BE BOTH ....................................................................................................... 17

     C.    BAROQUE DID NOT FAIL TO EXHAUST ADMINISTRATIVE REMEDIES .................... 22

CONCLUSION .............................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S,* 426 F. Supp. 3d 1395 (CIT 2020)............. 22

*Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007) ................................. 22

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (CIT 2019) ............................................ 12

*Cooper (Kunshan) Tire Co., Ltd. et. al v. United States*, No. 20-113, Slip Op. 22-137 (CIT Dec. 8, 2022).................................................................................................................................. 13

*Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302 (CIT 2022) ....................................... 15

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (CIT 2018).............................. 12

*Risen Energy Co. v. United States*, 570 F.Supp.3d 1369 (CIT 2022)....................................... 4, 5

*Timken Co. v. United States*, 894 F.2d 385 (Fed. Cir. 1990)...................................................... 9

*Yama Ribbons & Bows Co. v. United States*, No. 21-00402, 2023 WL 5501536 (CIT Aug. 25, 2023)............................................................................................................................... 13, 14

**Statutes**

19 U.S.C. § 1677(5)(E)(iv) ....................................................................................................... 2

19 U.S.C. § 1677e(a)................................................................................................................ 14

19 U.S.C. § 1677e(b) ................................................................................................................ 14

19 U.S.C. § 1677m(d)............................................................................................................... 22

**Regulations**

19 C.F.R. § 351.511(a)(2)(ii) .................................................................................................. 1, 3

**Administrative Decisions**

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021)................................................................................................................................... 12

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021) ...................................................................................................... 12

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) .................................................................. 15

**Other Authorities**

*United States – Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products
    from India*, WT/DS436/AB/R (8 December 2014)................................................................. 16

Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively "Baroque") submit this Reply Brief in response to the Response Briefs filed by Defendant (the "Government") and Defendant-Intervenor ("Petitioner") ("Gov. Br." and "Pet. Br.," respectively).  For the reasons outlined below, and in Baroque's 56.2 motion and brief ("Baroque Br."), the Court should reject Defendant's and Defendant-Intervenor's arguments in full.

## I.     ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UN COMTRADE DATA ARE NOT

In its Final Results, Commerce failed to provide a reasoned explanation based on substantial evidence for including UN Comtrade data in the Tier 2 plywood benchmark (1) that are not grade specific, (2) where indisputable evidence exists that different plywood grades have *significantly* different prices, and (3) when record evidence demonstrates that UN Comtrade data is overbroad and includes grades of plywood that are materially and significantly different than the plywood used by Baroque. The Government's and Petitioner's briefs provide insufficient justification for Commerce's position.

The Government and Petitioner do not dispute that Commerce found the UN Comtrade data and ITTO data both to be "sufficiently reliable and representative" of a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Gov. Br. 10. Commerce made this determination by averaging the two sources together based on 19 C.F.R. § 351.511(a)(2)(ii). In other words, Commerce determined that the UN Comtrade data and the ITTO data were both individually and independently reliable and representative of a world market price; therefore, Commerce averaged the commercially available world market prices.

What is in dispute is whether the UN Comtrade plywood data (which is not grade-

specific and contains all grades) satisfy the "prevailing market conditions" criteria outlined in 19 U.S.C. § 1677(5)(E)(iv), permitting Commerce to use this source as a tier 2 benchmark in the first place. As discussed in detail in Baroque's brief, record evidence shows that no subject merchandise producer in China would use plywood grades higher than those reported by the ITTO data. Baroque Br. 11-17. Narrowing the benchmark data to only the ITTO data and excluding the UN Comtrade data that includes higher grade plywoods ensures that the benchmark selected is sufficiently comparable to the input subject to the less than adequate remuneration program.

Indeed, the Government in its brief acknowledges that Commerce considers "the facts surrounding the data/information placed on ***the record of a proceeding***. . . {which} must be evaluated on a case-by-case basis." Gov. Br. 10 (emphasis added) (citation omitted). We agree. The Government then goes on to explain that "Commerce's practice is to consider whether a dataset represents comparable. . . world market prices, and if so, to include it in the calculation of the benchmark, ***narrowing it to a more relevant subset if appropriate***." Gov. Br. 12 (emphasis added). Again, we agree. Here, the record indicates that Baroque did not purchase *or* use plywood grades greater than those reported by ITTO. Nor would any MLWF producer given that high quality face veneer is always placed on top of the plywood core obscuring any defects in the plywood.[1]

After explaining that Commerce's practice is to narrow the datasets where the record and data allow, the Government then attempts to rationalize why Commerce included non-grade-specific UN Comtrade HTS subheadings in the benchmark by distinguishing between tier 1

---

[1] Rebuttal Benchmark at 1, Exhibit 1 (Dec. 2, 2021) (**PR295**) ("the plywood used in MLWF is of a low-quality because it is used for the core of the product, which cannot be seen by the consumer.").

benchmarks and tier 2 benchmarks:

> Commerce draws on global datasets and takes the average, as required by 19 C.F.R. § 351.511(a)(2)(ii), ***to approximate a reasonable benchmark price. Commerce tailors those global datasets to the extent possible by using only the subheadings of the data that match the product at issue.***

Gov. Br. 12-13 (emphases added). The Government essentially argues that it only narrows the benchmark data where the HTS subheadings are specific enough to "match the product at issue." *Id.* The Government's explanation concedes that the UN Comtrade data "could not be filtered by grade" and, thus, do not match Baroque's plywood. *Id.* 15. In other words, Commerce concedes that the UN Comtrade data plywood subheading do not match the product at issue because these headings do not specify grade (and therefore include all grades). It makes little sense for Commerce to exclude only those HTS subheadings that are made up exclusively of products not similar to the input being valued on the one hand but, knowingly, to include basket subheadings that definitively include non-similar, and distortive products on the other. This is inconsistent with the myriad cases outlined in Baroque's direct brief at pages 6-11. Further, when prices are used for grade A or B plywood, the benefit being calculated for the subsidy is a result of grade differences and ***not a result of the countervailable subsidy being received***.

Commerce's own regulations mandate that Commerce must make allowances for "factors affecting comparability." 19 C.F.R. § 351.511(a)(2)(ii). As discussed above, the issue before this Court is not whether the ITTO data are narrow or the UN Comtrade data are robust, but whether the UN Comtrade data consists of products that are ***comparable to the product at issue based on the record of the case***.

When the products are not comparable, Commerce is not assessing whether the adequacy of remuneration is caused by a countervailable subsidy but rather is assessing the impact of product differences. Both the Government and Defendant-Intervenors imply that the non-grade-

specific UN Comtrade data are comparable (or more "robust") than the grade-specific ITTO data simply because UN Comtrade data include all grades that *could* be purchased by the respondents. *See*, *e.g.*, Gov. Br. 16-19; Pet. Br. 19-23. This robustness is exactly what makes the UN Comtrade data non-comparable. It is overinclusive of plywood of different (and higher) grades that Baroque did not purchase or use, making it distortive. Baroque presented a significant amount of evidence showing that:

- Plywood grades significantly impact price;

- Plywood used for subject merchandise is Grades C or D since a high-quality face veneer is placed on top of the plywood obscuring scars and defects in the plywood;

- The plywood that Baroque Timber uses in its production is Grade C/D; and

- The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

*See* Baroque Br. 12-17.

The question that should be asked in this case, given the significant record evidence submitted by Baroque, is: if the UN Comtrade data had been broken out by grade-specific subheadings similar to the species breakout (which Commerce excluded), would Commerce include the dissimilar grades in the average of the benchmark? The answer to this question is clearly "*no*" based on Commerce's own statements. Thus, there is no basis to use UN Comtrade data that include much more costly, grade A plywood.

The Government and Petitioner also attempt to address several cases cited by Baroque supporting the proposition that Commerce's practice is to narrow and tailor global datasets based on the record evidence to match the product at issue. Specifically, the Government argues that *Risen Energy Co. v. United States*, 570 F.Supp.3d 1369 (CIT 2022), supports Commerce's

position to include non-grade-specific UN Comtrade data, because the "Court reasoned that this dataset was 'sourced from limited samples' and that including it in the calculation risked 'overvaluing the United States to China route data.'" Gov. Br. 13 (citing *Risen*, at 1378). The Government's analysis entirely misses the mark of the court's reasoning in *Risen*. Based on the facts of that case, the court determined that the "narrow" Descartes ocean freight dataset was less accurate than the "broader" Xeneta ocean freight dataset for valuing ocean freight in the benchmarks. But this was not only because the Descartes data were limited or narrow. Rather, the court found that the Department did not address the "flaws" in the Descartes data (*i.e.*, (1) the data were from one company, and thus may not constitute a world price, (2) some of the data included less than a container load shipment rate, and (3) the data included inland freight "which would incur additional fees **not associated** with ocean freight or found in the Xeneta data"). *Id.* at 1379. In other words, like this case, the evidence in *Risen* showed that Descartes data were not specific to the input or services being valued, and the inclusion of the data skewed or did not add to the accuracy of the benchmark. *Id.* ("Presently, the analysis does not consider these flaws and whether the resulting Descartes data reasonably 'reflect{s} the price a firm actually paid or would pay if it imported the product.'"). While the specific facts are not the same, the dicta of *Risen* is the same as the Government's statement in its brief here: "Commerce's practice is to consider whether a dataset represents comparable—not identical—commercially available world market prices, and if so, to include it in the calculation of the benchmark, *narrowing it to a more relevant subset if appropriate*." Gov. Br. 12 (emphasis added).

This is no different than the other cases the Government tries to distinguish. There is no dispute that the specific facts are not the same as this case. However, all the cases stand for the idea and practice that "*in order to approximate a reasonable benchmark price . . . Commerce*

***tailors those global datasets to the extent possible by using <u>only the subheadings</u> of the data***

***that match the product at issue***" (emphasis added). Gov. Br. 14. In this case, the UN Comtrade

data cannot be differentiated by grade and therefore include significantly higher grades that

substantial record demonstrates are not used by Baroque. Consequently, the inclusion of the non-

grade-specific UN Comtrade data do not add to the accuracy of the benchmark, but rather cause

the benchmark to be skewed by including prices **not associated** with Baroque's purchases in the

benchmark calculation.

      Petitioner's other arguments and *post-hoc* reasoning is entirely without merit. Petitioner

states that since Baroque purchased grade C and D plywood data, UN Comtrade data (which

covers all grades, including grade D) is a better data set than ITTO, which only covers grades

C/CC. Petitioner then provides a venn diagram to provide a pictorial demonstration of its point.

Petitioner Br. 11-12. Petitioner's attempts to obfuscate the record on this issue should be

disregarded.

      Petitioner is correct that record evidence conclusively demonstrates that Baroque

purchased C and D grades of plywood. Baroque Br. 12-15. This means that the ***highest*** grade of

plywood Baroque purchased was Grade C. In other words, Baroque purchased ***no grades higher***

***than the grades covered by ITTO data***. It is precisely because UN Comtrade data includes all

grades that it should not be used. As noted by Professor Dai: "{t}here is a significant price

difference between Grade AB plywood and Grade CD."[2] Given these facts, it defies reason that

UN Comtrade data is more comparable than ITTO data simply because UN Comtrade data

includes Grade D data in addition to Grades A and B. Even if ITTO data does not include Grade

D, it is more similar to Baroque's purchases than any data set that would include Grades A and

---

[2] Rebuttal Benchmark at Exhibit 1 (Dec. 2, 2021) (**PR295**).

B.

      Petitioner's remaining argument, that "record does not establish that subject flooring can only be produced with certain grades of plywood,"[3] is also demonstrably false. Baroque cites copious amounts of record evidence in its direct brief. *See* Baroque Br. 11-17. Defendant-Intervenors speculative attempts to refute this record evidence fail altogether, as Petitioner does not cite to any record evidence that rebuts or refutes the information that Baroque provided.

      Consistent with its practice, Commerce is required to select the most product-specific data utilizing record evidence. Defendant and Defendant-Intervenors' arguments concerning the "robust" nature of the non-specific data are not reasoned or supported by substantial evidence. Moreover, Defendant's arguments concerning the narrower ITTO data are irrelevant given the fact that Commerce already determined that the ITTO data individually and independently was reliable and representative of a world market price. Based on record evidence, the Court should direct the Commerce to recalculate the benchmark consistent with these arguments.

## II.    UN COMTRADE DATA ARE NOT REPRESENTATIVE OF BACKBOARD AND FACE VENEER PURCHASES

      For many of the same reasons discussed above, Commerce's use of UN Comtrade data to calculate the benchmarks for backboard and face veneer purchases is not supported by substantial record evidence.

      The Government and Petitioner argue that, in the *Final Results*, Commerce correctly "found that the record did not show that the UN Comtrade data are unrepresentative of backboard or face veneer purchases." Gov. Br. 19. Further, Petitioner argues that "respondents fail to establish that the UN Comtrade veneer data is not representative of Baroque Timber's backboard or face veneer purchases." Pet. Br. 17. These claims are demonstrably false and

---

[3] Pet. Br. 15-16.

unsupported by record evidence. As discussed in Baroque's direct brief, and as Commerce specifically found, Baroque provided record evidence that showed:

> 1) "{B}ackboard differs from face veneers 'in terms of wood species, price and use;'"
>
> 2) "Riverside provided industry information on the classification of wood products based on characteristics like appearance and wood species;"
>
> 3) "Baroque Timber's distinction between backboard and face veneer appears to be genuine and reflect real industry practices;" and
>
> 4) Specific benchmark data for backboard and face veneer "demonstrate that the distinction between backboard and face veneer is common throughout the industry and are appropriate to value Baroque Timber's purchases of the input."

Final IDM at 91-92 (footnotes omitted). These are Commerce's own findings based on the record evidence submitted by Baroque; Commerce concluded that it is common to treat face and core veneers differently, and that it is appropriate to value them differently. *See id.*

Commerce's conclusions, based on record evidence, are undisputed and rebut the Government's and Petitioner's assertions that Baroque did not show that the UN Comtrade benchmark data based on broad Custom HTS subheadings are unrepresentative of backboard and face veneer purchase prices. There is no dispute that UN Comtrade benchmark data include both face and core veneers. There is also no dispute that it is impossible to know the exact composition of the HTS subheadings. As the Government itself acknowledges, it "could not further tailor the UN Comtrade data as it would if there were sufficient evidence to do so." Gov. Br. 20.

The Government also argues that "solely relying on the much narrower ITTO data for Peru and Ghana would also create potential distortion." Gov. Br. 20. Baroque notes that

Commerce made no such findings that relying on ITTO Data would create a distortion in its Final Results, and that this argument constitutes an *impermissible post hoc rationalization*. *Timken Co. v. United States*, 894 F.2d 385, 389 (Fed. Cir. 1990) ("{A}gency action cannot be sustained on post hoc rationalizations supplied during judicial review."). Indeed, in the Final Results, the Government itself took the position that the ITTO data was "specific to backboard and to face veneer" and were "appropriate to value Baroque Timber's purchases of the input."[4] The Department's sole reason for including UN Comtrade data was because Baroque/ Riverside purportedly "did not show that the other benchmark data on the record is unrepresentative of backboard and face veneer purchases," Final IDM at 92, a position that – as discussed above – is demonstrably false.

  For these reasons and the reasons described in the previous section discussing plywood, Commerce's determination to include the UN Comtrade data in its tier 2 veneer benchmark calculations is unsupported by substantial evidence and not in accordance with law.

III.   **COMMERCE'S INLAND FREIGHT BENCHMARK IS UNLAWFUL AND UNSUPPORTED BY RECORD EVIDENCE**

  As discussed in Baroque's direct brief, Commerce should have calculated the inland freight benchmark as a weighted average rather than a simple average.

  The Government and Petitioner argue that the decision whether to use a weighted average or a simple average depends on the specific context. Gov. Br. 22; Pet. Br. 17-18. Baroque agrees with this assertion. However, contrary to Petitioner's claim that "{t}here is simply no need to weight average in this context," Pet. Br. 19, record evidence demonstrates that the specific context of *this case* requires the use of a weighted average rather than a simple average. The inland freight benchmark is not on the same basis as respondents' data. While respondents

---

[4] Final IDM at 92.

reported the distance to the nearest international port in kilometers, they made purchases on different bases (*i.e.,* some purchases were in kilograms, metric tons, cubic meters or pieces). *See* Baroque Br. 23. Further, the simple average employed by the Department did not account for the different transporting distance with respect to each rate, resulting in a distorted benchmark. Fine Furniture Administrative Case Brief at 17 (**PR354**). A simple average does not consider the element of distance into the average, which is a critical part of the valuation. In this manner, using a simple average does not fulfill the Department's mandate to calculate the CVD rate as accurately as possible.

The Government faults Baroque for failing to identify "a single case outside of this review" for its assertion that the Department always uses weighted averages when calculating benchmarks. However, this is irrelevant, given the Government's acknowledgment that whether to use a simple or weighted average depends on the specific context and record of the case.

The Government also dismisses Baroque's argument that the *Boltless Steel Shelving* is distinct from this case, because the Government was simply citing to it to show "its practice is to use simple averages where appropriate, depending on the specific factual and methodological circumstances." Gov. Br. 23. However, the Government makes no attempt to demonstrate why the specific factual and methodological circumstances of this case warrant the use of a simple average. Further, as discussed in Baroque's direct brief, the fact that *Boltless Steel Shelving* is factually distinct from this case is significant. In that case, the Department considered the averaging of hot-rolled coil steel prices from multiple sources (i.e., American Metal Market, MEPS (International) Ltd., Metal Bulletin, Steel Orbis, and SBB-Platts). *Id.* Indeed, Commerce followed this approach in this review when confronted with multiple data sources – first it calculated the weighted (where possible) or simple average by source, and then calculated a

simple average of the different sources. This methodology does not apply where, as here, there

is only a single source on the record for a particular price. In this case, there is a single source

that reports volume, distance, and cost, for multiple shipments, related to inland freight.

Therefore, consistent with Commerce's benchmark calculations for the UNComtrade pricing in

this case, which weight-averages the values, see Preliminary Calculation Worksheets (**PR309;**

**CR131**), Tabs: "Paint Bench" tab & "Glue Bench," Commerce should be consistent, and

weight average the Doing Business in China 2020 data.

## IV.    AFA SHOULD NOT HAVE BEEN APPLIED TO THE EXPORT BUYER'S CREDIT PROGRAM USAGE

In their briefs, the Government and Petitioner argue that Commerce properly applied

AFA to the Export Buyer's Credit Program ("EBCP"), and to Baroque's customers' usage of

this program, in particular because the company failed to provide non-use certifications for all

of its U.S. customers. Gov. Br. 26-36; Pet. Br. 20-22. For the reasons discussed below,

Commerce's finding that Baroque did not provide sufficient information to demonstrate non-

use is not supported by substantial evidence.

### A.    THE MISSING INFORMATION IS NOT NECESSARY TO DETERMINE USAGE

The Government and Petitioner argue that Commerce adequately identified a gap in the

record because the GOC did not provide it with the 2013 Administrative Measures revisions to

the EBCP; and a list of all partner/ correspondent banks involved in the disbursement of funds

under the EBCP, and that this information is critical to its understanding of the program, without

which it is not able to verify the completely independent inquiry regarding use or non-use. Gov.

Br. 26-30, Pet. Br. 20-21. As multiple decisions by this Court have now held, and as discussed in

Baroque's direct brief, any gap resulting from the absence of the missing documents relates

solely to an **understanding** of the operation of the program and not to establishing **usage** of this

11

program. Baroque Br. 40-41; *see e.g., Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d

1261, 1270-71 (CIT 2018); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1360 (CIT

2019).

Commerce itself has determined that these missing pieces of information are in fact not

"necessary" to establish non-usage of the EBCP. See *Certain Vertical Shaft Engines Between*

*99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Final*

*Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021); *Certain*

*Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China:*

*Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021), IDM

at Cmt. 5. These cases demonstrate that the Government's claim that "the withheld information

prevented {Commerce} from verifying non-use of the EBC program" is without merit. Gov. Br.

29. Commerce can and has verified the usage of this program without the list of

partner/corresponding banks and the revised 2013 administrative measures and, therefore, the

absence of these documents cannot be the basis for Commerce's claim that it cannot verify the

program.

## B.   COMMERCE SHOULD HAVE ACCEPTED STATEMENTS OF NON-USE IN THE QUESTIONNAIRE RESPONSE

In its brief, the Government states that

> Baroque only submitted non-use certificates from a minority of its
> customers. IDM at 37 (citing Baroque Initial Questionnaire Response at
> Exhibits 18a, 18b (C.R.37)). ***To verify use (or non-use) of the EBC***
> ***program, all of the respondent's United States customers must be willing***
> ***to participate in the review because an exporter would receive a benefit***
> ***even if only some of its customers received EBC loans***.

Gov. Br. 36. There are several errors with the Government's position.

First, the Government (and Commerce) fail to explain why statements of non-use within

the response are not sufficient to establish non-use. In CVD cases, Commerce's initial

12

questionnaire asks each mandatory respondent whether it used the program alleged. If the respondent does not use the program, the respondent states so in the response. Commerce did not, for example, require more evidence of the accuracy of Baroque's statements of non-use for certain LTAR programs and did not issue any supplemental questions on this issue. *See* Baroque IQR at 32 (**PR109-112; CR30-42**). Baroque was not required to provide more information on its own "to build the record." Simply stating "no" regarding usage in the response is sufficient without more, just as it is for most other programs.

In questions related to the EBCP in this case, Commerce's questionnaire did not ask for customer certifications or for any documentation establishing non-use. In this response, Baroque Timber and Riverside Plywood indicated that they contacted all of their U.S. customers and confirmed non-use. Baroque IQR at 27 (**PR109-112; CR30-42**). Since Baroque Timber and Riverside Plywood contacted their customers and confirmed non-usage (but only obtained certifications for some customers), this case is distinguishable from *Cooper (Kunshan) Tire Co., Ltd. et. al v. United States*, where the court noted that "Commerce reiterated, and the court agrees that, because the respondents did not provide any customer certifications of non-use, it is unclear 'whether any communication ever took place between the respondents and their customers or whether the non-use statements are based solely on assumptions about how the program currently operates.'" No. 20-113, Slip Op. 22-137 at 62 (CIT Dec. 8, 2022).

Further, in a recent case, *Yama Ribbons & Bows Co. v. United States*, No. 21-00402, 2023 WL 5501536 (CIT Aug. 25, 2023), the court considered the application of AFA for the EBCP program under similar circumstances. As in this case, the respondent contacted all customers and confirmed that no customers used the EBCP. Yama also provided customer certifications for only 28 percent of its customers. The court nonetheless remanded this issue to

13

Commerce, holding that

> the administrative record does not contain substantial evidence to support
> a finding that Yama benefited from the EBCP. Nor does it contain
> substantial evidence to support the Department's finding that the record
> did not allow Commerce to determine whether a benefit to Yama occurred
> or its finding that it could not conduct any verification of Yama's or its
> customers' "non-use" of that program.

*Yama Ribbons & Bows Co*., 2023 WL 5501536, at *9.

The Court should remand this issue to Commerce as it consistently has in numerous prior

cases.

## V.   COMMERCE'S AFA DETERMINATIONS AS TO CERTAIN INPUT SUPPLIER'S GOVERNMENT AUTHORITY STATUS IS UNLAWFUL

In its direct brief, Baroque advances two main challenges to Commerce's application of

AFA to the government authority determination for certain of its input suppliers: (1) that

Commerce's "group" determination rather than individual determinations for each supplier,

renders the decision unreviewable; and (2) even if reviewable, the GOC responses were not

deficient or missing, preventing AFA because there is no gap in the record. Baroque Br. 26-39.

Both challenges address whether, based on the evidence and the requirements of 19 U.S.C.§§

1677e(a) and (b), Commerce lawfully rendered a decision based on AFA. Though Baroque

believes that substantial evidence demonstrates that its input suppliers are not government

authorities, that claim is not before this Court. Commerce's determination was based on AFA

only. Commerce did not find that the information the GOC provided in this case demonstrated

that Baroque's input suppliers were government authorities. Instead, Commerce found that the

GOC failed to provide requested information and, thus, failed to cooperate to the best of its

ability warranting the use of facts available with adverse inferences to fill that gap in the record.

Baroque argued at length in its direct brief that this finding was unlawful. Neither the

Government nor the Petitioner adequately rebut Baroque's position.

## A.   THE COURT HAS AN INSUFFICIENT BASIS ON WHICH TO REVIEW COMMERCE'S DETERMINATION

The first challenge that Baroque makes in its brief relates to how Commerce rendered its determination. Baroque Br. 32. Specifically, Baroque argued that Commerce erred by failing to make government authority determinations for each input supplier, particularly the individually owned suppliers identified in Attachment 1 to its direct brief. Baroque continued that failing to issue specific findings on how the GOC did not provide requested information or cooperate as to each of the nine suppliers made Commerce's determination unreviewable by this Court. As the court has explained:

> A court is obligated to review a decision of an administrative agency according to the reasoning the agency puts forth. . . .To do that, a court must be able to discern and evaluate that reasoning according to the applicable standard of review.

*Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1324 (CIT 2022).

Whether Baroque's input suppliers are government authorities is an individual determination based on the information provided by the GOC in its questionnaire responses (and any other information on the record). Indeed, Commerce must determine whether each individual supplier is "vested with government authority", thereby providing a countervailable subsidy to Baroque. If a supplier is not an authority, then the purchases from that supplier will not be countervailed. To determine whether an entity is an "authority" under section 771(5)(B) of the Act, Commerce reviews "the totality of record evidence and whether it demonstrates that the government has meaningful control over an entity such that it possesses, exercises, or is vested with government authority." *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021), IDM at Cmt. 13; *see also US – Anti-Dumping and Countervailing Duties (China)*." *United States – Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*,

15

WT/DS436/AB/R (8 December 2014) at para. 4.29 ("the term 'public body' in Article 1.1(a)(1) of the SCM Agreement means 'an entity that possesses, exercises or is vested with governmental authority.' Whether the conduct of an entity is that of a public body must in each case be determined on its own merits, with due regard being had to the core characteristics and functions of the relevant entity, its relationship with the government, and the legal and economic environment prevailing in the country in which the investigated entity operates."). Whether the GOC did or did not provide requested information for each supplier again is an individual determination since this information is used to determine whether ***that specific supplier is a government authority***. The Court must then determine whether Commerce lawfully concluded that the failure to provide that specific information created a gap in the record that needed to be filled to determine whether each supplier is a government authority. Finally, the Court must then determine whether substantial evidence supported Commerce's finding that information provided, or failed to be provided, for each specific supplier constituted the GOC's failure to cooperate to the best of its ability, i.e., whether adverse inferences were warranted. The Government in its brief does not address this claim that determinations must be made individually even though (1) different information was provided for different suppliers, creating a different record for each, and (2) certain suppliers where non-cross-owned affiliates of Baroque, creating a unique factual scenario.

Rather than address this issue, the Government in its brief simply repeats Commerce's reasoning in its decision memo. The Government explains:

> although the government of China provided information such as articles of incorporation, financial statements, appointment documentation, and certifications pertaining to its involvement, the government of China only provided such information for 18 of the 140 companies which supplied inputs to the mandatory respondents during the period of review. *Id.* Commerce explained that this information is necessary to fully evaluate

> whether the input producers are "authorities" within the meaning of
> section 19 U.S.C. § 1677(5)(B). Therefore, Commerce reasonably
> determined that necessary information was missing from the record, and
> that the government of China had withheld information that was requested
> of it and significantly impeded the proceeding within the meaning of 19
> U.S.C. § 1677e(a)(1) and 19 U.S.C. § 1677e(2)(A), (C). IDM at 56.
> Further, Commerce determined that the government of China failed to
> cooperate by not acting to the best of its ability, because the government
> of China failed to provide the requested information after multiple
> opportunities. IDM at 39. Therefore, Commerce found that an adverse
> inference was warranted.

Gov. Br. 38. This excerpt shows that Commerce found that adverse inferences were warranted

because the GOC only provided information for *some* suppliers, therefore, warranting AFA as to

*all* suppliers. *See also* Pet. Br. 24 (arguing that Commerce correctly evaluated this issue as a

group rather than individually). This finding ignores substantial evidence that complete

information is on the record for the suppliers identified in Attachment 1 of Baroque's direct

brief. It is irrelevant whether the GOC provided some or no information for some suppliers. That

has no bearing on whether the GOC did provide sufficient information for certain other

suppliers.

### B. EITHER INFORMATION FROM THE GOC IS MISSING OR THE INFORMATION PROVIDED CAN BE USED TO MAKE A GOVERNMENT AUTHORITY DETERMINATION; IT CANNOT BE BOTH

Next, the Government turned to some of the information provided by the GOC. Like

Commerce's explanation in its Final Results, the Government's tackling of this information is

confusing. That is, both Commerce in its decision and the Government in its brief seem to be

addressing the merits of the information provided, rather than identifying whether certain

information is missing, warranting adverse inferences. The Government explains:

> Specifically, regarding the company-specific information submitted by
> the government of China, such as articles of incorporation, capital
> verification reports, company by-laws, business licenses, and financial
> statements submitted for certain individually- or wholly foreign-owned
> suppliers, the documentation is helpful in identifying the individual

> owners, board members, officers, and managers of the company. *Id.* at
> 57. However, this documentation lacks information as to whether the
> owners and shareholders of the companies have any Chinese Communist
> Party involvement. *Id.* The government of China did not provide any
> government documentation to support its claim that the independently-
> owned suppliers were not government authorities. *Id.* at 58

Gov. Br. 40.[5] This statement has several errors. This reference relates to the so-called

"Documents Question" discussed in our brief at page 28. For the nine suppliers at issue, the GOC

responded fully to the question specifically requesting these documents. Again, the issue is

whether the GOC did not respond to this question warranting AFA and whether this requested

information is missing. This information is not missing, yet Commerce used the fact that the

information was not provided by some suppliers as part of the basis for AFA for all suppliers. All

government documents specifically requested in the Documents Question were provided for the

suppliers identified in Attachment 1 of Baroque's brief and thus the finding of a gap and adverse

inferences cannot be based on the GOC's response to this question, for these suppliers.

Next, the Government attempts to address the GOC's response to the "9 entities

question." Here, unlike virtually every other CVD case involving China, the GOC fully

responded to this question, which asks:

> Please explain whether a CCP committee, branch or "primary
> organization" has been formed within the enterprise. Please also explain
> any decisions taken by the entity that are subject to review or approval by
> the Government or the 9 entities listed above, as either an owner or
> regulator, or both (e.g., mergers/acquisition, issuance of shares, change in
> capital structure, change in leadership positions or board composition,
> etc.).

Baroque Br.  28. ***This question does not request documentation***. The GOC explained

for 8 of the 9 input suppliers that:

---

[5] We also note that it is not the GOC's burden to prove that the input suppliers are not
government authorities.

> There is no primary party organization in this producer. There is no
> decision taken by the producer that are subject to the review or approval
> by the Government or the 9 entities listed in the question. As demonstrated
> in the Articles of Association of the producer, the decisions are made
> within internal organizations of the producer without reference to any
> external review or approval.

GOC IQR at Exh. LTAR-1, pp. LTAR-27-29 (**PR115-126; CR45-54**); GOC Supp. Response at

14-16 (**PR154; CR69-77**). For the other supplier, the GOC explained that there was a primary

party organization and then provided documentation related to the functions of that organization

in the company. *Id*. This response is notable because: 1) the GOC responded fully with the

explanation requested and documentation where needed (which was not requested) and, thus, this

information is not missing from the record; there is no gap and it cannot be the basis of AFA; 2)

it dispels Commerce's presumption that a primary party organization is in all companies, as

outlined in the 9 Entities Question which states "Commerce also understands that, in accordance

with the CCP Constitution, a (9) CCP committee, branch, or 'primary organization' needs to be

formed in any enterprise with three or more party members, regardless of stateownership"[6]; and

3) it also contradicts Commerce's statement in its Final Results that "{P}ublicly available

information indicates that Chinese law requires the establishment of CCP organizations 'in all

companies, whether state, private, domestic, or foreign-invested' and that such organizations

may wield a controlling influence in the company's affairs." Final IDM at 57. Obviously, the law

does not require this if these suppliers do not have primary party organizations.

     The Government in its brief makes no reference to this primary party discussion despite

Commerce's clear discussion of it as a basis for its AFA decision in the IDM. *See* Final IDM at

56-57. Commerce's discussion of this aspect of its decision is further perplexing. Commerce

seems to be saying that the GOC's response that there were no primary party organizations in

---

[6] GOC IQR at *Id*. at Exhibit LTAR-1 at p. LTAR-26-27 (**PR 115-126; CR 45-54**).

eight of the suppliers was deficient, creating a gap, because public information in another case, or because of its "understanding," is that there should be a primary party organization in most companies. Commerce made this determination despite not asking any follow-up questions to the GOC about the information provided. Thus, while the GOC fully responded to this question, Commerce found the information nonetheless "missing" because, at bottom, it did not believe the GOC's response.

Then, for the one supplier who did have a primary party organization, Commerce concluded that the report provided for this company related to this issue actually suggested CCP involvement. *Id.* at 57. The question then is – did Commerce make a government authority determination with regard to this supplier based on substantial evidence or was its finding for this supplier still based on AFA? If it was an AFA finding, and Commerce evaluated the substance of the information actually provided, there was no information missing for which to apply facts available and adverse inferences. These questions alone necessitate a remand.

Lastly, the Government addressed the GOC's response regarding the involvement of CCP or government officials, explaining that "Commerce reasonably concluded that these certifications are not the documents that it requested, and that they are largely *pro forma* in nature, lacking particular details of government involvement in each company" and that "When asked to identify any owners, members of the boards of directors, or managers of the input producers who were government or Chinese Communist Party officials during the period of review, the government of China explained that there is "no central informational database to search for such information." Gov. Br. 39; Pet. Br. 23. This argument ignores the following. First, the Government claims that "the certifications are ***not the documents that it requested***." Gov. Br. 39 (emphasis added). Commerce's questions on this issue, however, ***did not request***

*documentation*. Commerce simply asked the GOC either "explain" or "identify" if there *was involvement*. Commerce did not ask the GOC to support its response *with documentation*. The GOC answered these questions fully in this regard stating "The GOC has confirmed that, for the companies that the GOC was able to collect and submit requested documents in the IQR and Exhibit SQ-1, all of the owners, directors, or managers were not Chinese Government or CCP officials during the POR." GOC Supp Response at 16-17 (**PR154; CR69-77**). There is no information on the record to rebut this statement.

Second, it is unclear how the statement regarding the lack of a central database signifies a lack of cooperation. The Government suggests that "prior countervailing duty proceedings, Commerce has found that the government of China was able to obtain the information requested independently from the companies involved, and that statements from company respondents, rather than from the government of China, were not sufficient." Gov. Br. 39. This is a reference to *Citric Acid from China 2012* only.[7] Baroque discussed this case in its brief, distinguishing it. Baroque Br. 39. Neither the Government nor the Petitioner provided a response to this argument in their brief. Baroque explained that the key difference in that case as compared to this one was that the owner/manager of the supplier was part of a CCP/government organization prior to the POR and, thus, the GOC could prove with documentation that it was no longer part of that organization (i.e., the GOC was not proving a negative but rather proving a change in status). The documentation in *Citric Acid from China 2012* did not include a "central database" and Commerce did not require in that case that the GOC provide documentation that none of the manager/owners were part of any of the other 9 entities. Commerce accepted the written

---

[7] *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec. 31, 2014).

response from the GOC that the managers/owners were not part of these entities, which is the same information the GOC provided here. The Government's simple repetition of Commerce's decision without any attempt to address Baroque's specific arguments is woefully inadequate.

### C.      BAROQUE DID NOT FAIL TO EXHAUST ADMINISTRATIVE REMEDIES

The Government's arguments that Baroque failed to exhaust administrative remedies by not raising its 19 U.S.C. § 1677m(d) claim below also fails. Gov. Br. 41; Pet Br. 25. First, Baroque argued at length below that the GOC's responses were not deficient, and that AFA was not warranted. This claim arises from that argument, Commerce had clear notice. Second, even if the 1677m(d) claim is unique from the arguments raised, the pure question of law exception applies. The question here is whether Commerce followed the express terms of an unambiguous statute; there is no question of fact. *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007); *see, e.g.*, *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S,* 426 F. Supp. 3d 1395, 1410 (CIT 2020) ("BMB's argument is that the express terms of the statute prohibit Commerce from making any PMS adjustment to an importer's cost of production… for purposes of the sales below COP test, so that Commerce acted contrary to the statute, and thus contrary to law….The 'pure legal question' exception applies because no further factual development is required, so that requiring exhaustion would be futile."). As explained above, Commerce explained in its Final Results in response to Baroque's briefing that the GOC failed to provide sufficient documentation for the 9 Entities Question, warranting AFA, and yet neither the 9 Entities Question nor Commerce's supplemental question requested documentation. The failure to advise the GOC of this deficiency, which formed the basis for Commerce's AFA finding, is contrary to the unambiguous statutory requirements in section 1677m(d).

For these reasons, the Court should disregard the Government's and Petitioner's claims concerning exhaustion.

## **CONCLUSION**

Baroque requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated: September 15, 2023

23

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 6,947 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*

Dated: September 15, 2023