Slip Op. 25-35

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. AND RIVERSIDE PLYWOOD CORPORATION,** | |
| Plaintiffs, | |
| and | |
| **ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*,** | |
| Consolidated Plaintiffs, | |
| and | **Before: Timothy M. Reif, Judge** |
| **LUMBER LIQUIDATORS SERVICES, LLC,** | **Consol. Court No. 22-00210** |
| Plaintiff-Intervenor, | |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,** | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's final results in the ninth administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.]

Dated:  April 3, 2025

Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington D.C., argued for plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation.  With him on the briefs were Francis J. Sailer and Kavita Mohan.

Sarah Marie Wyss, Kristin H. Mowry and Ronalda G. Smith, Mowry & Grimson, PLLC, of Washington D.C., for consolidated plaintiffs Fine Furniture (Shanghai) Ltd. & Double F Limited.

Adams Chi-Peng Lee, Harris Bricken Sliwoski LLP, of Seattle, WA, for consolidated plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

Mark Ludwikowski, Kelsey Christensen and Sally Alghazali, Clark Hill PLC, of Washington, D.C., for plaintiff-intervenor Lumber Liquidators Services, LLC.

Kelly M. Geddes, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and JonZachary Forbes, Of Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., argued for defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.

Timothy C. Brightbill, Stephanie M. Bell and Theodore P. Brackemyre, Wiley Rein LLP, of Washington D.C., for defendant-intervenor American Manufacturers of Multilayered Wood Flooring.

* * *

     Reif, Judge:  Before the court are the motions for judgment on the agency record by plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation (collectively, "Baroque" or "plaintiff"),[1] consolidated plaintiffs and plaintiff-intervenor.

---

[1] Baroque Timber is a cross-owned affiliate of Riverside Plywood.

Plaintiff invokes this Court's subject matter jurisdiction under 28 U.S.C. § 1581(c) and seeks review of the final results of the ninth administrative review by the U.S. Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF" or "subject merchandise") from the People's Republic of China ("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (Dep't of Commerce Jun. 16, 2022) ("*Final Results*"), PR 375; Department of Commerce, Issues and Decision Memorandum for the Final Results of the 2019 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China (June 10, 2022) ("IDM"), PR 369.

Plaintiff alleges that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law in regard to Commerce's: (1) calculation of the benchmark price for plywood; (2) calculation of the benchmark price for veneer; (3) calculation of the inland freight benchmark; (4) application of adverse facts available ("AFA") to find certain individually-owned input suppliers to be government authorities; and (5) application of AFA to find use of the Export Buyer's Credit Program ("EBCP"). *See* Baroque Mot. for J. on the Agency Record ("Baroque Br."), ECF No. 44.

For the reasons discussed below, the court sustains in part and remands in part Commerce's Final Results.

## BACKGROUND

On December 8, 2011, Commerce issued a CVD order on MLWF from China. *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011), amended by *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).[2]

On December 2, 2020, Commerce issued a notice that interested parties could request an administrative review of the CVD order. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 Fed. Reg. 77,431 (Dep't of Commerce Dec. 2, 2020).

On February 4, 2021, Commerce initiated an administrative review of the CVD order on MLWF from China for the period of review ("POR") January 1, 2019, through December 31, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021), PR 62.

On March 19, 2021, Commerce selected Baroque as well as Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") as mandatory respondents in the administrative review. Department of Commerce, Respondent Selection Memorandum (Mar. 19, 2021), CR 10, PR 77.

---

[2] The amendment consisted of removing an incorrect Harmonized Tariff Schedule of the United States ("HTS") number from the scope of the orders. *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders,* 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).

On December 27, 2021, Commerce published its preliminary results, in which it calculated a preliminary countervailable subsidy rate of 22.70 percent for Baroque, 5.50 percent for Senmao and 15.71 percent for the non-selected companies. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2019*, 86 Fed. Reg. 73,244 (Dep't of Commerce Dec. 27, 2021) ("*Preliminary Results*"), PR 311; Department of Commerce, Preliminary Decision Memorandum for the Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, In Part; 2019 (Dec. 17, 2021) ("PDM"), PR 303.

In its preliminary results, Commerce determined to calculate benchmark prices for plywood and veneer, two inputs used to produce MLWF, by taking an average of two datasets in the record: a dataset from the International Tropical Timber Organization ("ITTO") containing plywood data from Brazil and Peru and a global dataset from the United Nations Comtrade database ("UN Comtrade"). PDM at 40-42.

Commerce determined also to calculate the benchmark rate for inland freight by taking the simple average of two freight rates published in the World Bank's *Doing Business in China 2020 Report*. *Id.* at 43-44.

Additionally, Commerce preliminarily determined to apply an adverse inference that certain individually-owned input suppliers were authorities of the Government of China ("GOC") because the GOC withheld information that Commerce deemed necessary for analyzing Chinese Communist Party ("CCP") involvement in those suppliers. *Id.* at 13-16.

Commerce determined also to apply an adverse inference that Baroque's and Senmao's U.S. customers benefited from the EBCP, based on a finding that the GOC and mandatory respondents withheld necessary information for assessing whether such customers had used the EBCP.  *Id.* at 19-29.

On June 16, 2022, Commerce published its Final Results, in which it calculated a final countervailable subsidy rate of 12.74 percent for Baroque, 3.36 percent for Senmao and 9.85 percent for the non-selected companies.  *Final Results*, 87 Fed. Reg. at 36,306.  In its Final Results, Commerce continued to use both UN Comtrade and ITTO data to calculate benchmarks for plywood and veneer.  IDM at 92.  However, Commerce determined that it would calculate two separate benchmark prices for backboard and face veneer, in contrast with its preliminary calculation of a single veneer benchmark.  *Id.* at 91.  With regard to the application of adverse inferences relevant to this case, Commerce made no changes from the preliminary results.  *See id.* at 23, 54.

On July 18, 2022, and on August 17, 2022, Baroque filed its summons and complaint, respectively, before the Court seeking judicial review of certain aspects of the Final Results.  Summons, ECF No. 1; Complaint, ECF No. 10.

On September 20, 2022, the court granted defendant's consent motion to consolidate Baroque's action with three other actions involving the same administrative review.[3]  Order Def.'s Mot. to Consol., ECF No. 33.[4]

On February 7, 2023, and on March 9, 2023, plaintiff, consolidated plaintiffs, and plaintiff-intervenor filed motions for judgment on the agency record.  Mots. for J. on the Agency Record, ECF Nos. 44-48.[5]

On September 26, 2024, the court heard oral argument.  *See* Oral Arg. Tr., ECF No. 77.

As noted, in its motion, plaintiff maintains that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law with regard to Commerce's: (1) calculation of the benchmark price for plywood; (2) calculation of the benchmark price for veneer; (3) calculation of the inland freight benchmark; (4) application of AFA to find certain input suppliers to be government authorities; and (5) application of AFA to find use of the EBCP.  *See* Baroque Br. at 1-3.

---

[3] These actions were filed by: (1) Zhejiang Dadongwu GreenHome Wood Co., Ltd. ("GreenHome"), a foreign producer and exporter of MLWF (Case No. 22-00207); (2) Evolutions Flooring Inc. and Struxtur, Inc. (collectively, "Evolutions"), domestic importers of MLWF (Case No. 22-00209); and (3) Fine Furniture (Shanghai) Ltd. and Double F Ltd. (collectively, "Fine Furniture"), foreign producers and exporters of MLWF (Case No. 22-00211) (together, with Evolutions and GreenHome, "consolidated plaintiffs").

[4] On the same day, the court granted also the consent motion of the American Manufacturers of Multilayered Wood Flooring ("AMMWF") to intervene as a defendant-intervenor.  Order AMMWF's Mot. to. Inter., ECF No. 32.

[5] These motions were filed by: (1) Baroque, ECF No. 44; (2) plaintiff-intervenor Lumber Liquidators Services, LLC ("Lumber Liquidators"), a domestic importer of MLWF, ECF No. 45; (3) Evolutions, ECF No. 46; (4) GreenHome, ECF No. 47; and (5) Fine Furniture, ECF No. 48.

## JURISDICTION AND STANDARD OF REVIEW

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The court exercises jurisdiction pursuant to 28 U.S.C. §1581(c).

The court will uphold Commerce's determinations in CVD proceedings unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (citations omitted).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).

A court "[is] obliged to set aside Commerce's determination if it is unsupported by substantial evidence on the record[ ] or otherwise not in accordance with law.  To fulfill that obligation, . . . Commerce [must] examine the record and articulate a satisfactory explanation for its action."  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (internal quotation marks and citations omitted).

"[W]hen a statute grants an agency power to administer fact-intensive inquires, the agency's conclusion should be reversed only if the record is 'so compelling that no reasonable factfinder' could reach the same conclusion."  *Cooper (Kunshan) Tire Co. v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1316, 1325 (2021) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

"To be in accordance with law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations." *Yama Ribbons & Bows Co. v. United States,* 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1297 (2012) (internal quotation marks and citation omitted).  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted).  A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 43.

## DISCUSSION

I.    **Whether Commerce's calculation of the benchmark for plywood is supported by substantial evidence and otherwise in accordance with law**

The court addresses first Baroque's challenge to Commerce's calculation of the plywood benchmark.  Specifically, Baroque challenges Commerce's inclusion of non-grade specific UN Comtrade data in Commerce's tier two plywood benchmark calculation.

A.    **Additional Background**

In the Final Results, Commerce calculated plywood benchmark prices by averaging the UN Comtrade data and the ITTO data placed on the record.  *See* IDM at 86.  The UN Comtrade dataset consists of data reported monthly by approximately 90 countries for plywood transactions during the period of review.  *See* Wiley, AMMWF Benchmark Pricing Information (Nov. 22, 2021) at Ex. 1-A, PR 256, 266-275; Husch Blackwell, Senmao Benchmark Pricing Information (Nov. 22, 2021) at Attachs. 1-3, CR 92-100, PR 257.  The ITTO dataset contains C/CC grade plywood export prices from Brazil and Peru during the period of review.  *See* GDLSK, Riverside Benchmark Data

Submission (Nov. 23, 2022) ("Baroque Benchmark Pricing Information") at Ex. 2, CR
101-116, PR 276-286.

    **B.**    **Legal Framework**

A countervailing duty is "a remedial measure that provides relief to domestic
manufacturers by imposing duties upon imports of comparable foreign products that
have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai)
Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014). The countervailing duty
imposed shall be "equal to the amount of the net countervailable subsidy." 19 U.S.C. §
1671(a).

Commerce will determine that a countervailable subsidy exists when a foreign
authority provides a specific financial contribution to a party, and that party benefits
therefrom. *See id.* § 1677(5). A benefit is conferred where "goods or services are
provided for less than adequate remuneration," ("LTAR") which is "determined in relation
to prevailing market conditions for the good . . . which is subject to the investigation or
review." *Id.* § 1677(5)(E)(iv). Prevailing market conditions include "price, quality,
availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

To determine whether goods were provided for less than adequate remuneration,
"Commerce must determine the proper benchmark price." *Essar Steel Ltd. v. United
States,* 678 F.3d 1268, 1273 (Fed. Cir. 2012) (citing 19 C.F.R. § 351.511). The
benchmark price is "the price that could have constituted adequate remuneration." *Fine
Furniture,* 748 F.3d at 1368. To measure the adequacy of remuneration, Commerce
"compares the respondent's reported costs for the input in question . . . with the
calculated benchmark price, which is representative of the market price for the good at

issue." *Beijing Tianhai Indus. Co. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351, 1356 n.9 (2015).

Under 19 C.F.R. § 351.511(a)(2), Commerce sets forth the "bases for identifying an appropriate market-based benchmark for measuring the adequacy of the remuneration of a government provided good or service." *Id.* In order of preference, the potential benchmarks are as follows: (1) market prices from actual transactions within the country under investigation for the government-provided good (e.g., actual sales, actual imports, or competitively run government auctions) ("tier one" benchmarks); (2) world market prices that would be available to purchasers in the country under investigation ("tier two" benchmarks); or (3) prices consistent with market principles based on an assessment by Commerce of the government-set price ("tier three" benchmarks). *Id.* (citing *High Pressure Steel Cylinders from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 76 Fed. Reg. 64,301, 64,304 (Dep't of Commerce Oct. 18, 2011)).

"If there is no useable market-determined price with which to make the comparison," then Commerce will calculate a tier two benchmark, "measur[ing] the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). In calculating a tier two benchmark, if "there is more than one commercially available world market price," Commerce is required to "average such prices to the extent practicable, making due allowance for factors affecting comparability." *Id.* "These factors ensure that the

composite benchmark reflects prevailing market conditions in the [producer's] home country.  [The factors] include 'price, quality, availability, marketability, transportation, and other conditions of purchase or sale.'" *RZBC Grp. Shareholding Co. v. United States,* 39 CIT __, __, 100 F. Supp. 3d 1288, 1305 (2015) (citing 19 U.S.C. § 1677(5)(E)).

"The court's role is not to assess whether the benchmark data Commerce used was [sic] the 'best available,' but rather whether Commerce's choice was reasonable." *Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1274 (2018) (citing *Peer Bearing Company-Changshan v. United States*, 27 CIT 1763, 1770, 298 F. Supp. 2d 1328, 1336 (2003)).

### C.    Analysis

For the reasons discussed below, the court is not able to conclude that Commerce's calculation of the plywood benchmark is supported by substantial evidence.  The court remands to Commerce to take the actions as set forth below.

In the Final Results, Commerce determined to calculate the final plywood benchmark by averaging both the non-grade specific UN Comtrade data and the ITTO C/CC grade data from Brazil and Peru.  *See* IDM at 86-88.

In the IDM, Commerce explained that it continued to include the UN Comtrade data in its calculation because Baroque "did not adequately support its arguments that the UN Comtrade data are inappropriate to calculate plywood benchmarks for Baroque Timber's purchases of C/D grade plywood." *Id.* at 86.  Commerce added that "the UN Comtrade plywood data on the record include all grades of plywood." *Id.*  Additionally, Commerce cited its "practice to average multiple world market prices, pursuant to 19

C.F.R. § 351.511(a)(2)(ii)" in determining to average the UN Comtrade and ITTO C/CC grade data.  *Id.*

Baroque asserts that Commerce's plywood benchmark calculation was unsupported by substantial evidence because Commerce disregarded information in the record demonstrating the importance of grade in plywood valuation and that Baroque's input purchases were limited to C/D grade plywood.  Baroque Br. at 15-16.  Specifically, Baroque contends that Commerce disregarded supplier certifications, expert testimony, and various articles and website printouts demonstrating that using data containing higher-grade plywood prices, such as the UN Comtrade data, would be distortive and inaccurate.  *Id.*

The court concludes that Commerce did not address adequately the information in the record demonstrating that the UN Comtrade data are overbroad and, on that basis, may not be comparable for purposes of the plywood benchmark calculation.

In the IDM, Commerce acknowledged that the record demonstrated that plywood grade has a significant impact on price and that Baroque purchased only lower grade plywood.  However, notwithstanding that Commerce acknowledged this fact, Commerce determined to use the UN Comtrade data because it "include[d] all grades of plywood."  IDM at 86.

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp.*, 340 U.S. at 488; *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("A reviewing court must consider the record as a whole . . . .").

"While [the agency] need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines [sic] its reasoning and conclusions."  *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001) (internal citation omitted).

Commerce did not address adequately the "significant arguments and evidence" put forth by Baroque that "seriously undermine[]" Commerce's determination to include the UN Comtrade data in the plywood benchmark.  *Id.* at 1117-18, 167 F. Supp. 2d at 1374.  The court does not conclude that the information that "fairly detracts" from Commerce's determination itself constitutes substantial evidence for an alternative conclusion, *Universal Camera Corp.*, 340 U.S. at 488; rather, Commerce has not shown that its conclusion is supported by substantial evidence considering the record as a whole.  *See Nippon Steel Corp.*, 458 F.3d at 1351.

Accordingly, the court remands to Commerce to explain adequately its conclusion in light of the record and arguments presented that inclusion of the UN Comtrade data is appropriate to calculate the plywood benchmark.

## II.    Whether Commerce's calculation of the benchmarks for veneer is supported by substantial evidence and otherwise in accordance with law

The court addresses next Baroque's challenge to Commerce's calculation of the benchmarks for face and backboard veneer.  In particular, Baroque challenges Commerce's inclusion of the UN Comtrade data, which do not distinguish between face and backboard veneer, in calculating separate benchmarks for face and backboard veneer.  *See* Baroque Br. at 18-21.

For the reasons discussed below, the court is not able to conclude that Commerce's calculations of the benchmarks for face and backboard veneer are

supported by substantial evidence.  The court remands to Commerce to take the actions as set forth below.

In the Final Results, Commerce determined to calculate separate benchmarks for face and backboard veneer by taking the average of both the global UN Comtrade data and the relevant ITTO data from Ghana and Peru.  *See* IDM at 91-92.  The ITTO Ghana data are differentiated by backboard or face veneer while the UN Comtrade data and the ITTO Peru data are not.  *See* Baroque Benchmark Pricing Information at Ex. 2.

In the IDM, Commerce explained that it continued to include the UN Comtrade data because Baroque "did not show that the [UN Comtrade] benchmark data on the record is [sic] unrepresentative of backboard and face veneer purchases."  IDM at 92. Additionally, Commerce stated that Baroque's argument was undercut by its submission of "benchmark information that included both core and face veneer."[6]  *Id.*  Commerce added that it continued to find that the UN Comtrade data "describe both reported sets of purchases and thus are still suitable for benchmarking backboard and face veneer" because Commerce lacked "further information on the record about the composition of the UN Comtrade data with respect to face veneer and backboard/core veneer."  *Id*.

Baroque argues that Commerce's inclusion of the UN Comtrade data was unsupported by substantial evidence because Commerce failed to address adequately significant information in the record detracting from Commerce's conclusion.  Baroque contends that the UN Comtrade data would "be distortive of both benchmarks – i.e., artificially lowering one price and artificially increasing the other price," regardless of the

---

[6] As noted above, Baroque submitted ITTO data from Ghana, which are differentiated by backboard or face veneer, and Peru, which contain undifferentiated core and face veneer prices.  *See* Baroque Benchmark Pricing Information at Ex. 2.

exact composition of the data.  Baroque Br. at 20.  Further, Baroque asserts that it is in

fact "impossible to know the exact composition of" the UN Comtrade data with respect

to veneers.  Plaintiffs' Reply Brief ("Pl. Reply Br.") at 8, ECF No. 59.

      The court concludes that Commerce did not address adequately the information

in the record demonstrating that backboard and face veneer are distinct and that,

therefore, the UN Comtrade data containing both backboard and face veneer could be

overly broad and distortive.  *See NTSF Seafoods Joint Stock Co. v. United States*, Slip

Op. 22-38, 2022 WL 1375150, at *22 (CIT Apr. 25, 2022) (remanding for Commerce to

address "conflicting evidence on the record").

      Commerce "need not address every argument and piece of evidence," but "it

must address significant arguments and evidence which seriously undermines [sic] its

reasoning and conclusions."  *Altx, Inc.*, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374

(internal citation omitted).

      In the IDM, Commerce stated that the "record supports [Baroque's] claims that

[its] backboard differs from face veneers in terms of wood species, price and use."  IDM

at 91 (internal quotation marks omitted).  In doing so, Commerce accepted the following

information, which would appear to detract from Commerce's conclusion to include the

UN Comtrade data: (1) Commerce noted that Baroque "provided industry information on

the classification of wood products" and that "pictures of sample backboard and face

veneer provided by [Baroque] generally conform to these grading practices"; (2)

Commerce stated that Baroque demonstrated that it "differentiates between backboard

and face veneer throughout its purchasing, warehousing, and invoicing systems"; (3)

Commerce found that Baroque's "suppliers for backboard and face veneer are entirely

separate"; and (4) Commerce found also that Baroque "submitted benchmark data . . . specific to backboard and to face veneer . . . . [that] further demonstrate that the distinction between backboard and face veneer is common throughout the industry and are appropriate to value" Baroque's purchases.  *Id.* at 91-92.

In sum, the IDM contains a detailed discussion of the support in the record for the distinction between face and backboard veneer and raises questions about Commerce's conclusion on this issue; however, Commerce then concluded that Baroque "did not show that the [UN Comtrade] benchmark data on the record is unrepresentative of backboard and face veneer purchases."  *Id*.

This sentence does not make the path of Commerce's decision to include the UN Comtrade data in the benchmarks for face and backboard veneers "reasonably discernible."  *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  For substantially the same reasons, Commerce has not explained adequately its use of ITTO Peru Core/Face data, which are likewise undifferentiated by veneer type.  *See* Baroque Benchmark Pricing Information at Ex. 2.  Baroque does not object to Commerce's use of the ITTO Peru data but does not provide any reason that this use should be analyzed differently than Commerce's use of UN Comtrade data.

Accordingly, the court remands to Commerce to explain adequately its conclusion in light of the record and arguments presented that inclusion of the UN Comtrade and ITTO Peru data is appropriate to calculate the benchmarks for face and backboard veneer.  If, on remand, Commerce determines that it is unable to provide such an explanation, then Commerce is instructed to recalculate the benchmarks for face and backboard veneer using solely the ITTO Ghana data.

**III.    Whether Commerce's calculation of the inland freight benchmark is supported by substantial evidence and otherwise in accordance with law**

The court turns to Baroque's challenge to Commerce's determination to calculate the benchmark for inland freight by using a simple average of the Beijing and Shanghai inland freight rates as reported by the World Bank's *Doing Business in China 2020 Report*.

For the reasons discussed below, the court concludes that Commerce's calculation of the benchmark for inland freight was reasonable and supported by substantial evidence.

**A.    Additional Background**

As part of its LTAR calculations, Commerce calculated an inland freight benchmark for the value of transporting inputs from seaports to manufacturing facilities. *See* IDM at 97.  Commerce relied on benchmark data from the World Bank's *Doing Business in China 2020 Report*.  *Id.*

The World Bank China report provides hypothetical case studies for the cost of shipping a standardized 15 metric ton import to a given city, such as Shanghai or Beijing, from the nearest port.  *See* Senmao Benchmark Pricing Information at Attach. 9. The freight rates for each city are reported on a dollar per metric ton per kilometer basis. *Id.*  Commerce calculated the inland freight benchmark rate by simple averaging the World Bank freight rates for Shanghai and Beijing.  *See* IDM at 97.

B.    Analysis

In the Final Results, Commerce determined to calculate the inland freight benchmark using "a simple average of the China-Shanghai and China-Beijing rates applied to each respondents' factory-to-seaport distances."  *Id.*

In the IDM, Commerce offered three reasons for its conclusion.  First, the inland freight benchmark calculation was "consistent with Commerce's practice in other countervailing duty proceedings."  *Id.* (citing *Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (Dep't of Commerce Aug. 26, 2015) and accompanying IDM at cmt. 7 ("[T]he best methodology is to calculate a simple average of these [benchmark] prices.")).  Second, Baroque failed to identify "past proceedings where Commerce has employed a weight-average method."  *Id.*  Third, notwithstanding that "for certain other input benchmark calculations in this review [Commerce] employed a weighted-average approach," that approach was not necessary for Commerce's calculation of the inland freight benchmark "because the evidence on the record demonstrates that the inland freight benchmark information is already provided on the same basis (i.e., per kilometer) as the respondents' reported distances."  *Id.* Additionally, Commerce asserted that there was "no evidence on the record of this review demonstrating [that plaintiff's] alternate methodologies would result in a more accurate approximation of the respondents' inland freight costs."  *Id.*

Baroque argues that "the simple average employed by the Department did not account for the different transporting distance with respect to each rate, resulting in a distorted benchmark."  Pl. Reply Br. at 10.  Instead of a simple average, Baroque

argues that Commerce should have "weight-averaged the Beijing and Shanghai rates by: first summing the weight, distance, and cost separately for Beijing and Shanghai; and then calculating the weighted average."  Baroque Br. at 21.

This Court has sustained previously Commerce's use of a simple average to calculate freight rates using the World Bank's *Doing Business* report where respondents "neither explain[ed] why Commerce's use of a simple average was unreasonable, nor show[ed] how . . . their proposed [weighted average] method would lead to a more accurate calculation."  *Zhejiang Sanmei Chem. Indus. Co. v. United States*, 48 CIT __, __, 745 F. Supp. 3d 1356, 1380 (2024).  In *Zhejiang Sanmei Chemical*, the Court accepted as sufficient Commerce's explanation that plaintiff failed to demonstrate that a simple average was "incorrect on logical or mathematical principles."  *Id.*  Likewise, Baroque has not articulated any "logical or mathematical principles" that demonstrate that Commerce's use of a simple average was distortive.  *Id.*

This Court has articulated previously the circumstances under which use of a simple average benchmark would be unreasonable and unsupported by substantial evidence.  *See RZBC Grp. Shareholding Co.*, 39 CIT at __, 100 F. Supp. 3d at 1308-11 (holding that use of simple averages "distorted Commerce's benchmarks" by giving "undue weight to small-quantity, high-cost shipments").

Baroque has not in this case demonstrated that Commerce's simple average *is distortive*.  Accordingly, Baroque "has not established that Commerce's methodology is either unlawful or unsupported by substantial evidence, and accordingly, [Commerce] must be sustained."  *NSK Ltd. v. United States*, 29 CIT 1, 16, 358 F. Supp. 2d 1276, 1290 (2005).

IV.    **Whether Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities was supported by substantial evidence and otherwise in accordance with law**

The court addresses next Baroque's challenge to Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities.[7]  Specifically, Baroque argues that Commerce's application of AFA was unlawful for two reasons: (1) necessary information was not missing from the record; and (2) Commerce failed to specify deficiencies in the GOC's responses and did not permit the GOC to correct such deficiencies.

For the reasons set forth below, the court concludes that Commerce's application of an adverse inference to find certain of Baroque's input suppliers to be government authorities was not in accordance with law.  The court remands to Commerce to take the actions as set forth below.

A.    **Additional Background**

On March 23, 2021, Commerce issued its initial countervailing duty questionnaire to the GOC.  *See* Department of Commerce, Initial CVD Questionnaire (Mar. 23, 2021) ("Initial Questionnaire"), PR 78.

In the "Input Producer Appendix" to the Initial Questionnaire, Commerce requested information pertaining to the ownership and structure of Baroque's input suppliers, as well as the presence or involvement of any CCP entities in those suppliers. *See* Initial Questionnaire at II-38 to II-42.  Specifically, Commerce asked the GOC "whether a CCP committee, branch or 'primary organization' has been formed" within

---

[7] Baroque reported more than 100 input suppliers but challenges the application of AFA to only eight.  *See* Baroque Br. at Attach. 1.

any of the suppliers and whether "any decisions taken by [a supplier] are subject to

review or approval by" the GOC or by any one of nine listed CCP-associated entities

(the "nine entities question").  *Id.* at II-40.  Additionally, Commerce asked the GOC to

"identify any individual owners, members of the board of directors, or senior managers

who were Government or CCP officials during the POR" (the "CCP officials question").

*Id.* at II-41.

Further, Commerce asked the GOC to "explain how [it] developed the information

used in [its] response . . . to determine whether or not company owners, members of the

board of directors or managers were or were not officials of any of the above nine

entities."  *Id.*  For this question, Commerce specifically asked the GOC to address the

following points: (1) the "records question": "What records did you review to determine

the information that was reported in the response?"; (2) the "government sources

question": "Explain whether there are sources at the national, provincial, municipal, or

local levels to determine whether company owners, members of the board of directors

or managers were officials of any of the above nine entities"; (3) the "annual reports

question": "In addition to Government records (including CCP records), is there

information in the annual reports of the companies, such as biographical summaries,

that would indicate whether company owners, members of the board of directors or

managers were officials of any of the above nine entities?"; and (4) the "other

documents question": "Explain whether there are any other company records or

company documents that are submitted to the Government that would indicate a

person's official role with the Government, including the CCP."  *Id.*

On May 20, 2021, the GOC submitted its response to Commerce's Initial

Questionnaire.  *See* GOC, Section II Questionnaire Response (May 20, 2023) ("GOC

IQR"), CR 45-61, PR 115-126.  As to the nine entities question, the GOC responded for

each supplier as follows:

> There is no primary party organization in this producer.  There is no decision
> taken by the producer that are subject to the review or approval by the
> Government or the 9 entities listed in the question.  As demonstrated in the
> Articles of Association of the producer, the decisions are made within
> internal organizations of the producer without any reference to any external
> review or approval.

*Id.* at LTAR-27 to LTAR-29.

For the same suppliers, the GOC responded to the CCP officials question as

follows: "There is [sic] no individual owners, members of the board of directors, or senior

managers who were Government or CCP officials during the POR in this producer."  *Id.*

at LTAR-37 to LTAR-38.

In response to the records question, the GOC explained that it "sent the relevant

questions to the input suppliers" and reported the responses it received from those

suppliers.  *Id.* at LTAR-38.  In response to the government sources question, the GOC

responded that there "is no central informational database to search for such

information."  *Id.*  In response to the annual reports question, the GOC responded that

"[u]nder relevant Chinese laws, companies have no obligation to identify whether their

owners, members of the board of directors, or managers are officials or representatives

of any" of the nine entities.  *Id.* at LTAR-38 to LTAR-39.  In response to the other

documents question, the GOC stated that "no other company records or company

documents that are submitted to the government would indicate a person's official role with the government or CCP." *Id.* at LTAR-39.

Commerce identified certain areas in the GOC IQR for which Commerce required additional information and on August 4, 2021, Commerce issued a supplemental questionnaire to the GOC. *See* Department of Commerce, Section II Supplemental Questionnaire (Aug. 4, 2021) ("Supplemental Questionnaire"), PR 139.

On August 25, 2021, the GOC submitted its response to Commerce's Supplemental Questionnaire. *See* GOC, Supplemental Questionnaire Response (Aug. 25, 2021) ("GOC SQR"), CR 69-77, PR 154.

### B.    Legal framework

A countervailable subsidy may be found where the entity providing the subsidy is an "authority." 19 U.S.C. § 1677(5)(B). An "authority" is defined as "a government of a country or any public entity within the territory of the country." *Id.* Commerce's "longstanding practice" is to treat "most government-owned corporations as the government itself." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,402 (Dep't of Commerce Nov. 25, 1998).

Commerce may make determinations on the basis of the facts otherwise available whenever "necessary information is not available on the record" or "an interested party or any other person" (1) withholds information requested by Commerce; (2) fails to submit such information on time or in the form and manner requested by Commerce; (3) significantly impedes the proceedings; or (4) provides information that Commerce is unable to verify. 19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308(a).

In selecting from facts otherwise available, Commerce may use an inference that is adverse to the interests of a party "if [that] party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A); *see also* 19 C.F.R. § 351.308(c).  A respondent's failure to cooperate to "the best of its ability" is determined by "assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  If Commerce determines that a response to a request for information does not comply with the request, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d).

If Commerce finds that further information submitted in response to such deficiency is unsatisfactory or untimely, Commerce may "disregard all or part of the original and subsequent responses."  *Id.*  However, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements" if: (1) the information is timely; (2) verifiable; (3) complete enough to be reliable; (4) the interested party demonstrates that it acted to the best of its ability in providing the information and meeting the requirements established by Commerce; and (5) Commerce can use the information without undue difficulties.  *Id.* § 1677m(e).

C.    Analysis

1.    Whether Commerce determined reasonably that necessary information was missing from the record

The court addresses first whether Commerce determined reasonably that it lacked necessary information to analyze whether certain of Baroque's input suppliers are government authorities.

Baroque argues that the GOC provided full and detailed responses to Commerce's inquiries and, therefore, necessary information was not missing from the record. Baroque Reply Br. at 14-21.

In the IDM, Commerce explained that it asked the GOC to provide "information about the involvement of the CCP in each" of the input suppliers, information that Commerce deemed "necessary to fully evaluate whether the purportedly privately-owned input producers are 'authorities.'" IDM at 55. Commerce stated that the GOC's responses were insufficient because "the GOC did not provide any *government* documentation to support its claim that the independently-owned suppliers were not government authorities." *Id.* at 58 (emphasis supplied).

The GOC submitted certifications from the input suppliers denying any CCP influence, but Commerce explained that those certifications were "not the *government documents*" required and were "pro forma in nature, lacking particular details of government involvement in each company." *Id.* (emphasis supplied). Commerce asserted that the supplier statements "do not definitively deny the involvement by the government or the CCP in these suppliers; rather, they merely state rhetorically that even if there was some CCP presence in the company, it has no bearing on the company's management and operations." *Id.* On this basis, Commerce determined

that none of the company statements "actually address[es] whether any of the supplier's

individual owners, managers, or board [sic] of directors are in fact CCP officials."  *Id.*

Commerce explained further that it requires more than mere company

statements because "[p]ublicly available information indicates that Chinese law requires

the establishment of CCP organizations 'in all companies, whether state, private,

domestic, or foreign-invested' and that such organizations may wield a controlling

influence in the company's affairs."  *Id.* (citing *Certain Metal Lockers and Parts Thereof*

*from the People's Republic of China: Final Affirmative Countervailing Duty*

*Determination*, 86 Fed. Reg. 35,741 (Dep't of Commerce July 7, 2021) and

accompanying IDM (Dep't of Commerce June 28, 2021) at cmt. 5).

Commerce elaborated using the example of the one input supplier that the GOC

acknowledged contained a primary party organization.  For that supplier, the GOC

included a summary report stating that "[i]n 2019, Junda Party Branch, under the correct

leadership of Junda Party Committee, was guided by the spirit of the 19th Party

Congress (19th National Congress of the Communist Party of China), studied in depth,

united and cooperated, implemented and successfully completed the tasks assigned by

the party organization."  *Id.* (citing GOC SQR at Ex. SQ-2).  Commerce asserted that

this summary report "indicates the influence of the CCP over the employees in the

company."  *Id.*  Commerce added that its "request for information from the GOC is a

request for government information independent from company information."  *Id.*

In sum, Commerce explained adequately that the GOC's responses did not

include supporting government documentation — and not just internal company

statements or verbal affirmations — regarding the extent of CCP involvement in the

suppliers and that Commerce had previously required the GOC to submit government

documentation to demonstrate that input suppliers were not authorities.

 Therefore, the court concludes that Commerce determined reasonably that the

GOC did not provide information necessary for Commerce to analyze whether certain of

Baroque's input suppliers are government authorities.

   **2. Whether Commerce provided the GOC with notice and an**
     **opportunity to remedy its deficient responses**

 The court turns next to whether Commerce provided the GOC with adequate

notice and an opportunity to remedy its deficient responses, as required by 19 U.S.C. §

1677m(d).

 Baroque argues that "Commerce did not provide the GOC with any notice that

the specific information provided regarding the . . . suppliers at issue was deficient in

any way." Baroque Br. at 37. Further, Baroque asserts that Commerce sent the GOC

only one Supplemental Questionnaire, which did not explicitly reference any

deficiencies in the GOC's initial responses, denying to the GOC an opportunity to

remedy any deficiencies. *Id.*

 The government argues that: (1) Baroque failed to exhaust its administrative

remedies because it never raised a § 1677m(d) argument during the administrative

proceeding; and (2) Commerce complied with § 1677m(d) by "provid[ing] multiple

opportunities to the [GOC] to supply a list of specific information." Def.'s Resp. Pls.'

Mots. J. Agency Record ("Def. Br.") at 41, ECF No. 53.

 On the first point, the court concludes that the pure-question-of-law exception to

administrative exhaustion applies here.

The pure-question-of-law exception to administrative exhaustion applies "when (1) plaintiff raises a new argument; (2) this argument is of a purely legal nature; (3) the inquiry requires neither further agency involvement nor additional fact finding or opening up the record; and (4) the inquiry neither creates undue delay nor causes expenditure of scarce party time and resources." *Saha Thai Steel Pipe Pub. Co. v. United States*, 46 CIT __, __, 605 F. Supp. 3d 1348, 1366 (2022) (quoting *Zhongce Rubber Grp. Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1276, 1279 (2018)).

All four requirements are met here. Baroque has raised for the first time whether Commerce failed to provide any notice of deficiency to the GOC as required by § 1677m(d). This Court has previously held that whether "Commerce complied with the notice requirement [of § 1677m(d)] is a purely legal question" where "the facts relevant to that inquiry are present on the record [and] [n]o further agency involvement is required for the Court to consider the question." *Id.* Here, the only question before the court is whether Commerce's questionnaires provided the GOC with adequate notice and an opportunity to respond. Commerce's questionnaires are before the court and the court cannot identify any additional factual development or agency involvement that would be required before the court considers this issue. Further, the parties have not raised any concerns about scarce resources or time. Therefore, the court will consider Baroque's objection on the merits.

The court concludes that Commerce did not fulfill its obligations under § 1677m(d).

Section 1677m(d) requires that if Commerce determines that a response to a request for information does not comply with the request, Commerce "shall promptly

inform the person submitting the response of *the nature of the deficiency* and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."  19 U.S.C. § 1677m(d) (emphasis supplied).  The questions are, therefore: (1) whether Commerce adequately informed the GOC of the nature of the deficiency in the GOC's initial responses; and (2) whether Commerce provided the GOC with an opportunity to remedy that deficiency.  For the following reasons, the court concludes with respect to both questions that Commerce did not.

This Court has held that "Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire '*specifically point[s] out* and request[s] clarification of [the] deficient responses,' and *identifies the information needed* to make the required showing."  *Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp. 3d 1309, 1323 (2021) (alterations in original) (emphases supplied) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)); *see also Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding that Commerce satisfied its obligation under section 1677m(d) when the respondent "failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect").

Here, Commerce failed to satisfy its obligation under § 1677m(d) because Commerce did not "specifically point[] out and request[] clarification" of the deficiency, such as the lack of government documentation, in the GOC's initial responses and did not identify specifically "the information needed to make the required showing." *Hyundai Steel Co.*, 45 CIT at __, 518 F. Supp. 3d at 1323; *see also id.* at __, 518 F.

Supp. 3d at 1322 ("Broadly drawn initial or supplemental questionnaires may not

sufficiently place a respondent on notice of the nature of the deficiency, and deprive it of

the opportunity to remedy that deficiency.").

In the cover letter to the Supplemental Questionnaire, Commerce informed the

GOC that it "identified certain areas in the initial questionnaire response submitted by

the GOC for which [it] require[d] additional information."  Supplemental Questionnaire at

1.  However, Commerce did not elaborate further in the cover letter as to what these

"certain areas" were.

In the Supplemental Questionnaire, Commerce then repeated the nine entities

question and the CCP question nearly verbatim from the Initial Questionnaire, without

further explanation as to what Commerce found lacking in the GOC's initial responses

or what additional information Commerce required.  *Id.* at 8-9.  Commerce's repetition

alone of the nine entities and CCP officials questions was not sufficient to provide the

GOC with notice that its initial responses to those questions were deficient.

This Court has held previously that "[s]imilarities in questions between the initial

and supplemental questionnaire alone do not serve as evidence that Commerce found

the initial questionnaire response deficient."  *Cf. Hyundai Heavy Indus. Co. v. United

States*, 44 CIT __, __, 485 F. Supp. 3d 1380, 1402 (2020) (rejecting petitioner's

"assumption that Commerce's issuance of a supplemental questionnaire containing a

question similar to one posed in the initial questionnaire establishes that Commerce

found the [initial] response . . . deficient").  Commerce's failure to identify specifically the

deficiency in the GOC's initial responses and identify what information could be

provided to cure that deficiency denied the GOC the "opportunity to remedy or explain

the deficiency," as mandated by § 1677m(d).  Notably, Commerce's questionnaires did

not specifically request government documentation.

Commerce's omission with regard to the supplemental nine entities and CCP

officials questions stands out given that Commerce properly complied with the

requirements of § 1677m(d) for other questions in the same questionnaire.  For

example, supplemental question eight notes that in the Initial Questionnaire, Commerce

requested that the GOC provide "original and translated copies of laws, regulations or

other governing documents cited by the GOC in the Export Buyer's Credit Response."

Supplemental Questionnaire at 4.  Commerce then clearly stated in the question that

the GOC's initial response was deficient because the GOC "did not provide the 2013

amendment" to the EBCP Administrative Measures.  *Id.*  Last, Commerce requested

precisely the information the GOC needed to provide to respond fully: "Please provide

the 2013 amendment and guidelines to the above-mentioned laws."  *Id.*

It is well established that the burden of creating an adequate record rests with a

respondent, *see ABB Inc. v. United States*, 42 CIT __, __, 355 F. Supp. 3d 1206, 1222

(2018); however, Commerce is "obligat[ed] to let the respondent know what information

[Commerce] really wants."  *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT

804, 820 (1999); *see also Queen's Flowers de Colombia v. United States*, 21 CIT 968,

980, 981 F. Supp. 617, 628 (1997) ("[T]he alleged response deficiency cannot support

application of [AFA] where the information sought was apparently never requested.").

The GOC "cannot logically be faulted for failing to provide information beyond the

scope of the question that Commerce asked."  *Jinan Yipin Corp. v. United States*, 31

CIT 1901, 1916, 526 F. Supp. 2d 1347, 1360-61 (2007).  If Commerce viewed

government documentation from the GOC as necessary information, Commerce was

"obligat[ed] to let the [GOC] know."  *Ta Chen*, 23 CIT at 820; *see also Jinan Yipin Corp.*,

31 CIT at 1914, 516 F. Supp. 2d at 1359 ("If . . . it was essential . . . for Commerce to be

provided with [certain] information, . . . then *Commerce needed to request that specific*

*information*." (emphasis supplied)).

Accordingly, Commerce did not comply with its obligations under § 1677m(d) and

as a result Commerce's application of AFA to find that certain of Baroque's input

suppliers were government authorities is not in accordance with law.  *See* 19 U.S.C. §

1677e(a) (stating that Commerce may make determinations on the basis of facts

available "subject to" the requirements of § 1677m(d)).

The court directs Commerce on remand to: (1) identify with specificity the

deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP

officials and other related questions; (2) describe clearly the nature of each deficiency

and what information could correct that deficiency; (3) if Commerce continues to

determine that supporting government documentation is necessary information, request

that information explicitly from the GOC; and (4) provide the GOC an opportunity to

remedy any specified deficiencies.

**V.    Whether Commerce's application of AFA to find use of the EBCP is**
**        supported by substantial evidence and otherwise in accordance with law**

The court turns last to Baroque's challenge to Commerce's application of an

adverse inference to find that respondents benefited from the EBCP.

For the reasons discussed below, the court concludes that Commerce's

application of an adverse inference to find that respondents benefited from the EBCP

was supported by substantial evidence and in accordance with law.

### A.    Additional Background

The EBCP is a program of the Export-Import Bank of the People's Republic of China ("China Export-Import Bank"). *Cooper (Kunshan) Tire Co.*, 45 CIT at \_\_, 539 F. Supp. 3d at 1322. The program "provides loans at preferential rates for the purchase of exported goods from China." *Id*. (citation omitted).

In its Initial Questionnaire, Commerce "requested that the GOC answer specific questions regarding the export buyer's credits provided to Jiangsu Senmao's, Riverside's, and Baroque Timber's U.S. customers." IDM at 30. Specifically, Commerce requested that the GOC provide:

> the original and translated copies of laws, regulations or other governing documents for this program; a list of all partner/correspondent banks involved in disbursement of funds under the EBC program; and if the GOC claims that no customer respondent used the buyer credits to explain in detail the steps the government took to determine that the EBC program was not used and to identify the documents, databases, accounts, etc., that were examined to determine there was no use.

*Id*. (citing Initial Questionnaire at II-12)

In its response to Commerce's initial requests, the GOC asserted that the mandatory respondents never applied for, used, or benefited from the EBCP, and that the China Export-Import Bank "searched its records to confirm that [respondents'] customers did not receive credits under" the EBCP during the period of review. GOC IQR at 26. The GOC provided the 2000 Administrative Measures of Export Buyer's Credit of the Export-Import Bank of China ("Administrative Measures") and Detailed Implementation Rules Governing Export Buyer's Credit of the Export-Import Bank of China ("Implementing Rules"). *See id*. at Exs. Export-2 and Export-3.

The GOC answered that the "Chinese exporter is in a position to verify and confirm the existence, if any, of sales contracts that were supported by" the EBCP as "the Chinese exporter should be aware of the buyer's receipt of loans and should be involved in the loan evaluation proceeding and in particular in the post-lending loan management." *Id.* at 26. The GOC maintained also that "information such as the EX-IM Bank's internal guidelines are not necessary or material to the question of non-usage" and that the 2013 revisions to the Administrative Measures were "entirely irrelevant." *Id.* at 28 (internal quotations omitted).

In its Supplemental Questionnaire, Commerce again requested that the GOC provide documentation from the China Export-Import Bank; the original and English translation of the 2013 revisions to the Administrative Measures; and a list of all partner/correspondent banks involved in disbursement of funds under the EBCP. *See* Supplemental Questionnaire at 4-5. In its supplemental response, the GOC again stated that "none of the U.S. customers of the respondents applied, used, or received benefits under" the EBCP and that Commerce's requested information was not necessary. GOC SQR at 4.

## B.    Legal framework

The Court has repeatedly held that in an EBCP case, Commerce may apply AFA to a cooperative respondent if Commerce takes the following steps: (1) defines the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establishes how the withheld information creates this gap by explaining the reason that the information the GOC refused to give was necessary to verify claims of non-use; and (3) shows that only the withheld information

can fill the gap by explaining the reason that other information, on the record or accessible by respondents, is insufficient or impossible to verify.  *Guizhou Tyre Co. v. United States*, 45 CIT __, __, 523 F. Supp. 3d 1312, 1361 (2021) (citing *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1333 (2019)).

### C.    Analysis

The court concludes that Commerce took each of the required steps.  *See id.* at __, 523 F. Supp. 3d at 1361.

In the Final Results, Commerce found that necessary information regarding the EBCP was not on the record because the GOC withheld information that Commerce requested.  IDM at 39.  On this basis, Commerce drew an adverse inference to determine that the mandatory respondents benefited from the EBCP.  *Id.*

In the IDM, Commerce explained that a gap in the record existed because the GOC refused to provide: (1) "the 2013 revisions to the administrative measures, which provide internal guidelines for how [the EBCP] is administered by the China EX-IM Bank"; (2) "a list of partner/correspondent banks that are used to disperse funds through this program"; and (3) "documents making up the 'paper trail' of a direct or indirect export credit from the China EX-IM Bank" such as "specific applications, correspondence" or other "underlying [loan] documentation."  *Id.* at 33-34.

As detailed above, Commerce noted that it requested this information from the GOC in both the Initial and Supplemental Questionnaires.  Both times, the GOC did not provide the requested information and instead responded that the information was not

necessary or material to the question of use of the EBCP.  *See* GOC IQR at 26; GOC

SQR at 4.

Commerce explained next that the withheld information was "especially

necessary to verify claims of non-use because the available record evidence indicates

that under the [EBCP], credits are not direct transactions from the China EX-IM Bank to

the U.S customers of the respondent exporters."  IDM at 32.  Rather, "there can be

intermediary banks involved, the identities of which the GOC has refused to provide to

Commerce."  *Id.*

Regarding the list of partner/correspondent banks, Commerce stated that "based

on our more recent understanding of the [EBCP], . . . performing the verification steps to

make a determination of whether the manufacture, production, or export of the company

respondents' merchandise has been subsidized would . . . require knowing the names

of the intermediary banks."  *Id.* (internal quotation marks omitted).  Commerce noted

that it would be the names of the partner/correspondent banks, "not the name 'China

Ex-Im Bank,' that would appear in the subledgers of the U.S. customers if they received

the credits."  *Id.*  Commerce added that its "typical non-use verification procedures (i.e.,

selecting specific entries from the subledger and requesting to see underlying

documentation, such as applications and loan agreements) would be of no value"

because "Commerce would simply not know what to look for behind each loan in

attempting to identify a loan provided by the China EX-IM Bank via a correspondent

bank."  *Id.* at 33.

Regarding the missing "paper trail," Commerce explained that such documents "would be necessary even if the GOC provided the list of correspondent banks." *Id.* at 34. Commerce elaborated with the following example:

> For instance, assuming that one of the correspondent banks is HSBC, Commerce would need to know how to differentiate ordinary HSBC loans from loans originating from, facilitated by, or guaranteed by the China EX-IM Bank. In order to do this, Commerce would need to know what underlying documentation to look for in order to determine whether particular subledger entries for HSBC might actually be China EX-IM Bank financing: specific applications, correspondence, abbreviations, account numbers, or other indicia of China EX-IM Bank involvement.

*Id.*

Regarding the 2013 Administrative Measures, Commerce stated that such information is required to verify non-usage because "without a thorough understanding of the [EBCP], Commerce might not recognize indicia of [China Export-Import Bank] involvement." *Id.* Commerce explained that a "complete understanding of the program provides a 'roadmap' for the verifiers by which they can conduct an effective verification of usage" and that to "conduct verification of the customers without the information requested from the GOC would amount to looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found." *Id.* Commerce then asserted that the GOC "is the only party that can answer questions about the internal administration of" the EBCP and that the GOC's "failure to provide the requested information further undermines Commerce's ability to verify [the respondents'] claims of non-use." *Id.* Further, Commerce stated that a "review of ancillary documents, such as applications, correspondence, emails, etc., is insufficient for Commerce to verify any bank disbursement or loan amount pertaining to

the company respondent, its customers, and/or the GOC's participation in the program."
*Id.* at 35.

In summary, Commerce noted that, absent the requested information, Commerce "simply do[es] not know what to look for when [it] look[s] at a loan to determine whether the China Ex-Im Bank was involved or whether a given loan was provided under the EBC program." *Id.* at 37.

Commerce addressed also "whether any available information provided by respondents may be sufficient to fill the gap of missing record information in considering claims of non-use for the EBC program." *Id.; see, e.g.*, *Jiangsu Zhongji Lamination Materials Co.*, 43 CIT at __, 405 F. Supp. 3d at 1317. Commerce explained that "for Commerce to determine use (or non-use) of the EBC program, all of the respondent's U.S. customers must be willing to participate in the review because any benefit calculation for this program would need to take them all into account." IDM at 37.

Commerce concluded that Baroque "did not provide declarations of non-use certifications of the EBC program for all of its U.S. customers." *Id.* (citing GDLSK, Riverside Plywood Initial Questionnaire Response (May 14, 2021) ("Baroque IQR") at Exs. 18a-b, CR 30-43, PR 109-112). Commerce explained that "given the apparent unwillingness of most of [Baroque's] U.S. customers to participate, [Commerce] did not issue any additional questions or requests for loan data." *Id.*

Baroque argues that the record contains sufficient evidence demonstrating that neither Baroque nor its U.S. customers used the EBCP, namely: (1) "statements of non-use in the GOC's questionnaire response; (2) Baroque's statements of non-use in its initial response after confirmation with its U.S. customers; and (3) Baroque's customer

declarations of non-use."  Baroque Br. at 42 (citing GOC IQR at 23-28; Baroque IQR at

Ex. 11c).  Baroque adds that none of the information deemed missing by Commerce

creates a gap in the record because Commerce already has sufficient information to

verify non-usage of the EBCP.  *Id.* at 43-44.

The court concludes that Commerce explained sufficiently the reason that the

withheld information was necessary to verify non-use[8] and the reason that contrary

information cited by Baroque was insufficient for such verification.  The court concludes

also that Commerce properly defined the gap in the record created by the GOC's

withholding of requested information and that the GOC refused to provide this

information.  Commerce explained also that only the withheld information can fill the gap

because the ancillary documents and Baroque's partial non-use certifications are

insufficient or impossible to verify.[9]

Accordingly, the court concludes that Commerce's application of AFA regarding

Baroque Timber's use of the EBCP was supported by substantial evidence and in

accordance with law.

---

[8] Regarding Commerce's explanation that verification would be overly burdensome
absent the withheld information, this Court has previously held that "Commerce's limited
resources may constitute a legitimate constraint to verification."  *Cooper (Kunshan) Tire
Co. v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1316, 1332 (2021) (citing
*Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995)).

[9] This Court has acknowledged previously that Commerce's practice of finding partial
certifications insufficient to verify non-use of the EBCP is "consistent with the Court's
treatment of incomplete certifications" and that "Commerce would not have to take the
next step of sending supplemental questionnaires" before applying an adverse
inference.  *Cooper (Kunshan) Tire Co. v. United States*, 46 CIT __, __, 610 F. Supp. 3d
1287, 1318 (2022).

**CONCLUSION**

In conclusion, the court sustains in part and remands in part Commerce's Final Results.  For the foregoing reasons, it is hereby

**ORDERED** that Commerce's calculation of the plywood benchmark is remanded for further explanation; it is further

**ORDERED** that Commerce's calculation of the benchmarks for veneer is remanded for further explanation; it is further

**ORDERED** that Commerce's calculation of the benchmark for inland freight is sustained; it is further

**ORDERED** that Commerce's decision to apply AFA to find certain of Baroque's input suppliers to be government authorities is remanded for compliance with § 1677m(d); it is further

**ORDERED** that Commerce's decision to apply AFA to Baroque's use of the EBCP is sustained; it is further

**ORDERED** that Commerce shall file its remand results within 90 days following the date of this Order; it is further

**ORDERED** that within 14 days of the date of filing of Commerce's remand results, Commerce shall file an index and copies of any new administrative record documents; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the Court.

**SO ORDERED**.

/s/     Timothy M. Reif
Timothy M. Reif, Judge

Dated:        April 3, 2025
        New York, New York