C-570-971
Remand
Slip Op. 25-35
POR:  01/01/2019 – 12/31/2019
**Public Document**
E&C/OVIII:  JS/LJS

***Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation et al.
v. United States***
**Court No. 22-00210, Slip Op. 25-35 (CIT April 3, 2025)**
**Multilayered Wood Flooring from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) in *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood*

*Corporation et al. v. United States*, Consol. Court No. 22-00210, Slip Op. 25-35 (April 3, 2025)

(*Remand Opinion and Order*).  These final results of redetermination concern the final results of

the 2019 administrative review of the countervailing duty (CVD) order on multilayered wood

flooring from the People's Republic of China (China).[1]

In the *Remand Opinion and Order*, the Court remanded Commerce to explain its

conclusion that it is appropriate to include data from United Nations (UN) Comtrade and

International Tropical Timber Organization (ITTO) in the benchmark for the benefit calculation

of the provision of plywood and veneers for less than adequate remuneration (LTAR) programs,

and to reexamine its application of adverse facts available (AFA) to find that certain of the

companies that supplied inputs to Riverside Plywood Corp., (Riverside) and its cross-owned

affiliate Baroque Timber Industries (Zhongshan) Co., Ltd. (Baroque) are government authorities.

---

[1] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (June 16, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

As discussed below, Commerce has further explained its selection of the data for the plywood and veneer benchmarks and has issued supplemental questions to the GOC for further information and concluded, based on the GOC's responses, that it is appropriate to continue to apply AFA to find that certain of Baroque and Riverside's input suppliers are government authorities. On August 15, 2025, Commerce released its Draft Remand to interested parties.[2] On August 27, 2025, we received comments from Baroque and Fine Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture).[3] No other interested party filed comments.

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has addressed parties' comments regarding the inclusion of certain data from UN Comtrade and the ITTO in the benchmarks for plywood and veneers, and its application of AFA to find that certain input suppliers to be government authorities within the meaning of section 771(B) of the Tariff Act of 1930, as amended (the Act).

## II.    BACKGROUND

On February 4, 2021, Commerce initiated an administrative review of the CVD order on multilayered wood flooring from China for 170 producers and exporters of subject merchandise for the period of review (POR) January 1, 2019, through December 31, 2019.[4] On March 19, 2021, Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) and Riverside as mandatory respondents.[5] On March 23, 2021, Commerce issued its initial

---

[2] *See* Draft Results of Redetermination, *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation et al. v. United States*, Consol. Court No. 22-00210, Slip Op. 25-35 (CIT 2025), dated August 15, 2025 (Draft Remand).

[3] *See* Baroque's Letter, "Comments on Draft Remand," dated August 27, 2025 (Baroque's Draft Remand Comments); *see also* Fine Furniture's Letter, "Letter in Lieu of Remand Comments," dated August 27, 2025, (Fine Furniture's Draft Remand Comments).

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 8166 (February 4, 2021). On March 4 and October 7, 2021, we explained in subsequent initiation notices that we inadvertently omitted two additional companies. *See also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 12599 (March 4, 2021), and *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 55811 (October 7, 2021) (collectively, *Initiation Notice*).

[5] *See* Memorandum, "Respondent Selection," dated March 19, 2021.

questionnaire to the Government of China (GOC),[6] and on April 6 and 13, 2021, Senmao and

Riverside, respectively, timely filed their affiliation questionnaire responses.[7]  On May 11, 2021,

Riverside filed its response to Commerce's supplemental affiliation questionnaire.[8]  Between

May 6 and 20, 2025, Senmao, Riverside, including its cross-owned affiliate Baroque, and the

GOC filed initial questionnaire responses.[9]  On July 13, August 5, and August 13, 2021,

Commerce issued supplemental questionnaires to Senmao,[10] and on August 4 and 5, 2021,

Commerce issued supplemental questionnaires to the GOC and Riverside, respectively.[11]  From

August 10 to 26, 2021, all parties filed responses to Commerce's supplemental questionnaires.[12]

On November 22, 2021, the petitioner,[13] Senmao, and Riverside submitted data for Commerce to

consider using as benchmarks in the benefit calculations for various LTAR programs.[14]  On

December 2, 2021, Senmao, Riverside, and the petitioner submitted rebuttal benchmark

comments.[15]

---

[6] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated March 23, 2021 (Initial Questionnaire).
[7] *See* Senmao's Letter, "Section III Affiliations Questionnaire Response," dated April 6, 2021 (Senmao AQR); *see also* Riverside's Letter, "Riverside Plywood Affiliation Response," dated April 13, 2021 (Riverside AQR).
[8] *See* Riverside's Letter, "Riverside Plywood Supplemental Affiliation Response," dated May 11, 2021 (Riverside SAQR); *see also* Commerce's Letter, "
[9] *See* Senmao's Letter, "Section III Questionnaire Response," dated May 6, 2021; *see also* Riverside's Letter, "Riverside Plywood Initial Questionnaire Response," dated May 14, 2021 (Riverside's IQR); and GOC's Letter, "GOC Section II Questionnaire Response," dated May 20, 2021 (GOC's IQR).
[10] *See* Commerce's Letter, "Export Buyer's Credit Supplemental Questionnaire," dated July 13, 2021; *see also* Commerce's Letter, "Section III Supplemental Questionnaire," dated August 5, 2021; and Commerce's Letter, "Export Buyer's Credit Second Supplemental Questionnaire," dated August 13, 2021.
[11] *See* Commerce's Letter, "Section II Supplemental Questionnaire," dated August 4, 2021; *see also* Commerce's Letter, "Section III Initial Questionnaire Response," dated August 5, 2021.
[12] *See* Senmao's Letter, "Export Buyer's Credit Supplemental Questionnaire Response," dated August 10, 2021; *see also* Senmao's Letter, "Export Buyer's Credit Second Supplemental Questionnaire Response," dated August 23, 2021; GOC's Letter, "GOC Supplemental Questionnaire Response," dated August 25, 2021; Riverside's Letter, "Riverside Plywood First Supplemental Response," dated August 26, 2021; and Senmao's Letter, "Section III Supplemental Questionnaire Response," dated August 26, 2021.
[13] The petitioner is the American Manufacturers of Multilayered Wood Flooring and its individual members.
[14] *See* Petitioner's Letter, "Benchmark Pricing Information," dated November 22, 2021 (Petitioner's Benchmark Data); Riverside's Letter, "Benchmark Data Submission," dated November 22, 2021 (Riverside's Benchmark Data); and Jiangsu Senmao's Letter, "Benchmark Submission," dated November 22, 2021 (Senmao's Benchmark Data).
[15] *See* Jiangsu Senmao's Letter, "Rebuttal Benchmark Submission," dated December 2, 2021 (Senmao's Benchmark Rebuttal); Riverside Plywood's Letter, "Benchmark Rebuttal," dated December 2, 2021 (Riverside's Benchmark Rebuttal); and Petitioner's Letter, "Rebuttal Benchmark Pricing Information," dated December 2, 2021 (Petitioner's Benchmark Rebuttal).

On December 27, 2021, Commerce published the *Preliminary Results* of this administrative review in the *Federal Register*.[16]  In the *Preliminary Results*, Commerce found that Riverside and Baroque had domestically purchased plywood, veneer, and other input products from suppliers that were "authorities" for LTAR.[17]  For the calculation of plywood and veneer benchmarks, Commerce used data from UN Comtrade and the ITTO.  In the *Final Results*, published on June 16, 2022, Commerce continued to rely on data from UN Comtrade and the ITTO, as well as data from Stats.NZ for the calculation of the plywood benchmark.[18]  For the veneer benchmark, Commerce continued to rely both on UN Comtrade and ITTO data, but calculated separate benchmark prices to value Baroque's purchases of backboard veneer and face veneer.[19]  Commerce made no changes in the *Final Results* with respect to its determination to apply AFA to find that all of the companies that supplied inputs to the mandatory respondents, including Riverside and its cross-owned affiliate Baroque, are government authorities.[20]

## A. Commerce's Plywood and Veneers for LTAR Benchmark

Riverside, including its cross-owned affiliate Baroque, reported purchases of plywood and veneers during the POR.[21]  As noted above, interested parties submitted data for use in Commerce's benchmark calculations to determine the benefit conferred by Riverside and Baroque's purchases of plywood and veneer for LTAR.  Riverside provided monthly pricing data for plywood from Brazil, Ghana, Malaysia, and Peru, some of which denote the grade and species.[22]  For veneer, Riverside provided data from Ghana, which differentiates by face and

---

[16] *See Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2019*, 86 FR 73244 (December 27, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[17] *See Preliminary Results* PDM at 40 and 45-49.
[18] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (June 16, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM) at Comments 5 and 8D.
[19] *Id*. at Comment 8E.
[20] *Id*. at Comment 4.
[21] *See* Riverside's IQR at 19-23 and Exhibits 11a and 11b.
[22] *See* Riverside's Benchmark Data at 2 and Exhibit 2.

core, and Peru, which does not differentiate between face and core veneers.[23]  Riverside also provided certifications from its suppliers that all plywood purchased by Baroque during the POR was "made of eucalyptus with C/D grade only," and information concerning the grading and pricing of plywood and veneers.[24]  The petitioner submitted world merchandise trade data from UN Comtrade and the New Zealand official statistics database (*i.e.*, Stats.NZ) to value plywood and veneers based on various Harmonized System (HS) subcategories.[25]  Senmao also provided world merchandise trade data from UN Comtrade to value plywood.[26]

In its rebuttal comments, Riverside provided:  (1) an expert's statement regarding the plywood industry and the HS subheadings proposed by the petitioner and Senmao; and (2) sections of the United States Harmonized Tariff Schedule (HTS) that Riverside contends shows that the Chapter 44 benchmark data provided by the petitioner and Senmao are inappropriate to value veneers.[27]  The petitioner submitted rebuttal comments arguing that Riverside's benchmark data are not representative of global plywood and veneer prices, based on a comparison with different price data from the ITTO.[28]

In the *Preliminary Results*, Commerce relied on tier two "world market price" benchmarks pursuant to 19 CFR 351.511(a)(2)(ii) to measure the adequacy of remuneration for the provision of plywood and veneer to Riverside and its cross-owned affiliate Baroque.[29]  For plywood and veneer, Commerce included both the UN Comtrade and ITTO data to calculate its benchmarks.[30]  In doing so, Commerce explained that, per its regulations, "{w}here there is

---

[23] *Id.*
[24] *Id.* at 2 and Exhibits 3, 4A,
[25] *See* Petitioner's Benchmark Data at 2 and Exhibits 1-A,1-C, and 2.
[26] *See* Senmao's Benchmark Data at 1 and Attachment 3.
[27] *See* Riverside's Benchmark Rebuttal at 1-2 and Exhibits 1 and 2.
[28] *See* Petitioner's Benchmark Rebuttal at 2 and Exhibit 1.
[29] *See Preliminary Results* PDM at 10-13 and 40.
[30] *Id.* at 42.

more than one commercially available world market price, {Commerce} will average such prices to the extent practicable…"[31]

In the *Final Results*, Commerce addressed, *inter alia*, arguments about the composition of its plywood and veneer benchmarks from Riverside.  Commerce agreed with Riverside's claim that the supplier certifications it provided demonstrate that Baroque purchased only C/D grade plywood.[32]  However, Commerce disagreed that this fact, and the other record evidence cited by Riverside, necessitated the exclusion of all UN Comtrade data for being overly broad and justified reliance solely on ITTO C/CC grade price data, as Riverside contends.[33] Specifically, Commerce found that "Riverside did not adequately support its arguments that the UN Comtrade data are inappropriate to calculate plywood benchmarks for Baroque {}'s purchases of C/D grade plywood" and continued to include the UN Comtrade data in the plywood benchmark.[34]  In explaining its reasoning, Commerce relied on its practice which is to average multiple world market prices as stipulated in 19 CFR 351.511(a)(2)(ii).[35]  However, Commerce modified the plywood benchmark for Baroque to exclude ITTO Malaysia and Ghana data, because Baroque argued that these data do not describe its C/D grade plywood purchases.[36]

For the veneer benchmark, Commerce agreed with Riverside's argument that it should calculate separate benchmarks for Baroque's purchases of face veneer and backboard veneer.[37] Commerce explained that, based on record evidence, "Baroque{}'s backboard and face veneers differ sufficiently such that they require separate price benchmarks to most accurately calculate the benefit for the veneer for LTAR program."[38]  However, Commerce noted that "Riverside did

---

[31] *Id*. (internal citation omitted); *see also* 19 CFR 351.511(a)(2)(ii) ("Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability").
[32] *See Final Results* IDM at 86.
[33] *Id*.
[34] *Id*. at 86
[35] *Id*.
[36] *Id*.
[37] *Id*. at 91-92.
[38] *Id*. at 91.

not show that the other benchmark data on the record is {sic} unrepresentative of backboard and face veneer purchases" because the record lacked sufficient evidence about the composition of the UN Comtrade data to demonstrate that the data are overly broad and, thus, distortive.[39]  In explaining its reasoning to continue including the UN Comtrade data for veneers, Commerce relied on its practice, which is to average multiple world market prices as stipulated in 19 CFR 351.511(a)(2)(ii).[40]  Thus, for Baroque's face veneer benchmark, Commerce calculated an average of the UN Comtrade veneer data, the Peru ITTO veneer data, and the Ghana ITTO data for face veneer.[41]  Likewise, for Baroque's backboard veneer benchmark, it calculated an average of the same UN Comtrade veneer data, the same Peru ITTO veneer data, and the Ghana ITTO data for core veneer.[42]

## B. Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities

As stated above, Riverside, including its cross-owned affiliate Baroque, reported purchasing plywood, veneer, and other input products, during the POR.[43]  Commerce requested information from the GOC regarding the companies that produced these inputs purchased by Riverside and Baroque during the POR, in order to evaluate whether the producers are "authorities" within the meaning section 771(B) of the Act.[44]  The GOC provided certain of this information pertaining to the ownership and structure (*e.g.*, articles of association) for a small subset of these companies.[45]  This included statements from the GOC and the suppliers themselves that there is no primary party organization in the suppliers and that none of the owners, board members, or managers of the suppliers are government or Chinese Communist

---

[39] *Id*.
[40] *Id*. at 91.
[41] *Id*. at 92.
[42] *Id*.
[43] *See* Riverside's IQR at 20-23, 41-42 and Exhibits 11a, 11b, 11c, 12a, 12b, 25a, 25b, 25c, 26a, and 26b.
[44] *See Preliminary Results* PDM at 13 (citing Commerce's Letter, "Countervailing Duty Questionnaire," dated March 23, 2021," (Commerce's CVD Questionnaire) at II-5 to II-9 and II-24 to II-28).
[45] *Id*. at 14; *see also* GOC's Letter, "GOC Section II Questionnaire Response," dated May 20, 2021 (GOC's IQR) at Exhibits LTAR-1 and LTAR-2.

Party (CCP) officials in any of the nine entities.[46]  Commerce repeated its request for this

information from the GOC for all of the reported input suppliers in a supplemental questionnaire,

and the GOC provided certain company information for nine additional input producers,

including the same certified statements provided in the GOC's IQR denying any role for the CCP

in company operations.[47]

In the *Preliminary Results*, Commerce found that the GOC had withheld information

requested of it regarding the CCP's role in the ownership and management of these input

suppliers and that Commerce must rely on facts available in conducting its analysis of the

producers that supplied the mandatory respondents with certain inputs during the POR.[48]

Specifically, Commerce stated that the declarations from the input producers on CCP

involvement in company operations were insufficient, and that government documentation,

independent of the input suppliers, was necessary for fully evaluating the influence and control

the GOC (through the CCP) has over the input suppliers.[49]  Commerce also noted that, moreover,

the GOC had not provided any of the requested information for the large majority of input

suppliers.[50]  Therefore, Commerce found that the GOC failed to cooperate by not acting to the

best of its ability to comply with its requests for information.  Consequently, Commerce

determined that an adverse inference was warranted in the application of facts available to find

---

[46] Commerce understands that for each level of Government, *i.e.*, central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding:  (1) Chinese Communist Party (CCP)  Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP.  Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of state-ownership.  We refer to officials of any of these 9 entities as "Government or CCP officials." *See* Commerce's CVD Questionnaire at II-40.
[47] *See* GOC's Letter, "GOC Supplemental Questionnaire Response," dated August 25, 2021 (GOC's SQR) at 12-16 and Exhibits SQ-2 and SQ2.1.
[48] *See Preliminary Results* PDM at 15-16.
[49] *Id*. at 15.
[50] *Id*.

that all companies that supplied inputs to the mandatory respondents (including Riverside and Baroque) were "authorities" within the meaning of section 771(5)(B) of the Act.[51]

In the *Final Results*, Commerce addressed arguments from interested parties that the subset of suppliers that provided certain of the requested company information were not "authorities." Commerce explained that the certifications that the GOC had provided were not the required government documentation necessary to support its claims with respect to this subset of input suppliers, and that the certifications were "*pro forma* in nature, lacking particular details of government involvement in each company."[52] In its reasoning in the *Final Results*, Commerce relied on *Citric Acid from China 2012*, where a local GOC entity, *i.e.*, a CCP Village Committee, provided a certified letter indicating that the owner of the input suppliers was not a Party Committee Secretary to find that two input suppliers with common ownership were not authorities.[53] Commerce explained that this type of government documentation, rather than statements or certifications from the company, was necessary for its analysis of the GOC/CCP's control in the companies that supplied inputs to the mandatory respondents.[54] On this basis, Commerce continued to apply AFA in the *Final Results* to find all input suppliers, including the subset that provided certifications and other government documentation, to be "authorities" within the meaning of section 771(5)(B) of the Act.[55]

## III. REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court concluded that Commerce did not adequately address certain record evidence relating to the benchmark data used to calculate the benefits for Baroque's purchases of plywood and veneer for LTAR.[56] Specifically, the Court

---

[51] *Id* at 15-16.
[52] *See Final Results* IDM at 55.
[53] *Id*. at 58 (citing *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014) (*Citric Acid from China 2012*), and accompanying IDM at Comment 2).
[54] *Id*.
[55] *See Final Results* IDM at Comment 4.
[56] *See Remand Opinion and Order* at 13 and 16.

found that Commerce did not sufficiently take into account supplier certifications, expert testimony, and various articles/website printouts that Baroque contends demonstrate the UN Comtrade data used in the plywood benchmark are not comparable to Baroque's plywood purchases.[57]  In addition, the Court found that Commerce did not sufficiently take into account record evidence demonstrating that backboard veneer and face veneer are distinct and that, as Baroque contends, the UN Comtrade data and ITTO data containing both backboard veneer and face veneer could be overly broad and distortive.[58]  Accordingly, the Court remanded to Commerce to explain adequately its conclusions in light of record evidence and Baroque's arguments that the data used in the plywood and veneer benchmarks in the *Final Results* are appropriate to value Baroque's purchases of plywood and veneer (face and backboard).[59]

The Court also held in the *Remand Opinion and Order* that Commerce did not satisfy its obligations under section 782(d) of the Act before applying AFA to find that certain companies that supplied inputs to Baroque and Riverside are government "authorities" within the meaning of section 771(5)(B) of the Act.[60]  Specifically, the Court found that Commerce failed to properly notify the GOC that Commerce required official documentation from the government or the CCP in its initial or supplemental questionnaire to the GOC prior to applying AFA.[61]  Consequently, the Court directed Commerce on remand to:  (1) identify with specificity the deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continued to determine that supporting government documentation is necessary information, request that information explicitly from the GOC; and (4) provide the GOC an opportunity to remedy any specified deficiencies.[62]

---

[57] *Id*. at 13.
[58] *Id*. at 16.
[59] *Id*. at 17.
[60] *Id*. at 28-33.
[61] *Id*. at 31-32.
[62] *Id*. at 33.

Therefore, Commerce addresses below the Court's order to further explain its decisions to include certain benchmark data in the plywood and veneer benchmarks and fulfill its obligations to notify the GOC of deficiencies with its response prior to applying AFA, and based on the information provided by the GOC, continues to find that certain companies that supplied inputs to Riverside and Baroque during the POR are government authorities.

## A.   Commerce's Calculation of the Plywood and Veneer for LTAR Benchmarks

As noted above, Riverside provided certain evidence that it claims demonstrates the UN Comtrade data include products unlike those it purchased (*i.e.*, are overly broad), which Riverside argued resulted in a distorted tier two benchmark price.  Commerce addresses this evidence in detail below and continues to find that record evidence does not support excluding UN Comtrade data from neither the plywood nor the veneer (face and backboard) benchmarks for Baroque.

As noted above, Riverside provided:  (1) certifications from its suppliers that all plywood purchased by Baroque during the POR was "made of eucalyptus with C/D grade only"; (2) information concerning the general grading and pricing of plywood and veneers; and (3) an expert statement on the plywood industry and the appropriateness of the HS subheadings included in the UN Comtrade and Stats.NZ data provided by the petitioner and Senmao.[63]  In evaluating record evidence on the comparability of available benchmark data and the purchase of input products under an LTAR program, Commerce must consider the connection between record evidence and the benchmark data and/or the reported input purchases.  In this respect, Commerce finds that the record evidence cited by Baroque does not provide any information on the composition of the UN Comtrade/Stas.NZ data.  Therefore, the record evidence does not support a conclusion that the UN Comtrade/Stats.NZ data are overly broad or result in a

---

[63] *See* Riverside's Benchmark Data at 2 and Exhibits 3, 4A, and Riverside's Benchmark Rebuttal at Exhibit 1.

distortion of the benchmark price applied to Baroque's purchases because record evidence shows that these data include some degree of products that are a different type of plywood.

For the reasons explained below, Commerce finds that neither UN Comtrade/Stats.NZ nor ITTO data perfectly reflect the characteristics of Baroque's reported plywood purchases, as both have relative strengths and weaknesses, but that both types of benchmark data are for plywood, and thus are sufficiently comparable to Baroque's purchases and appropriate for use as a benchmark. Therefore, consistent with its regulations under 19 CFR 351.511(a)(2)(ii) and its normal practice, Commerce continues to find that calculating Baroque's plywood benchmark as an average of record UN Comtrade/Stats.NZ and ITTO data results in the most accurate comparison to evaluate the adequacy of remuneration of Baroque's input purchases during the POR.

Regarding Baroque's supplier certifications, Commerce continues to find that this evidence sufficiently demonstrates that its plywood purchases were entirely C/D grade plywood made of eucalyptus, as it did in the *Final Results*.[64] However, these certifications alone do not demonstrate that other grades of plywood are not comparable to Baroque's purchases of C/D grade plywood. Riverside also provides a variety of publicly available information concerning the input purchases in question, including printouts of websites and articles on the grading conventions of plywood.[65] These describe, in general, the physical characteristics of plywood grade and provide visual guides to identify the plywood grade of various wood species. Record evidence also demonstrates that higher grade plywood, containing fewer defects in quality and appearance, have generally higher market prices than lower grade plywood, which contain more defects.[66]

---

[64] *See Final Results* IDM at 86.
[65] *See* Riverside's Benchmark Data at Exhibit 4A.
[66] *Id*.

In its rebuttal benchmark submission, Riverside provides an affidavit from Chunping Dai, associate professor of wood science at the University of British Columbia.[67] The affidavit similarly describes the plywood industry as being influenced by grade and species, with higher grades and slower growing species being more expensive.[68] In the affidavit, Chunping Dai claims that Baroque used "Grade D, or Grade C/D" plywood to produce multilayered wood flooring.[69] The affidavit then makes a number of sweeping claims about the accuracy of using HS and/or HTS subheadings[70] to value grade C/D eucalyptus plywood because they include different grades, concluding that such data are "inaccurate to value" Baroque's plywood purchases using "HTS categories."[71]

As stated in the *Final Results*, Commerce continues to agree that this evidence shows: (1) "the plywood industry as a whole is delineated by grade;" (2) "Baroque {}'s plywood purchases consisted solely of C/D grade plywood;" and (3) Baroque's plywood is generally consistent with industry descriptions of lower grade plywood.[72] Accordingly, as Commerce did in the *Final Results*, it is appropriate to exclude ITTO Malaysia and Ghana data from the plywood benchmark for Baroque (*i.e.*, relying on UN Comtrade data, and ITTO data from Brazil and Peru), because Baroque explained that these data do not describe its C/D grade plywood purchases.[73] However, for the reasons explained below, Commerce continues to find that this evidence does not support Baroque's arguments that the UN Comtrade/Stats.NZ data are inappropriate to include in the calculation of the plywood benchmark for its purchases of C/D grade plywood.

---

[67] *See* Riverside's Benchmark Rebuttal at Exhibit 1.
[68] *Id*. at Exhibit 1, paragraphs 8-11.
[69] *Id*. at Exhibit 1, paragraphs 12-14.
[70] "HS" refers to the global Harmonized System, while "HTS" refers specifically to the schedule used for U.S. imports of goods.
[71] *Id*. at Exhibit 1, paragraphs 15-18.
[72] *See Final Results* IDM at 86.
[73] *Id*.; *see also* Riverside's Letter, "Administrative Case Brief," dated February 22, 2022, at 6.

Commerce's tier two benchmarking practice is set forth in section 351.511(a)(2)(ii) of its regulations, which states:

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, {Commerce} *will* average such prices to the extent practicable, making due allowance for factors affecting comparability (emphasis added).

Based on this regulation, which calls for a benchmark using a broad range of prices available to purchasers (*i.e.*, prices available on the world market for imports), Commerce has a longstanding preference to average multiple data sources when multiple commercially available world market prices are on the record. As such, Commerce's decisions to exclude data from a benchmark are done on a case-by-case basis and based on a careful examination of record evidence, consistent with Commerce's regulations' emphasis on Commerce finding a "world market price" and that Commerce "will average such prices to the extent practicable."[74]

Commerce also notes that its regulations require comparing the purchase price of government goods to a "world market price" that takes into account "factors affecting comparability" permit a broad benchmark price, not one that precisely matches the reported purchases.[75] As the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) explained in *Essar Steel*, Commerce's benchmarks do not need to be "identical" to the purchased good, because "Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue."[76]

---

[74] *See* 19 CFR 351.511(a)(2)(ii).
[75] *Id.*
[76] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273-1274 (Fed. Cir. 2015) (*Essar Steel*).

Separately, Commerce also has a practice of relying on benchmark data reflecting the narrowest category of products encompassing the purchased product.[77]  However, in cases where Commerce has excluded benchmark data on this basis, it does so because the data does not encompass the type or category of input purchased at all (*i.e.*, not just some portion of the data reflecting certain types or categories that were not purchased).[78]  This practice does not extend to excluding data that encompasses the type or category of input purchased, just because the data also encompasses other types or categories of the same input (*i.e.*, broad data).  Benchmark data containing different categories of merchandise (*e.g.*, different grades of plywood) can still be suitable for benchmarking purchases of a narrower category of merchandise (*e.g.*, Baroque's purchases of C/D grade plywood), if that data is still comparable to the purchases in question.  Doing so can still be consistent with Commerce's practice of creating benchmarks reflecting the "narrowest category" of the purchased merchandise if data for different categories of the merchandise cannot be isolated then excluded, so long as Commerce still takes into account "factors affecting comparability" in line with its regulations.  This is inclusive of products not necessarily purchased by the respondents, but which are nevertheless comparable and available on the world market.

While more specific benchmark data are preferable, Commerce cannot conclude that broader data, such as global merchandise trade data from UN Comtrade and Stats.NZ, are necessarily distortive for benchmarking purposes because they include different grades or variations of the same product (*i.e.*, plywood).  Without evidence in support of the specific

---

[77] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 34828 (July 23, 2018) (*China Solar 2015*), and accompanying IDM at Comment 3; and *Certain Uncoated Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 81 FR 3110 (January 20, 2016) (*Uncoated Paper from China*) and accompanying IDM at 25-26.
[78] *See, e.g.*, *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 FR 9274 (March 5, 2018) (*China Aluminum Foil Investigation*), and accompanying IDM at Comment 16 (revising the benchmark to exclude alloyed ingot where the respondent demonstrated that it purchased only unalloyed aluminum ingot).

composition of these data (*e.g.*, how much of the UN Comtrade data is one grade of plywood or another), such a conclusion that the data contain a distortive amount of non-identical product grade would be speculative. No party has argued that the UN Comtrade/Stats.NZ data are not inclusive of C/D grade plywood, nor that the other grades of plywood included in these data cannot be used in a similar fashion to Baroque's C/D grade plywood. Rather, the argument for the distortion of the HS subheading data rests solely on the assumed result of an unquantified distortion resulting from the pricing difference between grades of plywood.

However, the price difference between the UN Comtrade/Stats.NZ data and the ITTO data cannot be solely attributed to the grade of the plywood based on the information provided by parties on the record. The record evidence cited by Baroque is reflective of its plywood purchases and of general industry characteristics but is not tied to the UN Comtrade/Stats.NZ data and does not represent dispositive evidence as to the composition of the HS subheading data on the record. The only evidence directly pertaining to the UN Comtrade/Stats.NZ data is the affidavit from Chunping Dai, which provides conclusory statements that it is "inaccurate" to benchmark Baroque's plywood purchases with data that does not distinguish by grade.[79] None of the evidence provided by Riverside describes the prevalence of different plywood grades in the global merchandise trade, or in a particular plywood market, such that Commerce can infer or "make allowances for" differing plywood grades in calculating the plywood benchmark. Importantly, without this evidence, the UN Comtrade data might consist mostly of sales of grade C or D plywood, that might be more reflective of Baroque's C/D grade plywood purchases than even the ITTO data, which is composed of only C/CC grade plywood. Absent such record evidence to support Baroque's claims, Commerce cannot evaluate Baroque's alleged distortion caused by including the grade-inclusive UN Comtrade against the distortion of not including that

---

[79] *See* Riverside's Benchmark Rebuttal at Exhibit 1, paragraph 18.

data in the plywood benchmark. Indeed, absent such information, Baroque's claims that the ITTO data would be more comparable to its actual purchases are speculative.

Moreover, UN Comtrade data satisfies certain aspects of Commerce's standards for benchmarks under a tier two world market price as compared to the ITTO data, such that continuing to include UN Comtrade data results in a benchmark that is arguably more comparable to Baroque's reported purchases. Primarily, the UN Comtrade data are significantly more reflective of a broadly available world market price than the ITTO data, encompassing global export data from 89 countries and large number of transactions of plywood made of a variety of species (*i.e.*, including eucalyptus under HS subheading 4412.33).[80] In comparison, the ITTO data which Baroque argues should be used to benchmark its purchases are comprised of bi-monthly price quotes from two countries (*i.e.*, Brazil and Peru) for specific destination markets (*i.e.*, "EU market" and "domestic" for Brazil and "Mexican market" for Peru) for plywood made of pine, copaiba, virola, cedar, and lupuna.[81] Notably, none of the data are for plywood made of eucalyptus, which is the species of Baroque's reported plywood purchases.[82] The evidence cited by Baroque clearly demonstrates that species, as well as grade, impacts plywood prices, by as much as 67-75 percent according to Chunping Dai's affidavit.[83] In previous administrative reviews of this order, Commerce excluded data from the benchmark because they corresponded only to products that were made from a species different from the reported purchases.[84]

---

[80] *See* Petitioner's Benchmark Data at Exhibit 1-A; and Jiangsu's Benchmark Data at Attachment 3. We also note that the plywood benchmark also included world export data from New Zealand from another source, Stats.NZ.
[81] *See* Riverside's Benchmark Data at Exhibit 2 (data for Brazil Parica Domestic Plywood Prices, Brazil Pine plywood plywood EU Market, Peru plywood, FOB Callao (Mexican market)).
[82] *Id*. at Exhibit 3.
[83] *See* Riverside's Benchmark Data at Exhibit 4A and Riverside's Benchmark Rebuttal at Exhibit 1, paragraph 9.
[84] *See e.g.*, *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2017*, 85 FR 76011 (November 27, 2020), and accompanying IDM at 38.

Thus, based on species alone, the UN Comtrade data are more comparable than the ITTO data, which do not match Baroque's reported eucalyptus plywood purchases. Although the UN Comtrade and Stats.NZ data cannot be segregated to more closely reflect Baroque's C/D grade plywood, Commerce continues to find that these data are still appropriate to include in the benchmark because they are comparable to the quality of Baroque's purchases in other respects. As noted above, Riverside has not argued that Baroque's plywood purchases are not classifiable under the HS subheadings used in its plywood benchmark in the *Final Results.* Additionally, there is no information on the record substantiating that the UN Comtrade and Stats.NZ data in question consist of or include any merchandise other than plywood, albeit of different grades. Thus, we find that these data are still comparable to Baroque's C/D grade plywood purchases. Further, it can be observed that the prices for plywood vary significantly between countries,[85] thus in making allowances for comparability in this case, and in calculating a price that "would be available" to Baroque, it is advantageous to include data that is more representative of prices in more countries in calculating the plywood benchmark. Moreover, as discussed above, the UN Comtrade and Stas.NZ data are valid commercially available world market prices, that we find are comparable to Baroque's plywood purchases, thus these prices should be averaged with other world market prices under Commerce's regulations."[86]

*Baroque's Backboard Veneer*

Regarding the backboard veneer, Commerce determined in the *Final Results* that it was appropriate to calculate separate benchmarks for Baroque's purchases of backboard and face veneer.[87] In doing so, Commerce explained that, based on record evidence, "Baroque{}'s backboard and face veneers differ sufficiently such that they require separate price benchmarks

---

[85] *See* Petitioner Benchmark Rebuttal at Exhibit 1, p. 4-6.
[86] *See* 19 CFR 351.511(a)(2)(ii).
[87] *See Final Results* IDM at Comment 8E.

18

to most accurately calculate the benefit for the veneer for LTAR program."[88]  However, this distinction between backboard and veneer does not necessitate the exclusion of data for containing both kinds of veneer, merely a recognition that the record allows for the calculation of separate benchmarks, which is more accurate than a single one would be in this instance.  Put another way, this distinction does not mean that UN Comtrade data, which do not reflect the differences between backboard and face veneer, are not still comparable to Baroque's purchases of both.

As explained in detail above with respect to Baroque's plywood benchmark, Commerce's benchmarking practice does not require the creation of a benchmark that is "identical" to the comparison product, only one that it is "comparable" to the purchased good.[89]  Thus, data should still be included in the benchmark so long as they are sufficiently comparable to the purchases in question.  Baroque's backboard and face veneer are both types of veneer, and are clearly included in the UN Comtrade and ITTO Peru data.[90]  Inclusion of these data result in a more robust benchmark for veneer and is more comparable to Baroque's purchases in some respects. Relying solely on ITTO Ghana for separate benchmarks for backboard and face veneers would also contradict Commerce's regulatory directive that it "will" average multiple available world market prices.[91]  However, in making "due allowances for comparability factors" as directed by its regulations, Commerce determined that a split benchmark, utilizing the ITTO Ghana data that differentiates between face and core (i.e., backboard) veneers would result in a more accurate comparison than one that does not account for these differences.

Commerce's practice of using split benchmarks is distinct from its decisions not to use particular data in its benchmark calculations.  Commerce employs two distinct benchmark prices

---

[88] Id. at 91.
[89] See Essar Steel, 678 F.3d at 1273-1274.
[90] The former based on the descriptions of the HS subheadings ("…sheets for veneer or plywood…"), and explicitly in the case of the latter see Petitioner's Benchmark Data at Exhibit 1-C and Riverside's Benchmark Data at Exhibit 2.
[91] See 19 CFR 351.511(a)(2)(ii).

to calculate the benefit of an input for LTAR program where there is sufficient record support for the differentiation of purchases and suitable *distinct* benchmark data for both categories of the same input.[92]  As described in the *Final Results*, Baroque's backboard and face veneers fit this description, and Baroque provided benchmark data for each type of veneer (*i.e.*, ITTO Ghana data).[93]  This treatment of face and backboard veneer is consistent with Commerce's normal practice to rely on data reflecting the narrowest category of products encompassing the input product.[94]  In other words, Commerce's practice of calculating split benchmarks is merely a recognition that it is more appropriate to calculate more specific benchmarks when it is reasonably able to do so.  In this case, it would be less accurate to include the ITTO Ghana data for both face and backboard veneer in a single benchmark applied to Baroque's purchases of both face and backboard veneer, than calculating the benefit using separate benchmark prices for face and backboard veneer.

Despite the recognition of the differences between backboard and face veneer as described in the *Final Results*, Commerce still determines that including UN Comtrade and ITTO Peru data is appropriate.  Although the UN Comtrade data do not differentiate by veneer type, they, like the UN Comtrade data used in the plywood benchmark, are more reflective of a world market price, encompassing nearly one billion kilograms worth almost $1.5 billion of world export sales from 75 countries.[95]  Further, no party has argued that the data in question do not consist of or include product comparable to Baroque's purchases, only that the UN Comtrade and ITTO Peru data also include an unknown degree of purportedly unlike merchandise.  The UN Comtrade data and ITTO data from Peru clearly describe both face and backboard veneer,[96] and therefore are still appropriate to include in both benchmark calculations, consistent with 19

---

[92] *See, e.g., 53-Foot Domestic Dry Containers from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 80 FR 21209 (April 17, 2015), and accompanying IDM.
[93] *See Final Results* IDM at 91-92.
[94] *See, e.g.*, *China Aluminum Foil Investigation* IDM at Comment 16.
[95] *See* Petitioner's Benchmark Data at Exhibit 1-C.
[96] Explicitly in the case of the latter and based on the description of the products included in the former.

CFR 351.511(a)(2)(ii), as both data sets include the input in question and cannot be further filtered.  Further, as with plywood described above, prices vary significantly between countries.[97] These variations are greater than the variations between face and core veneer reflected in the ITTO data from Ghana.[98]  Thus, inclusion of the UN Comtrade data in the benchmark, and the ITTO Peru data, results in a more reliable broad average that properly represents "world market prices."

Although Baroque provided information on the differences between backboard and face veneer, this evidence is not specific to the UN Comtrade (or the ITTO Peru) data, and, as such, does not provide a basis to conclude that the inclusion of these data in the benchmark is distortive.  Like with plywood described above, we agree with Baroque that the evidence provided is descriptive of grading and usage of different types of veneer in the industry as a whole, but disagree that these distinctions in industry are valid grounds to exclude data that does not reflect such distinctions.  In addition, the fact that both face veneer and backboard/core veneer are both classifiable under the same HS subheadings in the UN Comtrade data and are not differentiated in the ITTO Peru price data demonstrate that both types of veneer are still comparable to one another in ordinary commercial activities, despite the differences discussed above.  Thus, Commerce finds that it is appropriate not to change Baroque's veneer benchmarks used in the *Final Results*.

**B.    Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities**

As explained below, Commerce continues to determine that government documentation is necessary for its analysis of Riverside and Baroque's input suppliers.  As directed by the Court, we issued a supplemental questionnaire to the GOC explicitly requesting government documentation to support its questionnaire response in the underlying review with respect to

---

[97] *See, e.g.*, Petitioner's Benchmark Rebuttal at Exhibit 1, p. 1-3.
[98] *See* Riverside's Benchmark Data at Exhibit 2.

certain input suppliers.[99]  The GOC continued to decline to provide *any* government documentation in response.  Instead, the GOC provided responses to questionnaires that it sent the input suppliers in question and asserted this information is sufficient for Commerce's analysis.[100]  Therefore, we continue to find that the application of AFA is warranted to find Riverside and Baroque's input suppliers to be government authorities.

On June 24, 2025, Commerce issued a supplemental questionnaire to the GOC regarding deficiencies in the information provided in its initial and supplemental questionnaire responses.[101]  In the Remand Supplemental Questionnaire, Commerce requested that the GOC "provide government documentation, such as CCP records, supporting the GOC's claim that no individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR" as it reported in its initial questionnaire responses.[102]  The Remand Supplemental Questionnaire also asked the GOC to reconcile certain contradictory statements on the record and to provide documentation from the input suppliers substantiating the reported roles, decision-making, and affiliations of senior staff.[103]

The GOC timely filed its questionnaire response on July 11, 2025.[104]  In response to Commerce's request that the GOC provide government (including CCP) documentation in support of its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR, the GOC stated that "there is no central governmental database to search for the requested information… therefore the GOC cannot provide government documentation as requested by Commerce."[105]  The GOC

---

[99] *See* Commerce's Letter, "Supplemental Questionnaire Pursuant to Court Remand," dated June 24, 2025 (Remand Supplemental Questionnaire).
[100] *See* GOC's Letter, "Remand Supplemental Questionnaire," dated July 11, 2025 (GOC's Remand SQR) at 2-5 and Exhibits RSQ-1 and RSQ-2.
[101] *See* Remand Supplemental Questionnaire.
[102] *Id*. at 5 (citing GOC's IQR at Exhibit LTAR-1, pages LTAR-36 to LTAR-38).
[103] *Id*. at 4-6.
[104] *See* GOC's Remand SQR.
[105] *Id*. at 4.

contends that the response received directly from the input suppliers is sufficient support for the claim in its questionnaire response that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR. The GOC also asserts "there is no record evidence suggesting otherwise" and that, as such, "the burden is no longer with the GOC to further prove the negative but is with the party making the allegation to present evidences {sic} proving otherwise. There is no such evidence."[106]

This refusal to provide information demonstrates the GOC's failure to cooperate to the best of its ability, and its assertion that solely company information is sufficient for our analysis is incorrect. Commerce determines what information is necessary for its analysis – not the GOC.[107] Commerce has previously explained why such government information is necessary and outlines the reasons below. However, we note that in the *Remand Opinion and Order*, the Court found our reliance on government documentation to analyze for this purpose to be reasonable in this case. Therefore, we do not revisit the necessity of government documentation for our analysis in detail.

As stated in the Public Bodies Memo, Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes, even with no formal government ownership, if Commerce determines that the GOC exercises meaningful control over the enterprise.[108] As described in the *Preliminary Results*, record evidence demonstrates that the CCP exerts significant control over economic activities in China.[109] Record evidence also

---

[106] *Id.* at 4-5.

[107] *See ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1222 (CIT 2018) ("Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record.").

[108] *See* Memorandum, "Public Bodies Analysis Memo," dated October 5, 2021, at Attachment 1 (Public Bodies Memo), p. 28-29.

[109] *See Preliminary Results* PDM at 14-15 (citing Memorandum, "Placing Documents on the Record," dated October 5, 2021 (Additional Documents Memorandum) at Attachments "Section 129 Determination of the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe; Light-Walled Rectangular Pipe and Tube; Laminated Woven Sacks; and Off-the-Road Tires from the People's Republic of China: An Analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379" and "The relevance of the Chinese Communist Party for the limited purpose of determining whether particular enterprises should be considered to be 'public bodies' within the context of a countervailing duty investigation").

demonstrates that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector.[110]

Although the GOC states that it cannot provide the requested information because there is no central GOC database, Commerce did not specify in its request for government documentation to support the GOC's claim that such documentation must be derived from a central government database.

Section 782(c) of the Act states that:

{i}f an interested party, promptly after receiving a request from {Commerce}, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and *suggested alternative forms in which such party is able to submit the information*, {Commerce} shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party (emphasis added).

In its response, the GOC did not suggest any alternative form in which it could provide the requested government documentation. To the contrary, the GOC refused Commerce's open-ended request for supporting government documentation because "there is no central governmental database" where such information could be searched. Commerce did not limit the scope of its question, for the purpose of allowing the GOC opportunity to provide the government documentation that best supports its claim. Moreover, the GOC's response does not establish whether there are other government databases containing the information at the provincial or any other level of government.

In addition, the GOC's response implies that it is unable to provide any CCP records at all. The GOC in its supplemental questionnaire response states that "the industry and commerce administration does not require companies to provide such government information." This

_____

[110] *Id*. (citing Additional Documents Memorandum at Attachments, p. 35-36 and sources cited therein).

statement focuses exclusively on the GOC's official governmental bodies and ignores the existence of *any* CCP records, which are specifically requested in Commerce's Remand Supplemental Questionnaire. The GOC's assertion implies that the CCP, at all levels, maintains no records *or any other mechanism* by which it could determine the individual owners, members of the board of directors, or senior managers of the companies that supplied inputs to the mandatory respondents are affiliated with the CCP. For example, the GOC could have provided screenshots from a national, or sub-national CCP database with the results when searching for each individual owner, member of the board of directors, and senior manager of the input suppliers.

As noted above, in *Citric Acid from China 2012*, the documentation Commerce accepted to find an input supplier to not be an authority was documentation from the CCP. Thus, the GOC has previously been able to provide documents from the CCP specifically and gives no explanation why it is unable to do so here. The GOC has previously provided government documentation in *Citric Acid from China 2012* relating to the status of individual owners, members of the board of directors, or senior managers of the input suppliers as officials of the GOC and/or CCP.[111] Accordingly, Commerce finds that the GOC has failed to provide information requested by Commerce, within the meaning of section 776(a)(2)(A) of the Act. Further, as the GOC has provided government documentation on this issue in prior CVD proceedings, Commerce finds that the GOC has failed to cooperate by not acting to the best of its ability to comply with this request for information. Therefore, Commerce continues to find, as it did in the *Final Results*, that a reliance on AFA is warranted.

Having properly notified the GOC of the deficiencies with its questionnaire responses, Commerce has fulfilled its obligation under section 782(d) of the Act, prior to applying AFA. As stated above, the GOC continued not to provide requested government, including CCP,

---

[111] *See Citric Acid from China 2012* IDM at Comment 2.

documentation in support of its claim that no individual owners, members of the board of directors, or senior managers of the companies that supplied inputs to Riverside and Baroque were GOC or CCP officials during the POR. This information is necessary for Commerce's analysis, because of the meaningful control the GOC exercises throughout the Chinese economy, including in ostensibly private entities, as detailed above. Therefore, Commerce continues to find, based on AFA, that the producers that supplied inputs to Riverside and Baroque are "authorities" within the meaning of section 771(5)(B) of the Act, and, thus, that such producers provided a financial contribution in supplying certain inputs to these respondents for less than adequate remuneration within the meaning of section 771(5)(D)(iii) of the Act.

## IV.    INTERESTED PARTY COMMENTS

As noted above, we received two sets of comments on Commerce's draft results of redetermination. In its comments, Baroque challenges Commerce's continued inclusion of UN Comtrade and ITTO data in the benchmarks for plywood and veneers. Baroque also argued that Commerce erred in continuing to apply AFA to find certain of its input suppliers to be government authorities. Fine Furniture submitted a letter concurring and incorporating by reference Baroque's Draft Remand Comments.[112] We address these comments below.

**Issue 1:    Whether to Revise Commerce's Plywood and Veneers for LTAR**

**Benchmarks**

Baroque did not provide the requested executive summary regarding its comments. Baroque's arguments may be found at pages 2 to 13 of Baroque's Draft Remand Comments.

**Commerce's Position:**

We continue to include the ITTO data, the UN Comtrade data, and Stats.NZ data in the Plywood and Veneer for LTAR benchmarks under 19 CFR 351.511(a)(2)(ii). Baroque argues that in continuing to include data that are not grade-specific, Commerce has failed to take into

---

[112] *See* Fine Furniture's Draft Remand Comments.

account prevailing market conditions, as required in the Act, in calculating the benchmark to evaluate the adequacy of remuneration for a purchased good.[113]  More broadly, Baroque claims that because the global merchandise trade data from UN Comtrade and Stats.NZ, and non-grade-specific ITTO data do not match the quality standard (*i.e.*, grade of plywood, or type of veneer) of the purchased good, Commerce is not calculating the subsidy benefits as accurately as possible, as it is required to do.[114]  We disagree, and, for the reasons set forth below, continue to find the UN Comtrade, Stats.NZ, and non-grade-specific ITTO data each comprise world market prices that are comparable to Baroque's purchases of plywood and veneer that are properly included in the respective benchmarks consistent with 19 CFR 351.511(a)(2)(ii).  Thus, we continue to find it appropriate to include each dataset in the respective benchmarks for these final results of redetermination.

Consistent with the *Remand Opinion and Order*, Commerce analyzed the record evidence regarding Baroque's purchases of plywood, including information about the quality grading system and pricing in the industry.[115]  Nevertheless, Commerce concluded that this evidence is not demonstrative of the composition of the benchmark data on the record and thus cannot not serve as the basis to conclude that such data are overly broad as Baroque asserts.[116]  Indeed, as Commerce explained, without knowledge of the actual grade composition by percentage of each of the datasets, including the ITTO dataset, it's speculative to say that *any* dataset is necessarily more reflective of Baroque's purchases of C/D grade.  In addition, Commerce reasoned that benchmark data containing different categories of merchandise, such as different grades of plywood, may still be suitable for benchmarking purchases of just one category of that

---

[113] *See* Baroque's Draft Remand Comments at 2.
[114] *Id*. (citing *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007); *see also Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994))
[115] *See* Draft Remand at 12-13.
[116] *Id*. at 11-12.

merchandise, so long as the different categories are still comparable to the purchases in question.[117]  Baroque argues that this reasoning is inconsistent with the Act.[118]

Section 771(E) of the Act sets forth the following for determining the benefit conferred by purchases for LTAR:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions or purchase or sale.

Baroque argues that in the Draft Remand, Commerce did not properly consider "quality" as required by the Act by not excluding the UN Comtrade and Stats.NZ from the plywood benchmark.  However, Commerce has considered grade in its analysis and further grade is just one characteristic of the "quality" of Baroque's plywood purchases.  As stated in the Draft Remand, "neither UN Comtrade/Stats.NZ nor ITTO data perfectly reflect the characteristics of Baroque's reported plywood purchases."[119]  Because no one dataset on the record represents the best benchmark in all aspects (*i.e.*, such that excluding other datasets would yield a more comparable benchmark) as explained in detail below, we find that it is appropriate to continue including the UN Comtrade/Stats.NZ data and the ITTO data in Baroque's plywood benchmark.

First, as directed by the *Remand Opinion and Order*, we reconsidered the record evidence Baroque provided and summarized our conclusions in the Draft Remand, which are also stated in the "Commerce's Calculation of the Plywood and Veneer Benchmark" section above.  However, because this record evidence does not directly describe the UN Comtrade or Stats.NZ data, Commerce found that it cannot conclude the UN Comtrade/Stats.NZ data are overly broad or result in a distortion of the benchmark price.[120]  Baroque does not comment on Commerce's

---

[117] *Id*. at 16.
[118] *See* Baroque's Draft Remand Comments at 3-4.
[119] *See* Draft Remand at 12.
[120] *Id*. at 16-17.

explanation that the cited record evidence is not clearly applicable to the data Baroque is seeking to exclude from the benchmark.[121]  Instead, Baroque challenges Commerce's analysis of the similarity of the available benchmark information to Baroque's plywood purchases due to the level of detail regarding the characteristics of the plywood in each data set.[122]

As an initial matter, Baroque claims that our analysis in the Draft Remand focused on "comparability" is contrary to record evidence and the statute.[123]  We note that "comparability" is the regulatory standard stated in 19 CFR 351.511(a)(2)(ii).  Moreover, Commerce considers the similarity of the purchases in the benchmark information to the purchases in question, including product quality and other "prevailing market conditions" established in section 771(E) of the Act, as part of this "comparability" analysis.

As explained in the Draft Remand, we find that the data from UN Comtrade and Stats.NZ are comparable to Baroque's plywood purchases because such purchases would be classifiable in the HS subheadings used in the *Final Results* and certain of the HS subheadings used are more specific than the ITTO data in terms of wood species.[124]  In addition, using the UN Comtrade and Stats.NZ data results in are more robust benchmark because it includes numerous real export sales of the plywood products  for 89 countries.[125]  In comparison, the ITTO data represent less than 24 price quotes of grade-specific plywood from two countries for specific destination markets.[126]  Section 351.511(a)(2)(ii) of Commerce's regulations calls for the use of "a world market price where it is reasonable to conclude that such price would be *available* to the purchasers in the country in question" {emphasis added}.  Importantly, the regulation establishes that "where there is more than one commercially available world market price, {Commerce} *will* average such prices to the extent practicable." (emphasis added).  Thus, under this standard for

---

[121] *See* Baroque's Draft Remand Comments at 3-11.
[122] *Id*. at 3-6.
[123] *Id*. at 8.
[124] *See* Draft Remand at 17-18.
[125] *See supra* "Commerce's Calculation of the Plywood and Veneer for LTAR Benchmarks" section.
[126] *Id*.

adequate remuneration, if prices on the world market provided by parties are commercially available, comparable to the goods or services benchmarked, and it is practicable to average such prices, the regulation calls for the inclusion of as wide a variety of prices as is available, because this is reflective of a benchmark for a world market price.

Baroque also acknowledges that "UNComtrade {and Stats.NZ} data could be used as a benchmark … because it is potentially comparable enough."[127]  While Baroque argues that UN Comtrade/Stats.NZ data would be usable "if it was the only benchmark source on the record,"[128] Commerce's regulations under 19 CFR 351.511(a)(2)(ii) direct us to average all comparable benchmark information.  Baroque's admission here demonstrates the reasonableness of Commerce's determination to include benchmarks that are "comparable enough" in its benchmarks, and indeed would be required in accordance with 19 CFR 351.511(a)(2)(ii).

We agree with Baroque that Commerce has a well-established practice of excluding prices from its benchmarks that are not sufficiently comparable to the product in question due to encompassing an overly broad variety of products.[129]  However, such decisions are dependent on the product in question and the evidence on the record.  Most of the cases Baroque references[130] are instances where Commerce excluded data that did not describe the purchased product in favor of equivalent data that did (*i.e.*, using one HS subheading instead of another),[131] or basket categories of particular HS subheadings in favor of more specific subheadings.[132]  Commerce addressed these decisions in the Draft Remand, explaining that in cases where Commerce has

---

[127] *See* Baroque's Draft Remand Comments at 8.
[128] *Id*.
[129] *Id*. at 4-5.
[130] *Id*. at 5-6.
[131] *See, e.g.*, *China Aluminum Foil Investigation* IDM at Comment 16; *see also Uncoated Paper from China* IDM at 25-26, 28-29, and 31; and *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 FR 56640 (September 28, 2005), and accompanying IDM at Comment 1 (Relying only on "Region 1" instead of "other regions" as the log prices specific to the reported purchases "are reported in Region 1 of these data sources.").
[132] *See, e.g.*, *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 73 FR 35639 (June 24, 2008), and accompanying IDM at Comment 15.

excluded benchmark data on this basis, it does so because the data do not encompass the type or category of input purchased at all. These cases are inapposite to the instant remand because the UN Comtrade and Stats.NZ data are inclusive of Baroque's plywood purchases and there is no alternate form or method to filter such data to use in lieu of the broader datasets. These cases do not support Baroque's argument that the ITTO data are more comparable (in terms of grade) and thus should be used exclusively to calculate the benchmark. As discussed above, all three data sources in this remand represent (numerous) "commercially available world market prices" that are comparable to Baroque's plywood purchases, and therefore should be averaged under Commerce's regulations.

There are some similarities in the fact patterns of *China Solar 2015* and the instant case; however, Baroque's reliance on *China Solar 2015* is misplaced. [133] Although in *China Solar 2015* Commerce acknowledged that the IHS Markit data were more specific to the aluminum extrusions purchased by the respondent, it continued to use the less-specific UN Comtrade data because of other weaknesses with the IHS Markit data. [134] On remand Commerce revised the aluminum extrusion benchmark used in *China Solar 2015* to include only the IHS Markit data because the UN Comtrade data contained "several types of aluminum extrusions" beyond just the solar frames purchased by the respondent. [135] In sustaining Commerce's remand redetermination the Court explained that its concern was "that the {UN} Comtrade data appeared to include data from products unrelated to solar frames, whereas the IHS data was specific to solar frames." [136] There is no similar concern here because different grades of plywood contained in the UN Comtrade data on the record of this review are all still plywood and are all capable of being incorporated into subject merchandise. While there may be some differences in quality

---

[133] *See* Baroque's Draft Remand Comments at 4 (citing *China Solar 2015* IDM at Comment 3).
[134] *See China Solar 2015* IDM at Comment 3.
[135] *See Final Results of Redetermination Pursuant to Court Remand*, *Canadian Solar Inc., et al. v. United States*, Consol. Court No. 18-00184, Slip Op. 20-23 (CIT February 25, 2020) dated June 26, 2020, available at https://access.trade.gov/public/FinalRemandRedetermination.aspx at 13-14.
[136] *See Canadian Solar, Inc. v. United States*, Slip Op. 20-149 (CIT October 19, 2020) at 13-14.

grading of the plywood encompassed by the UN Comtrade data, all are still plywood and thus still comparable to Baroque's purchases of C/D grade plywood. Baroque has not claimed that the UN Comtrade data include products other than plywood nor has it suggested that any of the products encompassed in the HS subheadings included in the UN Comtrade data could not be used in the same way as the plywood Baroque purchased. No party has argued, at any point in the proceeding, that the plywood in the UN Comtrade and Stats.NZ data are unrelated to general production of multilayered wood flooring.

Further, although record evidence demonstrates that grade affects the price of plywood, as considered in detail in the "Commerce's Calculation of the Plywood and Veneer for LTAR Benchmarks" section above, the evidence does not indicate the magnitude of the effect of grade on price. However, the little record evidence that does quantify the relative pricing differences between different grades of plywood reveals that this effect is relatively minor. For example, the ITTO Tropical Timber Market (TTM) reports state that in the section for "Ghana – Export Plywood Prices," which are prices for BB/CC plywood, that "Grade AB/BB {plywood} would attract a premium of 10%, B/BB 5%, C/CC 5% and CC/CC 10%."[137] Even if we did know the comparative composition of each dataset by grade, this evidence suggests a benchmark including differing grades of plywood, such as the UN Comtrade and Stats.NZ data, would result in a distorted average of world market prices to measure the adequacy of remuneration, as Baroque contends.

We also note that Baroque's argument that non-grade-specific data are unsuitable for the plywood benchmark is contradicted by the fact that only two of the three ITTO datasets Baroque asserts Commerce should rely on indicate the grade of plywood. The "Brazil – Domestic Plywood Prices" tables in the ITTO TTM reports merely state the species (*i.e.*, Parica), the thickness (4mm, 10mm, and 15mm), and whether the product is moisture resistant (MR) or

---

[137] *See* Riverside's Benchmark Data at Exhibit 2, p. 9 (ITTO TTM Report: 23:1 1 – 15 January 2019 at p. 4).

weather and boil proof (WBP).[138]  If, as Baroque claims, "inclusion of products not used by the respondent makes the benchmark unviable when alternative sources are on the record,"[139] then clearly the "Brazil – Domestic Plywood Prices" should also be excluded.  However, we disagree, for the reasons explained above.

In addition, Baroque's claims that Commerce's regulations do "not require nor prefer" the use of multiple prices, and that the reference in the regulation to "world market price" is singular, are meritless.  Section 351.511(a)(2)(ii) of Commerce's regulation plainly states that "{w}here there is more than one commercially available world market price, {Commerce} *will* average such prices to the extent practicable, making due allowance for factors affecting comparability" {emphasis added}.  This regulation makes clear that when multiple comparable world market prices are available on the record, Commerce's practice is to average them, to the extent practicable and in consideration of comparability.  Baroque has not challenged Commerce's averaging methodology and its arguments regarding comparability are addressed above.  Having determined that the UN Comtrade and Stats.NZ data are comparable to Baroque's purchases, and thus a valid "world market price," Commerce's practice dictates that such prices should be averaged with Baroque's preferred ITTO data.  Baroque is correct that the use of "world market price" in the regulations does not *per se* mandate that Commerce calculate a benchmark that is representative of the entire world, but Commerce's regulations do require that it calculate an average when multiple comparable world market prices are on the record, which is the case here as explained above.

Baroque echoes its comments for the calculation of the face and backboard veneer benchmarks.[140]  However, we note that Commerce's decision to calculate separate benchmarks for face and backboard veneer, as it did in the *Final Results* based on the evidence and

---

[138] *Id.* at Exhibit 2, p. 14 and 28 (ITTO TTM Report: 23:1 1 – 15 January 2019, pages 9 and 23).
[139] *See* Baroque's Draft Remand Comments at 9.
[140] *Id*. at 11-13.

benchmark information on the record, is distinct from its analysis of what benchmark information is sufficiently comparable to include in each benchmark.  In this regard, as described above, we continue to find that the UN Comtrade and ITTO Ghana data describe Baroque's purchases of face and backboard veneer and are thus comparable and suitable to use for benchmarking.[141]  Baroque did not challenge this analysis, and instead rested on its argument that because these data include both types of veneer they are not viable to be used as the benchmark for either type of veneer.[142]  Here, we note the distinction between comparability and identicalness in the creation of a benchmark; while Commerce separated face and backboard veneer data, where available, for increased reflectiveness in the benchmark, that does not indicate that face and backboard veneer are not comparable, and that a general veneer benchmark is not suitably commercially available and suitably comparable for purposes of inclusion in a benchmark under 19 CFR 351.511(a)(2)(ii).  Rather, Commerce found, in response to parties' arguments, that the information was available to create a calculation more narrowly specific to the benchmarked veneers in one dataset, and did so.  However, because Commerce found that the UN Comtrade and ITTO Ghana data are comparable, and could be practically averaged, 19 CFR 351.511(a)(2)(ii) instructs for the inclusion of those prices.  Therefore, we find that the UN Comtrade and ITTO Ghana data result in a more robust benchmark because of the volume of transactions covered and greater geographical representation.

---

[141] *See supra* 19-22.
[142] *Id*.

**Issue 2:**      **Whether to Apply AFA to the GOC to Find Certain Input Suppliers to be Government Authorities**

Baroque did not provide the requested executive summary regarding its comments. Baroque's arguments may be found at pages 13 to 18 of Baroque's Draft Remand Comments.

**Commerce's Position:**

Baroque argues that Commerce's application of AFA to find that Baroque's input suppliers are government authorities is not supported by substantial evidence.[143] Specifically, Baroque contends that the GOC provided sufficient factual information to demonstrate that no key personnel in the input suppliers in question were GOC or CCP officials and that record evidence demonstrates that a primary party organization was not required in any of these suppliers, thus these suppliers cannot be found to be government authorities.[144] As explained below, we disagree; company information is insufficient for this purpose. Further, the GOC did not comply with Commerce's repeated requests to provide government documentation supporting its claims about CCP influence in certain of Baroque's input suppliers. Accordingly, we continue to find it appropriate to apply AFA to find certain of Baroque's input suppliers to be government authorities under section 771(5)(B) of the Act that provided a financial contribution in supplying inputs to Baroque within the meaning of section 771(5)(D)(iii) of the Act.

First, Baroque claims that Commerce overstates the conclusions of the Public Bodies Memo to explain the need for GOC government documentation.[145] Baroque argues that the Public Bodies Memo only discusses CCP influence in private companies through primary party organizations, and that the GOC's questionnaire responses demonstrate that none of the relevant input suppliers have a primary party organization because no employees are CCP members.[146] Thus, record evidence is sufficient to conclude that the input suppliers are not government

---

[143] *See* Baroque Draft Remand Comments at 13-14.
[144] *Id*. at 17.
[145] *Id*. at 13-14.
[146] *Id*. at 14-15.

authorities.[147]  However, Baroque misstates the relevance of the Public Bodies Memo and the rationale for Commerce's request for government documentation in its authorities analysis. Even so, the GOC's questionnaire responses do not demonstrate with sufficient documentation that none of the relevant input suppliers have a primary party organization.

The Public Bodies Memo explains that Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes if Commerce determines that the GOC exercises meaningful control over the enterprise.  This control can exist through, *inter alia*, the establishment of primary party organizations and/or the presence of Government or CCP officials of the nine entities in the company's individual owners, members of the board of directors, or senior managers.  As explained above, record evidence demonstrates that the CCP continues to exert significant control over economic activities in China and exercises meaningful control over private entities to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector.[148]  This evidence demonstrates the need to fully evaluate each company that supplied inputs under an LTAR program, but does not alone explain why government documentation is necessary for Commerce's analysis.

In its response to Commerce's CVD questionnaire and the supplemental issued for the purpose of this remand, the GOC stated that to formulate its responses with respect to GOC/CCP influence it relied solely on information provided directly by the input suppliers.[149]  However, in its initial questionnaire response, the GOC also explained that input producers are not required to report or record in their internal records and documents whether any company owners, members of the board of directors or managers are officials in the nine entities.[150]  Based on this response,

---

[147] *Id*. at 15.
[148] *See* Additional Documents Memorandum at Attachments, p. 35-36 and sources cited therein.
[149] *See* GOC's IQR at Exhibit LTAR-1, p. LTAR-38; *see also* GOC's Remand SQR at 2.
[150] *Id*. at Exhibit LTAR-1, p. LTAR-38 and LTAR-39.

we continue to find that government documentation from the GOC is necessary to demonstrate and verify whether a person has an official role within either the GOC and/or CCP.

As stated above, Commerce may find ostensibly private businesses to be government authorities if it determines that the GOC exercises meaningful control over them. Baroque argues that the GOC provided internal work plans of each input supplier in question which purportedly confirms that there was no outside intervention in those plans or decision making.[151] However, such documentation remains insufficient without government documentation provided by the GOC to ascertain whether any owner or other individual with significant control over the operations and decisions of the company was a Government or CCP official during the POR.

Although the GOC provided company-specific information, such as articles of incorporation, capital verification reports, company by-laws, business licenses, and internal work plans, it is insufficient without government documentation supporting the GOC's claims about GOC/CCP influence. This company documentation is helpful in identifying the individual owners, board members, officers, and managers of the company; however, this documentation does not demonstrate on its own whether the owners and shareholders of the input suppliers have any CCP involvement. As Baroque argues, the GOC in the context of this remand redetermination re-stated that none of the relevant input suppliers had primary party organizations, providing confirmation from the input suppliers themselves that none of these enterprises had primary party organizations.[152]

Baroque further claims that Commerce discounts this information in the Draft Remand because the requested "government documentation" was not provided.[153] As explained above, given the significant influence of the CCP and GOC in the Chinese economic system and the lack of public reporting requirements, company information and documentation cannot replace

---

[151] See Baroque Draft Remand Comments at 15 (citing the GOC's Remand SQR at Exhibits RSQ-1 and RSQ-2).
[152] See Baroque Draft Remand Comments at 15; see also GOC's Remand SQR at Exhibit RSQ-2.
[153] Id.

government documentation in our analysis of whether the GOC/CCP may exert a controlling influence over a given input supplier.  Likewise, we find that the certifications on CCP influence provided by the suppliers cannot represent dispositive evidence about the involvement of the GOC, including the CCP, in that company that provided inputs to mandatory respondents under an LTAR program.

Baroque also asserts that, because the GOC stated that "personal information of the employees, including whether they are CCP members, would normally be provided to the Human Resources department of the company," Commerce can verify whether the suppliers have a primary party organization and any key company personnel are Government or CCP officials.[154]  Baroque is mistaken; as Commerce has previously explained, company information alone is insufficient for this purpose.[155]  Based on the GOC's questionnaire responses, we continue to find that government documentation is required to substantiate whether a person has an official role in either the GOC or CCP, as explained above.  Thus, verification of such information without the necessary corroborating government documentation would be pointless. Additionally, as noted in the Draft Remand, the company certifications are *pro forma* in nature and lack particular details for examining possible government involvement in each company. Without such details, Commerce is unable to evaluate the extent of GOC/CCP involvement in each input supplier in order to verify these certifications as Commerce does not have any official documentation to evaluate and review to corroborate or confirm the suppliers' mere statements. Verification is not intended to complete the record when parties, such as the GOC in this instance, fail to provide the necessary documentation.[156]

---

[154] *Id*. at 15.
[155] *See Citric Acid from China* IDM at Comment 5.
[156] *See e.g.*, *Tianjin Mach. Import & Export Corp. v. United States*, 806 F.Supp.1008, 1015 (CIT 1992) ("{T}he burden of creating an adequate record lies with respondents and not with Commerce…Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." (internal citations omitted)).

Baroque also argues that Commerce's request for government documentation is unreasonable because it was not specific in the type of government documentation the GOC should provide. However, Commerce's request for government documentation was intentionally open-ended to allow the GOC discretion to provide whatever information it believed would be sufficient to support its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials.[157] Commerce cannot speculate as to the forms of government documentation the GOC is able to provide that would best demonstrate that the key people in the input suppliers in question are not officials in the Government or CCP or that would provide Commerce some way of confirming or verifying the individual claims.

Based on what documentation and explanation was provided in response to its questionnaire, Commerce would then be able to evaluate such information, and consider whether it required additional information or explanation such that it should send a supplemental questionnaire. The GOC's refusal to provide any government documentation precluded Commerce from completing this basic questionnaire response analysis. In addition, Baroque's arguments that the question is too broad ignores the fact that the GOC did not provide *any* government documentation in response. We address Baroque's specific critiques of Commerce's request for government documentation below.

As explained above, in its response to the Remand Supplemental Questionnaire, the GOC restated its initial questionnaire response that "there is no central governmental database."[158] Baroque asserts that, there being no central database, it is unclear how there could be a "national" database that the GOC/CCP could provide documentation from, as we suggested in the Draft Remand. There may be multiple national databases (*e.g.*, separate ones for each of

---

[157] *See* Draft Remand at 25; *see also* GOC's Remand Supplemental Questionnaire at 5.
[158] *See* GOC's Remand SQR at 4; *see also* GOC's IQR at Exhibit LTAR-1, p. LTAR-38.

jurisdictions where the nine entities are located) that are not in one "central governmental database."  Alternatively, as discussed in the Draft Remand, the GOC appears to distinguish itself from the CCP in its questionnaire response, so perhaps there is a central database that is not "governmental" in the GOC's view because it is maintained by the CCP or a governmental entity other than "the industry and commerce administration."[159]

Likewise, Baroque argues that providing documentation from a local or other sub-national database would not sufficiently answer Commerce's request for government documentation.[160]  Again, such arguments are moot when the GOC has provided no government documentation of any kind.  It would be up the GOC to explain how the jurisdictions of the nine entities might overlap or not such that responses from certain of the nine entities at each level of the Chinese government are irrelevant (if they are).

Finally, as explained above, Commerce cannot speculate what exact type(s) and form(s) of government documentation the GOC can provide to support its claims, as only the GOC has the understanding of what government documents it, including the CCP, maintain and what they demonstrate.  Here, Commerce can only suggest that the GOC could have provided search results from a membership database or its equivalent listing any official position held at the local, provincial or other sub-national/non-central levels because the GOC did not address whether such information exists, nor did it explain whether there was some other source for independently confirming and documenting the GOC's claims.  Commerce's suggestion is based merely on the fact that to believe that such access to *any* information by the GOC defies belief for the reasons explained below.

---

[159] *Id*. ("There is no central governmental database to search for the requested information on whether any individual owners, members of the board of directors, or senior managers are government or CCP officials, and the industry and commerce administration does not require companies to provide such government information").
[160] *See* Baroque's Draft Remand Comments at 16.

Baroque also claims that Commerce's reliance on *Citric Acid from China 2012* is unreasonable because the type of documentation provided in that case was only possible because the owner had previously been a Government or CCP official.[161]  However, our reference to *Citric Acid from China 2012* is only to illustrate that the GOC can provide documentation from the government, including the CCP importantly, that attests to its records of officials.  The GOC's insistence that it cannot rely on any official source to demonstrate that the key persons in input suppliers are not officials suggests that the CCP has no tracking of the individuals who are officials in the nine entities.  Given that the CCP Constitution requires that all organizations with enough CCP members form primary party organizations,[162] it strains credulity that the CCP has no records with which it can track whether this requirement is followed.

In short, Baroque's arguments have focused on its claims that the company information the GOC provided is sufficient for Commerce's government authorities analysis and that the GOC cannot provide government documentation that would satisfy Commerce's analysis.  Commerce explained above why it requires government documentation and noted that Baroque's argument about what government documentation would be sufficient are speculative because the GOC has provided none.  Moreover, Baroque does not challenge that Commerce has complied with the *Remand Opinion and Order*.  Commerce issued an additional supplemental questionnaire requesting the government documentation necessary to evaluate whether Baroque's input suppliers are government authorities.  The GOC again refused to provide such documentation.  The GOC has, in other proceedings, provided government documentation, from the CCP specifically, to support its reported claims about GOC/CCP involvement in private companies.[163]

---

[161] *Id.* at 16-17.
[162] *See* Public Bodies Memo at 35.
[163] *See e.g.*, *Citric Acid from China 2012* IDM at Comment 2.

Therefore, Commerce continues to find that necessary information is missing from the record, that the GOC has withheld information requested of it, significantly impeded the proceeding, and has provided information that is not verifiable and, accordingly, that we must rely on facts available in conducting our analysis of Baroque's input producers.[164]  As a result of repeated incomplete responses to Commerce's questionnaires, we continue to find that the GOC has failed to cooperate by not acting to the best of its ability to comply with our requests for information.  Consequently, we determine that the GOC withheld information, and that an adverse inference is warranted in selecting from the facts available.[165]  As AFA, we find that CCP officials are present in each of Baroque's privately-owned input producers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the Government, meaningful control over the companies and their resources.  As explained in the Public Bodies Analysis Memo, an entity with CCP presence on its board, or in management, or in party committees, may be controlled such that it possesses, exercises, or is vested with governmental authority.[166]  Thus, for these final results of redetermination, we continue to find Baroque's input producers to be "authorities" within the meaning of section 771(5)(B) of the Act.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Opinion and Order*, we have further explained Commerce's selection of the data to benchmark Riverside's plywood and veneer purchases, and have not made changes to the benchmarks used in the *Final Results*.  In addition, we issued an additional supplemental questionnaire to the GOC notifying it of certain deficiencies with respect to Riverside's input suppliers, consistent with the Court's *Remand Opinion and Order*, and, having analyzed the GOC's response, continue to find the GOC did not cooperate to the best of its

---

[164] *See* section 776(a)(2)(A) of the Act.
[165] *See* section 776(b) of the Act.
[166] *See*, *e.g.*, Public Bodies Memo at 33-36 and 38.

ability.  Therefore, for these final results of redetermination, we are continuing to apply AFA to find that certain of Riverside's input suppliers are government authorities.  As we are making no changes from the *Final Results*, the total countervailable subsidy rate assigned to Riverside/Baroque for the POR continues to be 12.74 percent,[167] and accordingly we do not intend to issue a *Timken*[168] notice should the Court sustain these final results of redetermination.

9/19/2025

X  *Chris J. Abbott*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[167] *See Final Results*, 87 FR at 36306.
[168] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).