# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUS. (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION <br> Plaintiffs, <br> and <br><br> ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*, <br> Consolidated Plaintiffs, <br> and <br><br> LUMBER LIQUIDATORS SERVICES, LLC, <br> Plaintiff-Intervenor, <br> v. <br><br> UNITED STATES, <br> Defendant, <br> and <br><br> AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, <br> Defendant-Intervenor. | Consol. Court No. 22-00210 <br><br> PUBLIC DOCUMENT |

## <u>DEFENDANT'S COMMENTS SUPPORTING REMAND REDETERMINATION</u>

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
JONZACHARY FORBES
Attorney
U.S. Department of Commerce
Office of the Chief Counsel For Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 779-0204
Email: JonZachary.Forbes@trade.gov

TARA K. HOGAN
Assistant Director
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

March 20, 2026                    Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ........................................................................................................... 2

I.     The Court's April 3, 2025 Remand Order .......................................................... 2

II.    Commerce's Remand Results ............................................................................ 4

ARGUMENT ............................................................................................................... 6

I.     Standard Of Review .......................................................................................... 6

II.    Commerce's Benchmark Calculations for Plywood and Veneers Are Supported By Substantial Evidence And In Accordance With Law ...................................... 6

    A.  Commerce's Analysis of Record Evidence under 19 C.F.R. § 351.511(a)(2)(ii) Is in Accordance with Law ...................................................................... 7

    B.  Commerce Reasonably Continued to Include UN Comtrade Data in the Plywood Benchmark ............................................................................ 9

    C.  Commerce Reasonably Continued to Include UN Comtrade Data and ITTO Peru Data in the Veneer Benchmarks .......................................................... 12

III.   Commerce Complied with 19 U.S.C. § 1677m(d) and Its Application of AFA to Find Certain of Baroque's Input Suppliers To Be Government Authorities Is Supported by Substantial Evidence and in Accordance with Law .................................. 14

CONCLUSION .......................................................................................................... 18

# TABLE OF AUTHORITIES

Cases

*Archer Daniels Midland Co. v. United States*,
968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014)..................................................... 7

*Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States*,
776 F. Supp. 3d 1290 (Ct. Int'l Trade 2025)............................................. 2, 3, 4, 14

*Beijing Tianhai Indus. Co., Ltd. v. United States*,
52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015)..................................................... 7

*Canadian Solar, Inc. v. United States*,
Slip Op. 20-149 (CIT Oct. 19, 2020) ......................................................... 11

*Changzhou Trina Solar Energy Co. v. United States*,
466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ................................................. 11

*Changzhou Trina Solar Energy Co. v. United States*,
Slip Op. 18-166 (CIT Nov. 30, 2019) ......................................................... 11

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2015)................................................................... 7

*Essar Steel Ltd. v. United States*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010)................................................... 7

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015).................................................. 6

Statutes and Regulations

19 U.S.C. § 1516a ..................................................................................... 6

19 U.S.C. § 1677(5)(B)......................................................................... 3, 14, 18

19 U.S.C. § 1677m................................................................................ 4, 6, 14, 15

19 C.F.R. § 351.511 ............................................................................... 4, 7, 12

Other Authorities

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*,
    83 Fed. Reg. 9,274 (Mar. 5, 2017) ........................................................................................ 13

*See Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*,
    87 Fed. Reg. 36,305 (Dep't of Commerce June 16, 2022) ......................................................... 2

*Frozen Warmwater Shrimp From Indonesia: Final Negative Countervailing Duty Determination*,
    89 Fed. Reg. 85,512 (Oct. 28, 2024) ..................................................................................... 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BAROQUE TIMBER INDUS. (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION | ) ) ) |
| Plaintiffs, | ) ) ) |
| and | ) ) |
| ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*, | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| and | ) ) |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) ) |
| Plaintiff-Intervenor, | ) ) ) |
| v. | ) ) Consol. Court No. 22-00210 |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) ) |
| and | ) ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) |
| Defendant-Intervenor. | ) ) ) |

**<u>DEFENDANT'S COMMENTS SUPPORTING REMAND REDETERMINATION</u>**

Defendant, the United States, respectfully responds to the comments of plaintiffs,

Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation

(collectively, Baroque) (Baroque Cmts.) (ECF Nos. 100-101), and plaintiff-intervenors, Fine

Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture) (Fine

Furniture Cmts.) (ECF No. 97) concerning the Department of Commerce's remand results in this matter.  Final Results of Redetermination Pursuant to Court Remand (Sept. 19, 2025) (ECF No. 85) (Remand Results).  We respectfully request that the Court sustain the remand results because they comply with the Court's remand order and because they are supported by substantial evidence and otherwise lawful.

## BACKGROUND

**I.      The Court's April 3, 2025 Remand Order**

This case concerns Commerce's final results in the administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China, for the period of review from January 1, 2019, to December 31, 2019.  *See Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (Dep't of Commerce June 16, 2022) (P.R. 375),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 369).

On April 3, 2025, the Court sustained-in-part and remanded-in-part Commerce's final results.  *Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States*, 776 F. Supp. 3d 1290 (Ct. Int'l Trade 2025) (Remand Order).

The Court remanded three issues to Commerce.  First, the Court remanded to Commerce "to explain adequately its conclusion in light of the record and arguments presented that

---

[1] For ease of reference, the record citations refer to documents filed under the initial countervailing duty administrative review with P.R./C.R. designating citation to the initially filed administrative record indices, *see* ECF No. 34, and P.R.R./C.R.R. designating citation to the remand record indices.  *See* ECF Nos. 88-89.

inclusion of the UN Comtrade data is appropriate to calculate" the tier-two benchmark to measure the adequacy of remuneration for plywood.  *Remand Order*, 776 F. Supp. 3d at 1301.

Second, the Court remanded Commerce's calculation of the tier-two benchmark for veneer.  The Court held that Commerce's explanation for including benchmarks undifferentiated between backboard and face veneer was not reasonably discernible, in light of contradictory record information.  Accordingly, the Court ordered Commerce "to explain adequately its conclusion in light of the record and arguments presented that inclusion of the UN Comtrade and ITTO Peru data is appropriate to calculate the benchmarks for face and backboard veneer." *Remand Order*, 776 F. Supp. 3d at 1302-03.

Third, the Court remanded Commerce's determination that certain of Baroque's input suppliers are authorities within the meaning of 19 U.S.C. § 1677(5)(B) based on the application of adverse facts available to the GOC for not providing any government or official documentation to support the claims that none of the suppliers' managerial staff were involved in various CCP political organizations.

The Court sustained Commerce's determination that government documentation was necessary, holding that "Commerce explained adequately that the GOC's responses did not include supporting government documentation – and not just internal company statements or verbal affirmations – regarding the extent of CCP involvement in the suppliers." *Remand Order*, 776 F. Supp. 3d at 1307.  The Court held that Commerce reasonably determined that necessary information was missing from the record for Commerce to analyze whether certain of Baroque's supplier are government authorities within the meaning of 19 U.S.C. § 1677(5)(B).  *Remand Order*, 776 F. Supp. 3d at 1308.

However, the Court held that Commerce did not comply with the notice of deficiency requirement of 19 U.S.C. § 1677m(d) because Commerce did not specifically identify the need for government documentation. *Remand Order*, 776 F. Supp. 3d at 1310.  The Court ordered Commerce on remand to "(1) identify with specificity the deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continues to determine that supporting government documentation is necessary information, request that information explicitly from the GOC; and (4) provide the GOC an opportunity to remedy any specified deficiencies." *Id.*

## II.    Commerce's Remand Results

On September 19, 2025, Commerce filed the final results of redetermination pursuant to this Court's remand order.  Remand Results (ECF No. 95).

First, with respect to the plywood benchmark, Commerce found that no benchmark on the record was perfectly reflective of Baroque's reported plywood purchases.  Commerce continued to conclude that both the UN Comtrade/Stats.NZ data and the ITTO data are sufficiently comparable to Baroque's purchases to be included within the benchmark consistent with 19 C.F.R. § 351.511(a)(2)(ii).  Remand Results at 11-18.  In its analysis, Commerce noted that without information about the actual proportional composition of plywood grade in *both* the UN Comtrade/Stats.NZ data and the ITTO data that it would be speculative to say which dataset is more comparable to Baroque's purchases of C/D grade plywood.  Remand Results at 16-17. For example, Commerce explained that it is possible that the UN Comtrade/Stats.NZ data is weighted more heavily towards D grade plywood than the ITTO data, which does not include D grade plywood.  Notably, Commerce also concluded that the UN Comtrade data are *more*

comparable than the ITTO data based on species, because the UN Comtrade data include eucalyptus matching Baroque's reported purchases, whereas the ITTO data do not include eucalyptus.  Remand Results at 17.  Indeed, Commerce noted that Baroque's submitted information indicates that species as well as grade impacts plywood prices.  *Id*.

Second, with respect to the veneer benchmarks, Commerce continued to create two separate benchmark prices for backboard and face veneers and include the UN Comtrade data in both as sufficiently comparable to both categories of veneer.  Remand Results at 18-19.  Commerce found that "the fact that both face veneer and backboard/core veneer are both classifiable under the same HS subheadings in the UN Comtrade data and are not differentiated in the ITTO Peru price data demonstrate that both types of veneer are still comparable to one another in ordinary commercial activities, despite the differences."  Remand Results at 21.

Lastly, Commerce continued to determine that government or official documentation was necessary for its analysis of Riverside and Baroque's input suppliers.  Because the GOC failed to provide such documentation in response to a supplemental questionnaire issued on remand, Commerce continued to find that the application of AFA was warranted to find certain input suppliers are government authorities.  Remand Results at 21-22.

On June 24, 2025, Commerce reopened the record and issued a supplemental questionnaire to the GOC regarding deficiencies in its initial responses.  Supplemental Questionnaire Pursuant to Court Remand (June 24, 2025) (P.R.R. 1/C.R.R. 1) (Remand Supp. Questionnaire).  In the remand supplemental questionnaire, Commerce requested that the GOC "provide government documentation, such as CCP records, supporting the GOC's claim that no individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR" as it reported in its initial questionnaire responses.  *Id*. at 5.

The questionnaire also asked the GOC to reconcile certain contradictory statements on the record and to provide documentation from the input suppliers substantiating the reported roles, decision-making, and affiliations of senior staff. *Id.* at 4-6. In its response, the GOC again claimed that it could not provide government documentation as requested by Commerce. Remand Supplemental Questionnaire Response (July 11, 2025) (P.R.R. 8/C.R.R. 2-5) (GOC Supp. Response). Commerce stated that, "{a}lthough the GOC states that it cannot provide the requested information because there is no central GOC database, Commerce did not specify in its request for government documentation to support the GOC's claim that such documentation must be derived from a central government database." Remand Results at 24. Commerce also noted that the GOC did not suggest any alternative forms to submit the requested information consistent with 19 U.S.C. § 1677m(c)(1). Remand Results at 24.

## ARGUMENT

### I.     Standard Of Review

This Court's review of remand determinations in antidumping and countervailing duty proceedings applies the same standard of review as the one applied when reviewing the original determination. Thus, in remand proceedings, the Court will sustain Commerce's determination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

### II.     Commerce's Benchmark Calculations for Plywood and Veneers Are Supported By Substantial Evidence And In Accordance With Law

Consistent with the remand order, Commerce provided further explanation for why the UN Comtrade data are appropriate to include in the plywood benchmark and why the inclusion of UN Comtrade data and ITTO Peru data are appropriate to include in the veneer benchmarks.

Commerce addressed the arguments and evidence put forth by parties and, accordingly, this

Court should sustain Commerce's remand redetermination as supported by substantial evidence

and in accordance with law.

> **A.    Commerce's Analysis of Record Evidence under 19 C.F.R. § 351.511(a)(2)(ii) Is in Accordance with Law**

In constructing a tier-two benchmark to measure the adequacy of remuneration,

Commerce's regulation provides that:

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(ii).

The regulation unambiguously directs Commerce to average multiple prices available on

the record to determine a world market price as the benchmark where Commerce determines,

based on substantial evidence, that the prices are sufficiently reliable and representative. *See*

*Beijing Tianhai Indus. Co., Ltd. v. United States*, 52 F. Supp. 3d 1351, 1370 (Ct. Int'l Trade

2015) (citing *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade

2010)).  Further, the regulation only requires that Commerce use benchmark prices that are

comparable, not identical, to respondent's purchases. *See Essar Steel Ltd. v. United States*, 678

F.3d 1268, 1273-74 (Fed. Cir. 2015); *see also Archer Daniels Midland Co. v. United States*, 968

F. Supp. 2d 1269, 1278 (Ct. Int'l Trade 2014).  Given this regulatory preference, Commerce's

decisions to exclude data from a benchmark are done on a case-by-case basis and after careful

examination of record evidence.  Remand Results at 14.  Further, Commerce also considers the

robustness of a specific database in determining the suitability of a given benchmark.  Remand Results at 17, 29.

Baroque argues that the "regulation does not require nor prefer the use of multiple prices around the world to create the tier{-two} benchmark."  Baroque Cmts. at 7.  However, while "Baroque is correct that the use of 'world market price' in the regulations does not *per se* mandate that Commerce calculate a benchmark that is representative of the entire world," "Commerce's regulations do require that it calculate an average when multiple comparable world market prices are on the record."  Remand Results at 33.  Commerce did not establish a requirement that only a global dataset is permissible, but explained that the regulation does require the averaging of multiple world prices, if multiple are on the record, to the extent Commerce finds them reasonably comparable.

Baroque further contends that Commerce may not consider the robustness of a dataset in its evaluation.  Baroque Cmts. at 8-9.  We disagree.  First, as we explain further below, Commerce did not elevate robustness of the UN Comtrade dataset over considerations of its comparability.  Instead, Commerce found that the UN Comtrade dataset's relative comparability was speculative or in some sense, even more comparable than the ITTO data.  However, having found the dataset comparable, Commerce reasonably and permissibly considered the robustness of the dataset as further support for its continued inclusion of the UN Comtrade data.  The regulation's direction to average all available world market prices to derive a benchmark supports a regulatory preference for deriving a robust benchmark.  Indeed the regulation could alternatively state that where there is more than one commercially available world market price, Commerce must select only the "most comparable" world market price.  This makes sense in practice such to disincentivize parties from engaging in cherry-picking by providing the most

8

favorable singular data points.  Here, Commerce reasonably considered the datasets robustness

as a reason to include the UN Comtrade data, but even if this Court were to hold that such

consideration is impermissible, Commerce fully explained why the UN Comtrade data was

appropriate to include purely in terms of comparability as discussed below.

     **B.**     **Commerce Reasonably Continued to Include UN Comtrade Data in the Plywood Benchmark**

After further consideration of record evidence, Commerce reasonably determined to

continue to conclude that the UN Comtrade data was sufficiently comparable to be included in

the plywood benchmark.  Remand Results at 12.  Baroque itself concedes that "the UNComtrade

data could be used as a benchmark if it was the only benchmark source on the record because it

is *potentially comparable enough* and has no other option."  Baroque Cmts. at 9. (emphasis

added).  The Court's inquiry into this issue should end here.  In effect, Baroque concedes that

Commerce could permissibly use the dataset as a valid benchmark, but because there is another

dataset available, that Commerce must select the "most comparable."  This approach is contrary

to the regulation, as established above.  Even so, Commerce reasonably considered record

evidence and found that the UN Comtrade data was not necessarily less comparable than the

ITTO data, and even to the extent that it was, the UN Comtrade data is sufficiently comparable

to Baroque's purchases to be included in the benchmark.

First, Commerce determined that for purposes of measuring the benefit attributable to

Baroque's purchases of C/D grade plywood, without any quantification of the specific grade

makeup of either the UN Comtrade data or the ITTO data, it would be speculative to find that the

ITTO data is necessarily less distortive than the UN Comtrade data.  Remand Results at 16-17.

Baroque contends at the outset that "{t}he acceptance of a benchmark that undeniably contains

distortions, regardless of whether that distortion can be specifically quantifiable, is wrong and is

inconsistent with both the statute and regulations." Baroque Cmts. at 4.  However as Commerce

explained, absent knowledge of the actual make-up of either dataset, finding either dataset to be

more comparable to Baroque's purchases would be speculative.  As Commerce explained:

> None of the evidence provided by {Baroque} describes the prevalence of different
> plywood grades in the global merchandise trade, or in a particular plywood market,
> such that Commerce can infer or "make allowances for" differing plywood grades
> in calculating the plywood benchmark. Importantly, without this evidence, the UN
> Comtrade data might consist mostly of sales of grade C or D plywood, that might
> be more reflective of Baroque's C/D grade plywood purchases than even the ITTO
> data, which is composed of only C/CC grade plywood.

Remand Results at 16.  Finally, Commerce also concluded that record evidence showed that the

difference in plywood grade does not have a significant effect on price premium.  Remand

Results at 32.

Baroque and Fine Furniture do not grapple with Commerce's point that, without

knowledge of the grade proportional makeup of *both* datasets, it is speculative to conclude that

the ITTO dataset is necessarily more comparable than the UN Comtrade dataset; neither

perfectly match the grades purchased by Baroque, rather both focus solely on the UN Comtrade

data.  Baroque does dispute, as unreasonable, Commerce's conclusion that the magnitude of the

price impact of grade is not that significant.  Baroque Cmts. at 11-12.  Commerce identified

evidence showing that even the highest grade plywood would only include a premium of 5-10

percent over lower grade plywood.  Remand Results at 32.  Baroque does not contest the

accuracy of this conclusion.  Rather, Baroque attempts to demonstrate that a 5 percent change is

significant.  The calculations it proffers, however, rest on multiple unsupported assumptions.

Baroque Cmts. at 11-12.  First, it assumes that the UN Comtrade data solely comprises high

grade plywood, which is where Baroque derives the flat 5-10 percent that it applies, but that is

speculative.  Second, the starting point of the calculation is from the perspective that Baroque

10

received no countervailable subsidy, with only the 5-10 percent generating a non-*de minimis* margin, despite the program margin calculated for Baroque being 4.37 percent, not 1.98 percent. *Final Results* IDM at 10.  Of note, the other mandatory respondent in the review received a 0.00 percent program margin using the same plywood benchmark.  *Id.*

Fine Furniture argues that *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1294-95 (Ct. Int'l Trade 2020) should control.  Fine Furniture Cmts. at 5-6. However, similar to Commerce's explanation with respect to distinguishing *Canadian Solar, Inc. v. United States*, Slip Op. 20-149 (CIT Oct. 19, 2020), *see* Remand Results at 31-32, the Court in *Changzhou Trina* relied on the fact that the UN Comtrade data appeared to include data from products completely unrelated to solar frames.  *Changzhou Trina Solar Energy Co. v. United States*,  Slip Op. 18-166, 25 (CIT Nov. 30, 2018)   ("Neither of these HTS basket headings are specific to solar glass, but rather includes many types of safety glass (often a type of flat glass) unrelated to solar glass.").  Commerce found no similar concern here because different grades of plywood contained in the UN Comtrade data on the record of this review are all still plywood and are all capable of being incorporated into subject merchandise.  Remand Results at 31-32.

Commerce also explained that record information indicates that species of wood is a relevant factor in determining comparability of plywood benchmarks.  Remand Results at 17. Notably, the UN Comtrade data explicitly includes the HS subheading covering eucalyptus, which is the species of Baroque's reported plywood purchases, whereas eucalyptus is not one of the species included in the ITTO data.  Remand Results at 17.  Commerce accordingly found that in terms of grade, the UN Comtrade data would be reasonably considered more comparable than the ITTO data.  Remand Results at 18.

11

Baroque does not contest Commerce's findings with respect to species before this Court. Fine Furniture speculates that the wood species contained in the ITTO data may be fast growing softwoods similar to eucalyptus, Fine Furniture Cmts at 7-8, but does not dispute that the UN Comtrade data covers eucalyptus whereas the ITTO data does not. Accordingly, Fine Furniture's argument does not establish that the ITTO data is of the same kind of species type as Baroque's purchases.

Commerce has complied with the Court's remand order by considering all detracting record evidence concerning the inclusion of UN Comtrade and adequately explained its continued finding that the UN Comtrade are comparable to the purchases of Baroque. Neither dataset is perfect and neither dataset can be definitively shown to be more comparable than the other. In situations like this, given the instruction of 19 C.F.R. § 351.511(a)(2)(ii) to average comparable datasets, Commerce's determination is supported by substantial evidence and in accordance with law.

### C. Commerce Reasonably Continued to Include UN Comtrade Data and ITTO Peru Data in the Veneer Benchmarks

After further consideration of record evidence, Commerce reasonably determined to continue to include the UN Comtrade and ITTO Peru data in the two veneer benchmarks. While Commerce separated face and backboard veneer data, where available, for increased reflectiveness in the benchmark, that does not mean that face and backboard veneer are not comparable for purposes of 19 C.F.R. § 351.511(a)(2)(ii). Remand Results at 34. Commerce considered evidence of grading and usage of different types of veneer in the industry as a whole but concluded that the distinctions do not establish sufficient grounds to exclude data that does not reflect such distinctions. Remand Results at 21.

Specifically, Commerce found relevant the facts that both face veneer and backboard/core veneer are classifiable under the same HS subheadings, and that the UN Comtrade and ITTO Peru price data both treat the two types of veneer as a singular product type, without differentiation. Remand Results at 21. The UN Comtrade data and ITTO Peru data unquestionably include both face and backboard veneer, and Commerce noted that the prices variations between specific countries was greater than the variation between the two types of veneer in the ITTO Ghana data. Remand Results at 21. Therefore, Commerce reasonably concluded that inclusion of the available veneer datasets in both benchmarks was consistent with the regulation and resulted in a more reliable benchmark. Remand Results at 21.

Baroque and Fine Furniture do not address these specific points made by Commerce. Rather they repeat the same arguments that Commerce may not permissibly use any datasets that are arguably broader but still comparable to the purchases in question. We have addressed those above in the context of the plywood benchmark.

Baroque's reliance on *Aluminum Foil from China* is unavailing. Baroque Cmts. at 15 (citing *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM at Comment 16) (*Aluminum Foil from China*)). In *Aluminum Foil from China*, (1) the respondent reported the purchase of only unalloyed aluminum foil; (2) the benchmark contained separate HTS provisions, one for alloyed aluminum and one for unalloyed aluminum; and (3) therefore, Commerce determined to use only the unalloyed aluminum HTS provision. *Aluminum Foil from China* IDM at Comment 16. This case would be similar if there was a single non-divisible HTS provision covering both alloyed and unalloyed aluminum and

13

Commerce had to determine how to utilize that data in its benchmark for unalloyed aluminum. As Baroque states, "As with plywood, Commerce determined to use the UN Comtrade data / ITTO Peru {data}, which includes all types of veneer, including face and backboard, to value both face and backboard." Baroque Cmts. at 14. That is exactly what Commerce did here.

**III.    Commerce Complied with 19 U.S.C. § 1677m(d) and Its Application of AFA to Find Certain of Baroque's Input Suppliers To Be Government Authorities Is Supported by Substantial Evidence and in Accordance with Law**

On remand, Commerce continued to identify government documentation as necessary to its analysis of Baroque's input suppliers and possible connection to the GOC or CCP. Remand Results at 21. Commerce reopened the record to request the GOC provide any government or official documentation and to further inquire about certain identified deficiencies in the GOC's prior responses. Remand Results at 21-22. The GOC continued to decline to provide any documentation in response. Accordingly, Commerce complied with this Court's remand order and its obligations under 19 U.S.C. § 1677m(d), and its determination to continue to apply AFA to find certain of Baroque's input suppliers to be authorities within the meaning of 19 U.S.C. § 1677(5)(B) is supported by substantial evidence.

The Court has already held that Commerce determined reasonably that the GOC did not provide information necessary for Commerce to analyze whether certain of Baroque's input suppliers are government authorities. *Remand Order*, 776 F. Supp. 3d at 1307-08. The Court, however, found that Commerce did not comply with its obligations under 19 U.S.C. § 1677m(d) to provide the GOC with an opportunity to cure deficiencies. *Remand Order*, 776 F. Supp. 3d at 1310. Baroque devotes most of its arguments requesting the Court revisit its original determination of whether Commerce reasonably determined that it required government documentation. Baroque Cmts. at 19-22. This Court should decline to do so.

14

Baroque's only argument that Commerce did not comply with its obligations under 19 U.S.C. § 1677m(d) is that Commerce should have identified specifically what type of government or CCP documentation it wished for the GOC to provide. Baroque Cmts. at 19. However, Commerce's request for government documentation was intentionally open-ended to allow the GOC discretion to provide whatever information it believed would be sufficient to support its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials. Remand Results at 39. Commerce explained that it could not speculate as to the forms of government documentation that the GOC could provide that would best demonstrate that the key people in the input suppliers in question are not officials in the government or CCP. The argument that Commerce's request was too broad ignores the fact that the GOC did not provide *any* documentation. Remand Results at 39.

With respect to Baroque's arguments revisiting the issue of whether Commerce reasonably determined that government or official documentation was necessary for it purposes, we will address each in turn.

First, Baroque argues that Commerce does not support its conclusion that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector. Baroque Cmts. at 16-17. Baroque contends that the portions of the Public Bodies Memorandum cited by Commerce only support that CCP primary party organizations exercise meaningful influence. Accordingly, Baroque seemingly suggests that Commerce does not support its conclusion that the presence of CCP officials amongst a companies' managers or board members is sufficient to demonstrate influence. *Id.* However, Commerce reasonably concluded that knowledge of whether a companies' managers or board

15

members are active government or CCP officials, including being members of the relevant CCP entities is *relevant* to determining whether the GOC exerts meaningful influence over a company.

Baroque then contends that the information provided by the GOC is sufficient for Commerce to verify at the input suppliers. Baroque Cmts. at 17-18. Commerce observed the GOC's explanation that input producers are not required to report or record in their internal records and documents whether any company owners, members of the board of directors or managers are officials in the nine entities. Remand Results at 36. Further, Commerce noted that the company certifications are *pro forma* in nature and lack particular details for examining possible government involvement in each company. Remand Results at 38. Without such details, and without official documentation to evaluate and review to corroborate or confirm the suppliers' statements, Commerce cannot evaluate the extent of GOC/CCP involvement in each input supplier in order to verify these certifications. *Id.*

Next, Baroque contends that Commerce should have been satisfied with the GOC's response that there is no central database. Baroque Cmts. at 19. However, Commerce did not limit the scope of its request to documentation from a central database, providing the GOC the opportunity to provide the government documentation that best supports its claim. Remand Results at 24. Moreover, the GOC's response does not establish whether databases containing the information may exist at the provincial or other level of government. *Id.* Indeed, Commerce was reasonably skeptical of the claim that the CCP cannot verify the existence or identity of CCP officials, given its requirements that private companies establish primary party organizations based on CCP member presence. Remand Results at 41.

16

Baroque also argues that Commerce's reference to prior proceedings where the GOC was able to provide official CCP documentation was not applicable since the specific factual situation at issue was different. Baroque Cmts. at 20. Commerce's reference to prior proceedings was intended to demonstrate the GOC's ability to procure and submit official CCP documentation, not to analogize to any specific factual scenarios. Remand Results at 41.

Finally, Baroque argues that it is unreasonable to expect the GOC to provide Commerce officials the ability to verify data contained in a government database. Baroque Cmts. at 22. However, Commerce regularly conducts verification of government responses in countervailing duty proceedings, to verify original source documentation to support reported information. *See e.g.*, *Frozen Warmwater Shrimp From Indonesia: Final Negative Countervailing Duty Determination*, 89 Fed. Reg. 85,512 (Oct. 28, 2024), and accompanying IDM at Cmt. 2 ("We arranged a video call with government officials from the Indonesian Export Financing Agency, known as Lembaga Pembiayaan Ekspor Indonesia (LPEI) or Eximbank, regarding their operations and program participant databases. . . . We asked the officials to query several companies in the database to assist us in determining if they were past or current Eximbank customers. . . . None of these names/companies appeared in the Eximbank's database.").

For these reasons, this Court should continue to hold as it did previously that Commerce reasonably determined that government documentation is necessary. Further, now that Commerce has explicitly requested government documentation from the GOC and received none, this Court should sustain Commerce's application of AFA to find that certain of Baroque's input suppliers are authorities within the meaning of 19 U.S.C. § 1677(5)(B).

17

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:                          /s/Tara K. Hogan
JONZACHARY FORBES                    TARA K. HOGAN
Attorney                             Assistant Director
U.S. Department of Commerce          U.S. Department of Justice
Office of the Chief Counsel For Trade    Civil Division
   Enforcement and Compliance    Commercial Litigation Branch
1401 Constitution Avenue, NW         P.O. Box 480
Washington, D.C. 20230               Ben Franklin Station
Tel: (202) 779-0204                  Washington D.C. 20044
Email: JonZachary.Forbes@trade.gov   Tele: (202) 616-2228
                                     Email: Tara.Hogan@usdoj.gov

March 20, 2026                       Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitations set forth in Standard Chambers Procedures ¶ 2(B)(1) because it contains **4,795** words.

/s/Tara K. Hogan